**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| DYSON, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No.: 1:14-cv-09442 |
| v. | ) | |
| | ) | Judge: Honorable Joan B. Gottschall |
| EURO-PRO OPERATING LLC and | ) | |
| EURO-PRO SALES COMPANY, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**PLAINTIFF DYSON, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

I.  **Factual Background** ..................................................................................................**1**

   A.  Dyson Has A Long History Of Innovation And Superior Performance. .................1

   B.  Euro-Pro Is A Repeat False Advertiser With An Established Pattern Of Making False And Misleading Comparative Marketing Claims Directed At Dyson. ...........................................................................................3

   C.  Euro-Pro's Superiority Claims Regarding The Shark Rotator Powered-Lift Away Are Expressly False. ...................................................................................4

      1.  Euro-Pro's False Marketing Campaign ..................................................4

      2.  Robust, Independent Testing Proves That Euro-Pro's Superior Carpet Cleaning Claims Are False. ..........................................................6

      3.  Euro-Pro's Bar Graph Comparison Also Is Literally False. .......................8

II.  **A Preliminary Injunction Is Warranted** ...............................................................**10**

   A.  Dyson Is Likely To Prove That Euro-Pro's Advertising Statements Are False. ...............................................................................................................10

   B.  Dyson Will Suffer Irreparable Harm If Euro-Pro Is Not Enjoined .......................12

   C.  The Balance Of Hardships Favors Granting A Preliminary Injunction. ................13

   D.  Granting A Preliminary Injunction Would Serve The Public's Interest. ...............15

III.  **Conclusion** ............................................................................................................**15**

# **TABLE OF AUTHORITIES**

**Cases**

*Abbott Labs. v. Mead Johnson & Co.*,
    971 F.2d 6 (7th Cir. 1992) ................................................................................. 11, 13, 15

*Abbott Labs. v. Watson Pharms., Inc.*,
    No. 01 C 4432, 2001 WL 826870 (N.D. Ill. July 20, 2001) ........................................ 15

*B. Sanfield, Inc., v. Finlay Fine Jewelry Corp.*,
    168 F.3d 967 (7th Cir. 1999) ................................................................................ 11

*BASF Corp. v. Old World Trading Co., Inc.*,
    41 F.3d 1081 (7th Cir. 1994) ............................................................................... 11

*Castrol Inc. v. Pennzoil Co.*,
    987 F. 2d 939 (3d Cir. 1993) ............................................................................... 11

*F.T.C. v. Rhodes Pharmacal Co.*,
    191 F.2d 744 (7th Cir. 1951) ............................................................................... 15

*Genderm Corp. v. Biozone Labs.*,
    No. 92 C 2533, 1992 WL 220638 (N.D. Ill. Sept. 3, 1992) ........................................ 11

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
    No. CIV.A. 14-137, 2014 WL 2002126 (W.D. Pa. May 15, 2014) ................ 3, 12, 14, 15

*Homeland Housewares, LLC v. Euro-Pro Operating LLC*,
    No. CV 14-03954, 2014 WL 4187982 (C.D. Cal. Aug. 22, 2014) ........................ 3, 12, 15

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
    191 F.3d 813 (7th Cir. 1999) ............................................................................... 12

*Ill. Bell Tel. Co. v. MCI Telecoms. Corp.*,
    No. 96 C 2378, 1996 WL 717466 (N.D. Ill. Dec. 9, 1996) ...................................... 12, 13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ........................................................................................ 13

*Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*,
    128 F.3d 1111 (7th Cir. 1997) ............................................................................. 10

*Muzikowski v. Paramount Pictures Corp.*,
    477 F.3d 899 (7th Cir. 2007) ............................................................................... 11

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
    290 F.3d 578 (3d Cir. 2002) ............................................................................... 14

*POM Wonderful LLC v. Purely Juice, Inc.*,
   No. CV-07-02633, 2008 WL 4222045 (C.D. Cal. July 17, 2008) ................................... 13

*Stuller, Inc. v. Steak N Shake Enters., Inc.*,
   695 F.3d 676 (7th Cir. 2012) ......................................................................... 10

*Ty, Inc. v. Jones Group, Inc.*,
   237 F.3d 891 (7th Cir. 2001) .................................................................. 10, 13

**Statutes**

15 U.S.C. § 1125(a)(1) ............................................................................... 10

Euro-Pro recently launched a nationwide television and print advertising blitz proclaiming that its newest vacuum, the Shark Rotator Powered Lift-Away, "cleans carpets better than Dyson's best vacuum," the Dyson DC65. That campaign is false and Euro-Pro knows it. Worse yet, the timing of Euro-Pro's false ad campaign is no accident—nearly 20% of all vacuum cleaner sales happen during the holiday season—and Euro-Pro has designed its campaign to deceive consumers into buying as many Shark vacuums as possible during this critical period.

The fact of the matter is that, contrary to Euro-Pro's claims, the **_DC65 cleans carpets better than the Shark Rotator Powered Lift-Away_**. How to determine whether Dyson or Shark is the winner is not up for debate, because there is a single, industry-accepted method for measuring vacuum cleaner performance on carpets, known as the ASTM F608 standard. Actual tests run using the proscribed ASTM F608 protocol confirm that Euro-Pro's superiority claims are false and that Dyson's DC65 is, in fact, the superior vacuum. All the more troubling is that Euro-Pro is aware of that standard, and must know that its Shark Rotator falls short when the standard is properly applied. But instead of accepting that fact, Euro-Pro has chosen to mislead consumers by lying about its product's performance.

Euro-Pro's false claims must stop. Each day these claims remain in the marketplace, Euro-Pro continues to deceive consumers and harm Dyson's reputation and goodwill. Accordingly, Dyson seeks a preliminary injunction to put a stop to Euro-Pro's false Shark Rotator Powered Lift-Away ad campaign.

## I.     FACTUAL BACKGROUND

### A.     Dyson Has A Long History Of Innovation And Superior Performance.

Dyson is the industry leader in innovation and technology among vacuum cleaner manufacturers. Perhaps the most widely-recognized aspect of Dyson's ingenuity is its signature,

bagless "cyclone" technology, which introduced the world to the bagless vacuum and allows Dyson vacuums to generate and maintain powerful, continuous suction. (Declaration of Edward Culley (hereinafter "Culley Dec.") ¶ 4.) Dyson's superior technology and suction power is a significant feature that helps Dyson vacuums deliver some of the best pick-up performance in the vacuum industry on carpeting, and surpass *all* other vacuums' performance on carpets and hard floors combined. (*Id.*) Dyson's revolutionary cyclone technology generated industry recognition and immediate success in the marketplace. After only three years on the market, Dyson became the top seller of upright vacuum cleaners in the United States by dollar share. (*Id.* ¶¶ 4-5.) Today, Dyson is a premier brand in the United States, and its vacuums are renowned not just for their exceptional cleaning ability, but also for their sophisticated engineering and unique design.

Dyson's success has been hard earned. It is the result of Dyson's investment in its technology and its brand. Since James Dyson pioneered his first cyclonic vacuum in the late 1970s, Dyson has spent—and continues to spend—significant amounts of time, money, and resources to ensure that its vacuums remain on the cutting edge and that consumers are aware of its features and innovations. Since 2002, Dyson invested nearly £800,000,000—over $1.25 billion in U.S. dollars—on research and development, and over $600,000,000 in the U.S. alone marketing, promoting, and selling its products. (*Id.* ¶ 6.)

As part of its continuous innovation and new product development, in January 2014, Dyson introduced the U.S. to its newest, top-of-the-line upright vacuum cleaner, the DC65. (*Id.* ¶ 7.) Notably, the DC65 offers the best overall cleaning performance of any upright vacuum on the market when its performance is evaluated across the full range of floors commonly found in U.S. homes (*i.e.*, carpets, flat hard floors, and hard floors with crevices). (*Id.*) Because cleaning ability is a key factor behind consumers' vacuum purchasing decisions, Dyson relies heavily on

statements about the DC65's superior cleaning performance—including the DC65's strong performance on carpeting—in its advertising.  (*Id.*)

### B. Euro-Pro Is A Repeat False Advertiser With An Established Pattern Of Making False And Misleading Comparative Marketing Claims Directed At Dyson.

Not surprisingly, other major vacuum cleaner manufacturers, including Euro-Pro, began trying to develop and market their own bagless vacuums in an effort to compete with Dyson's innovation.  (*Id.* ¶ 5.)  Euro-Pro directly competes with Dyson in the U.S. vacuum cleaner market, and much of Euro-Pro's advertising focuses on expressly comparing its Shark brand vacuums to Dyson's vacuums.  While Dyson focuses its time, money, and energy on a relentless pursuit of innovation, Euro-Pro's business model rests on developing "me too" machines and promoting its Shark vacuums as being comparable but less expensive alternatives to a Dyson vacuum.  In virtually all of its vacuum cleaner advertising, Euro-Pro makes direct comparisons between its products and Dyson vacuums.  (*Id.* at ¶ 8 & Exs. 1-4.)

For some time, Euro-Pro's comparative claims walked the line between truth and falsity, often pushing the boundary between the two.  Recently though, Euro-Pro has gone even further, clearly crossing over the line and making expressly false claims about how its products' performance compares to Dyson's.[1]  Indeed, Euro-Pro has made superiority claims versus Dyson

---

[1] Euro-Pro does not limit its false advertising to vacuum cleaners.  Indeed, in each of the markets for the various appliance products it offers, Euro-Pro has a pattern and practice of targeting the best-in-class competitor and making false claims about that competitor in its ads.  In the past year, two different federal courts have enjoined Euro-Pro from making superiority claims against its competitors that were literally false.  *Homeland Housewares, LLC v. Euro-Pro Operating LLC*, No. CV 14-03954, 2014 WL 4187982, at *5 (C.D. Cal. Aug. 22, 2014) (finding Euro-Pro's claims about competitor's product performance literally false, and ordering comparative statements to be removed from packaging for Euro-Pro's Ninja Pro blender); *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, No. CIV.A. 14 137, 2014 WL 2002126, at *10 (W.D. Pa. May 15, 2014) (finding Euro-Pro's superiority claims for steam mop to be false and ordering Euro-Pro to sticker over or otherwise remove the literally false statement "MORE POWERFUL STEAM v. Rowenta at half the price" from its product packaging).

based on entirely unreliable data, and also has asserted claims of market superiority based on no data at all, forcing Dyson to challenge Euro-Pro's advertising both in court and before the National Advertising Division of the Council of Better Business Bureaus ("NAD"), the advertising industry's self-regulatory forum. These challenges have repeatedly found Euro-Pro's claims to be false or misleading. In this year alone, Dyson brought—and won—two different challenges against Euro-Pro at NAD:

- *First*, Dyson had to challenge Euro-Pro's false and unsupported claim that its Shark vacuums somehow were "America's Most Recommended Vacuum." NAD examined the claim and found that Euro-Pro's supposed support for such a bold claim was unreliable. (*See* Ex. A at pp. 14-16.) Euro-Pro appealed, delaying its discontinuation of these false claims, and lost that appeal as well. (Ex. B (affirming NAD decision).) Despite being told to discontinue that false claim and saying that it would do so, that falsehood remains in the market today. (Culley Dec. at ¶ 8 & Ex. 3 at p. 3, Ex. 4 at p. 5.)

- *Second*, NAD also this year called Euro-Pro to task for its brazen claim that its Shark Rocket stick vacuum outperforms *all* Dyson full-sized machines and, indeed, *all* other full-sized upright vacuum cleaners on the market. Yet Euro-Pro made that claim after testing only a single Dyson model and nothing else, which led NAD to find Euro-Pro's claims about Dyson and the market generally were unsupported and had to be stopped. (*See* Ex. C at pp. 7-15.) Again, Euro-Pro has dragged its feet and these false claims remain in the market. (Culley Dec. at ¶ 8 & Exs. 3-4.)

Now, with its new Shark Rotator Powered Lift-Away advertising campaign, Euro-Pro is once again making false comparative claims to try to gain an improper edge. Euro-Pro apparently believes that the short-term marketing gains from running false advertisements outweigh the downside of being enjoined by a federal court. Enough is enough.

**C.** **Euro-Pro's Superiority Claims Regarding The Shark Rotator Powered-Lift Away Are Expressly False.**

**1.** **Euro-Pro's False Marketing Campaign**

In connection with the recent introduction of its Shark Rotator Powered Lift-Away, Euro-Pro launched an aggressive and pervasive advertising campaign that includes a new dedicated website, videos on its YouTube channel, a 30-minute televised infomercial for the product,

15- and 30-second television commercials, online banner ads, and print ads in national magazines. (*Id.* ¶¶ 9-10 & Exs. 5-11, 13.) Within the last few weeks, Euro-Pro increased its media blitz, launching a 30-minute infomercial across cable television—which has aired over 100 times since November 1—and running ads in numerous national periodicals. (*Id.* at ¶ 10.)

In nearly every one of these ads, Euro-Pro declares that the Shark Rotator cleans carpets better than the DC65. For instance, in its infomercial, Euro-Pro's CEO tells consumers "my new Rotator Powered Lift-Away has more suction and ***deep-cleans carpets better than Dyson's best vacuum***" (while the claim also is shown prominently in text onscreen):



(*Id.* ¶ 12 & Ex. 5 at 0:15 (emphasis added).) Euro-Pro makes similar superior carpet cleaning claims everywhere—on its website, in its TV spots, in print advertising, and on its product packaging. (*Id.* at ¶¶ 12-15 & Exs. 5-13.) For example, similar claims appear in Euro-Pro's 15-second TV spot, and in nationwide magazines like People Magazine:

 

5

(*Id.* at Ex. 7 at 0:08 & Ex. 13.)   And that same claim is emblazoned on all sides of the Shark

Rotator Powered-Lift Away's packaging.  (*Id.* at ¶ 15 & Ex. 12.) [2]

> ## 2. Robust, Independent Testing Proves That Euro-Pro's Superior Carpet Cleaning Claims Are False.

Contrary to Euro-Pro's claim, ***independent tests conducted under the relevant industry testing standard establish that the Shark Rotator Powered Lift-Away does not clean carpets better than the DC65***.  Dyson retained IBR Laboratories—an accredited, independent laboratory that is the leading testing facility in the vacuum-cleaner industry—to test the Shark Rotator Powered Lift-Away against the Dyson DC65 under the governing ASTM F608 protocol.

ASTM F608 is the industry-accepted standard for assessing vacuum cleaner performance (*i.e.*, dirt pick up) on carpets.  (Declaration of Susan Goldsmith ("Goldsmith Dec.") ¶¶ 11-12 & Ex. 2.)  The protocol calls for testing sample units of a given vacuum cleaner model on four different types of carpet:  shag, plush, level loop, and multi-level.  (*Id.* ¶ 13.)  The standard sets forth certain testing requirements, including the amount and type of dirt used, the use of calibrated carpet test samples, and standardized cleaning paths across carpets.  (*Id.*)  Notably, the ASTM F608 protocol requires that, when a machine has different settings for different carpet types, the machines' settings must be adjusted according to the manufacturer's instructions.  (*Id.* at Ex. 2 § 9.2.3.1 ("If various settings are provided [on a test vacuum], set the motor speed setting, suction regulator, nozzle height, or combination thereof using the manufacturer's specifications as provided in the instruction manual for each type of carpet.").)  Once the testing is performed, a final score is calculated based on the geometric mean ("Geomean") achieved on

---

[2]  With these claims, Euro-Pro uses small disclaimer:  "Shark® NV650 vs. Dyson® DC65 based on . . . ASTM F608 embedded dirt (NV650 in carpet/low pile mode)."  (Culley Dec. ¶¶ 12-13 & Exs. 5-13.)

the four carpet types, which reflects the average amount of dirt picked up by the vacuum. (Goldsmith Dec. ¶ 15.) The higher the score, the better the vacuum cleans carpets. (*Id*.)

Applying the ASTM F608 protocol, IBR tested five Shark Rotator Powered Lift-Away model NV651 machines against the DC65.[3] Euro-Pro's product instructions for the Shark Rotator Powered Lift-Away direct consumers to adjust the settings differently when cleaning high-pile and low-pile carpets.[4] So, to test the Shark Rotator Powered Lift-Away properly according to the ASTM protocol—and according to Euro-Pro's own instructions—IBR tested five different Shark Rotator Powered Lift-Away NV651 units, using the appropriate high-pile carpet setting when testing on shag carpet and low-pile carpet setting when testing on plush, level loop, and multi-level carpets. (Goldsmith Dec. ¶¶ 30-32 & Ex. 9.) When properly tested as dictated by the ASTM F608 standard ***and Euro-Pro's own instructions***, the testing proves that the Shark Rotator Powered Lift-Away does ***not*** clean carpets better than the DC65; indeed, the DC65 outperformed Euro-Pro's new product 34.3 to 29.5. (*Id.* ¶¶ 22, 32 & Exs. 3, 9.)

While Euro-Pro purports to have independent testing to support its superiority claims, Euro-Pro seems to have resorted to faulty testing to make those claims. In fact, in its own disclaimer, while Euro-Pro claims to have tested pursuant to ASTM F608, it notes that it tested the Shark Rotator Powered Lift-Away *only on low-pile carpet mode*. (Culley Dec. Exs. 5-13.) Euro-Pro's apparent "test method" not only violates the very protocol to which it cites, as ASTM requires settings be adjusted, but it *contradicts* the very way that Euro-Pro tells consumers to use

---

3  Euro-Pro's Shark Rotator Powered Lift-Away product name refers to three models—NV650, NV651, and NV652—which Euro-Pro depicts interchangeably in its video advertising online and on television. (*See* Culley Dec. Exs. 5-10.) The NV650 and NV651 appear to be identical mechanically, but are offered in different colors. The NV652 is nearly the same as the NV650 and NV651, but is packaged with additional accessories.

4  Dyson's DC65 adjusts automatically to different carpet types, so there are no settings to change across the four ASTM F608 carpet types on that machine. (Goldsmith Dec. ¶ 26 n.1.)

the vacuums. (Goldsmith Dec. ¶¶ 27-28.) As a result, whatever results Euro-Pro got from its manipulated test methodology are ***not*** the results consumers can expect to see. Despite the protocol and Euro-Pro's manual, to try to decipher how Euro-Pro could even pretend it was justified in making a superiority claim, Dyson also asked IBR to test the Shark Rotator Powered Lift-Away only on low-pile mode on all four test carpets (*i.e.*, according to Euro-Pro's improper method). Notably, even that testing *further confirms* that the Shark Rotator Powered Lift-Away does not clean carpets better than Dyson's DC65. (*Id.* ¶ 28 & Ex. 7.)

In total, IBR tested 16 different Shark Rotator Powered Lift-Away machines.[5] When tested in accordance with Euro-Pro's product instructions and the ASTM F608 protocol, Dyson's DC65 had a higher Geomean—meaning it *cleaned carpets better*—than the Shark Rotator Powered Lift-Away. Euro-Pro's apparent basis for its aggressive superiority claims— manipulated testing—cannot overcome legitimate and extensive head-to-head testing on the DC65 and the Shark Rotator Powered Lift-Away using the accepted industry-accepted protocol. That testing proves that the Shark Rotator Powered Lift-Away does not "clean carpets better" than Dyson's DC65, and Euro-Pro should be enjoined from making such false claims.

### 3.      Euro-Pro's Bar Graph Comparison Also Is Literally False.

Euro-Pro also promotes the Shark Rotator Powered Lift-Away's allegedly superior carpet-cleaning using a graphic claiming that its vacuum outperforms the DC65, purportedly picking up 42 grams of dirt from "carpets" versus the 37 grams of dirt from the DC65:

---

[5]  IBR also performed ASTM F608 testing on the other Shark Rotator Powered Lift-Away model, the NV652, and obtained similar results. Specifically, when IBR tested the NV652 using the proper setting on each ASTM F608 carpet type, the DC65 had a higher score, *again* proving that the Shark Rotator Powered Lift-Away does not clean carpets better than the DC65. (Goldsmith Dec. ¶ 36 & Ex. 12.) IBR also tested the NV652 twice more using Euro-Pro's apparently manipulated version of the protocol. In the first round of this testing, the DC65 beat the Shark; in the second round, the Shark had a slightly higher score. (*Id.* at ¶¶ 34, 38 & Ex. 10, 13.) In other words, the DC65 beat the Shark Rotator Powered Lift-Away four out of five times, and the only time that the Shark could win was if it was tested using a methodology that violates the ASTM protocol and Euro-Pro's instructions for use.



(Culley Dec. ¶ 17 & Exs. 5-6.)  This is literally false:  the Shark product does not outperform the DC65 on carpets by ***any*** margin, let alone by the nearly 15% Euro-Pro claims.

Instead, Euro-Pro attempts to limit this bold false comparison with a small-print disclaimer that states:  "Shark® NV650 vs. Dyson® DC65 ASTM F608 in carpet/low pile mode (embedded dirt ***in multi-level carpet sample***)."  (*Id.* (emphasis added).)  In other words, although Euro-Pro tells consumers that it beat Dyson on carpets generally, it tries to bury in small type that it made a comparison based only on one type of carpet, multi-level.  Even if it were appropriate for Euro-Pro to try to narrow its claim in this manner using an inconspicuous disclaimer—which it is not[6]—***a superiority claim directed at performance on multi-level loop carpeting alone is still false***.  IBR's testing shows that the Shark Rotator Powered Lift-Away does not outperform the DC65 on the multi-level loop carpet portion of the ASTM F608 test at all, let alone by the 42 to 37 margin cited in Euro-Pro's ads.  To the contrary, the DC65 handily beats Euro-Pro on that surface 40.2 to 27.6.  (Goldsmith Dec. ¶¶ 23, 29 & Exs. 4, 8.)  Thus, Euro-Pro's quantified comparison remains literally false even if limited to one type of carpet, and is deceiving consumers generally.

---

[6]  Notably, this bar graph appears in the context of an onscreen claim that "Shark deep cleans carpets"—*plural*—"better than [a] $600 Dyson," and in the infomercial, Euro-Pro's CEO introduces the graphic by saying, "Both vacuums were tested on *four* of the most commonly-owned carpet types in America...."  (Culley Dec., Ex. 5 at 0:43, Ex. 6 at 9:56.)  The graph, therefore, communicates that the Shark Rotator Powered Lift-Away offers this degree (*i.e.*, 42 g vs. 37 g) of superior cleaning performance on "carpets" in general.

## II.     A PRELIMINARY INJUNCTION IS WARRANTED.

Dyson is entitled to a preliminary injunction because: (1) it has a strong likelihood of succeed on the merits; and (2) it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 -1115 (7th Cir. 1997). ("In the preliminary injunction context, a "likelihood of success" exists if the party seeking injunctive relief shows that it has a "better than negligible" chance of succeeding on the merits."). Moreover, the balance of hardships weighs entirely in Dyson's favor, and the injunction serves the public interest. *Id.* (finding that the court must balance the threshold showing of likely success and inadequate remedy with "(3) the irreparable harm the nonmovant will suffer if the injunction is granted balanced against the irreparable harm to the movant if the injunction is denied and (4) the effect granting or denying the injunction will have on nonparties."); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001) (to balance these factors, the Court engages in a "sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position."); *see also Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012). Here, all four factors in the analysis plainly favor granting a preliminary injunction.

### A.     Dyson Is Likely To Prove That Euro-Pro's Advertising Statements Are False.

The Lanham Act prohibits any "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . ." 15 U.S.C. § 1125(a)(1). "To establish liability [under the Lanham Act], a plaintiff must show that the challenged advertisement is literally false, or, if literally true or ambiguous, that it is 'misleading in context, as demonstrated by actual customer confusion.'" *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081,

10

1088-89 (7th Cir. 1994) (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992)); *see also Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir. 2007) (extending same analysis to Illinois false advertising claims). "If the challenged advertisement makes implicit or explicit reference to tests"—as all of Euro-Pro's ads do, with their references to ASTM F608—then "the plaintiff may satisfy its burden by showing that those tests do not prove the proposition" for which they are offered. *BASF*, 41 F.3d at 1091; *see also Genderm Corp. v. Biozone Labs.*, No. 92 C 2533, 1992 WL 220638, at *14 (N.D. Ill. Sept. 3, 1992) ("Representations found to be unsupported by accepted authority or research may be deemed false on their face and actionable under § 43(a).").

Here, Euro-Pro's claims that its Shark Rotator Powered Lift-Away cleans carpets better than Dyson's DC65 per ASTM F608—and that its product outperforms the DC65 by a specific quantified margin of 42 to 37 under the ASTM F608 protocol—are ***demonstrably false***. Robust, independent testing conducted pursuant to ASTM F608 shows that the DC65 consistently outperforms the Shark Rotator Powered Lift-Away on carpeting. In other words, tests prove that Euro-Pro's advertising statements are literally false—and hence that Euro-Pro's claims have deceived the public. *B. Sanfield, Inc., v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999) ("Where the statement in question is actually false, then the plaintiff need not show that the statement either actually deceived consumers or was likely to do so."). Carpet cleaning superiority in this country is defined by ASTM F608 and Euro-Pro has acknowledged that protocol. Euro-Pro cannot rely on what appears to be a manipulated test method to support its claims of superiority. *Castrol Inc. v. Pennzoil Co.*, 987 F. 2d 939, 944-45 (3d Cir. 1993) (rejecting defendant's reliance on incorrect application of test standard to substantiate claim plaintiff's evidence proved was literally false).

Moreover, because cleaning performance is the most important consideration to consumers when purchasing a vacuum, Euro-Pro's superior carpet cleaning claims are certainly likely to influence consumers' purchasing decisions. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999) (finding that to succeed on a claim for false advertising, a plaintiff must show the statements are material, such that they influence purchasing decisions); *see also* Culley Dec. ¶ 19. Indeed, floor cleaning, including from carpets, is a vacuum cleaner's primary purpose. Euro-Pro's false statements therefore are material to consumer purchasing decisions, and are likely to have a direct impact on the sale of the advertised products. Ultimately, given the nature of Euro-Pro's claims and their literal falsity, the first factor readily favors granting a preliminary injunction.

### B.    Dyson Will Suffer Irreparable Harm If Euro-Pro Is Not Enjoined.

Euro-Pro's advertising expressly targets Dyson by name. And worse, Euro-Pro **wrongly** tells consumers that Dyson vacuums are inferior to Shark on **carpet cleaning ability**—a key attribute for any vacuum. The Court need not go beyond these facts in evaluating the irreparable harm factor, because "[i]n cases of false comparative advertising, where there is a misleading comparison to a specific competing product, irreparable harm may be presumed." *Ill. Bell Tel. Co. v. MCI Telecoms. Corp.*, No. 96 C 2378, 1996 WL 717466, at *4 (N.D. Ill. Dec. 9, 1996).

Moreover, Euro-Pro's false superiority statements "effectively amount to an assertion that [Dyson] manufactures inferior products," and is it "self-evident" that such claims "would have the tendency to diminish the company's goodwill among consumers." *Homeland Housewares v. Euro-Pro*, 2014 WL 4187982, at *5 (preliminarily enjoining Euro-Pro's false advertising).; *Groupe SEB v. Euro-Pro*, 2014 WL 2002126, at *10 ("[Euro-Pro]'s literally false statements on the packaging of the Shark 405 and Shark 505 are likely to weaken [plaintiff]'s brand and result in a loss of control of reputation, a loss of trade, and a loss of goodwill").

12

Here, Euro-Pro's false claims diminish the goodwill and reputation Dyson has spent years building (Culley Dec. ¶ 19), and "[i]t is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill." *Ty, Inc.*, 237 F.3d at 902. It is precisely the "practical impossibility" of measuring the full harm resulting from Euro-Pro's false advertising that renders Dyson's injuries irreparable. *Abbott Labs.*, 971 F.2d at 17; *see also Illinois Bell Tel. Co.*, 1996 WL 717466, at *9 (holding that damage of reputation and loss of goodwill and market share constitute irreparable injury).

Notably, time is of the essence in this case because this is the most significant buying season for vacuums. Nearly twenty percent of all vacuum cleaner sales in the United States are made between Black Friday and Christmas, and Dyson's sales during the holiday season account for approximately 28% of Dyson's overall yearly vacuum sales. (Culley Dec. ¶ 20.) Euro-Pro's false comparative claims against Dyson will divert customers and sales from Dyson to Euro-Pro at the most crucial time of the year. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1393 (2014) (describing "classic Lanham Act false-advertising claim" as case in which "one competitor directly injures another by making false statements about his own goods or the competitor's goods and thus inducing customers to switch."). The harm Dyson faces is further exacerbated by the fact that the average consumer buys a vacuum cleaner only once every five years. (Culley Dec. ¶ 21.) If Euro-Pro's false advertising campaign is allowed to continue, not only will Dyson lose sales, but it will not have a chance to recoup its lost opportunity with those consumers for many years, if ever. (*Id.* ¶¶ 21-22.)

## C. The Balance Of Hardships Favors Granting A Preliminary Injunction.

Unlike Dyson, Euro-Pro will not suffer any legitimate hardship from the issuance of a preliminary injunction against these false claims. *See POM Wonderful LLC v. Purely Juice, Inc.*, No. CV-07-02633, 2008 WL 4222045, at *16 (C.D. Cal. July 17, 2008) *aff'd*, 362 F. App'x 577

(9th Cir. 2009) ("Indeed, there is no harm to a defendant from an injunction which prevents continuing dissemination of false statements."). Even under the requested preliminary injunction, Euro-Pro will still be free to market and advertise its newly-released product—albeit truthfully. Any loss Euro-Pro may suffer would be minimal and would be limited to the costs of correcting its advertisements, website, and product packaging to remove the false claims. Nor would the proposed injunction prevent Euro-Pro from selling vacuum cleaners this holiday season. Euro-Pro currently manufactures and sells over a dozen other upright and cordless vacuum cleaners, none of which would be impacted by the Court's grant of an injunction on Euro-Pro's specific claims for the Shark Rotator Powered Lift-Away. *See Groupe SEB v. Euro-Pro*, 2014 WL 2002126, at *12 (noting Euro-Pro had numerous other vacuums to sell while the enjoined model was recalled for stickering and tag removal). If the Court does not enter the requested injunction, however, consumers will be misled, and Dyson will suffer irreparable harm to its reputation and goodwill, impacting not just one product but its overall business and brand.

Moreover, any hardship Euro-Pro might suffer is self-imposed. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself."). Euro-Pro made a conscious decision to market its products by falsely asserting that the Shark Rotator Powered Lift-Away cleans carpets better than the DC65 "knowing that [Dyson's competing vacuums] are often sold near or next to one another on store shelves." *Groupe SEB v. Euro-Pro*, 2014 WL 2002126, at *12. Euro-Pro is a repeat false advertiser, and it has clearly elected to take the risk of running false advertisements in order to boost its revenues. Simply put, Euro-Pro has put its profits above principle. Euro-Pro cannot now legitimately complain about any hardships caused by

14

being caught deceiving consumers and correcting its advertisements. The balance of hardships therefore decidedly weighs in favor of granting a preliminary injunction.

### D. Granting A Preliminary Injunction Would Serve The Public's Interest.

There is no public interest in the dissemination of false or misleading advertising—"[t]he public certainly is entitled to truthful advertising." *Abbott Labs. v. Watson Pharms., Inc.*, No. 01 C 4432, 2001 WL 826870, at *5 (N.D. Ill. July 20, 2001); *see Abbott Labs.*, 971 F.2d at 19 (enjoining false advertising serves, rather than disserves, the public interest). Allowing Euro-Pro to continue to flood the market with false claims about the Shark Rotator Powered Lift-Away's performance runs counter to the public's interest. *See F.T.C. v. Rhodes Pharmacal Co.*, 191 F.2d 744, 747 (7th Cir. 1951) ("To protect the purchasing public against deceptive methods and misrepresentations by which purchasers are deceived, is in the public interest."); *Homeland Housewares v. Euro-Pro*, 2014 WL 4187982, at *6 ("There is a strong public interest in preventing false advertising of products in the marketplace."). As one district court recently explained when preliminarily enjoining Euro-Pro's false advertising:

> The public has a right to information that will allow them to assess the quality of the product and to accurately price the product in accordance with their priorities and desires. False advertising deprives the consumer of this information and deceives them into thinking they are buying a less expensive equivalent, a bargain on a quality product.

*Groupe SEB v. Euro-Pro*, 2014 WL 2002126, at *13. Euro-Pro's false claims deceive consumers and induce them to purchase the Shark Rotator Powered Lift-Away by making them believe that it cleans carpets better than Dyson's best vacuum—which simply is not true.

### III. CONCLUSION

For the foregoing reasons, Dyson respectfully requests that this Court grant Dyson's motion for a preliminary injunction.

Dated: November 25, 2014                    Respectfully submitted,


                                      By: */s/ Robin A. McCue*
                                          Robin A. McCue (IL Bar No. 6256551)
                                          rmccue@kirkland.com
                                          Ian J. Block (IL Bar No. 6299117)
                                          ian.block@kirkland.com
                                          Susan L. Tanaka (IL Bar No. 6314120)
                                          susan.tanaka@kirkland.com
                                          KIRKLAND & ELLIS LLP
                                          300 North LaSalle
                                          Chicago, Illinois 60654
                                          Telephone: (312) 862-2000
                                          Facsimile: (312) 862-2200

                                          Gregg F. LoCascio, P.C. (*pro hac vice* pending)
                                          glocascio@kirkland.com
                                          KIRKLAND & ELLIS LLP
                                          655 Fifteenth Street, N.W.
                                          Washington, D.C. 20005-5793
                                          Telephone: (202) 879-5000
                                          Facsimile: (202) 879-5200

                                          *Counsel for Plaintiff Dyson, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2014, the foregoing document was filed electronically through the Court's Electronic Case Filing System. Service of this document is being made upon all counsel of record in this case by the Notice of Electronic Filing issued through the Court's Electronic Case Filing System on this date. I further certify that a true and correct copy of the foregoing document also was served by U.S. postal mail this date on:

> Euro-Pro Operating LLC and Euro-Pro Sales Company
> Attn: Jennifer McCabe, General Counsel and Secretary
> 180 Wells Avenue, Suite 200
> Newton, Massachusetts 02459

I further certify that the foregoing document also will be served on November 26, 2014 via hand delivery on:

> CT Corporation System
> Registered Agent for Euro-Pro Operating LLC
>    and Euro-Pro Sales Company
> 208 South LaSalle Street, Suite 814
> Chicago, Illinois 60604

By: _/s/ Robin A. McCue_