IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DYSON, INC., | ) | |
|     Plaintiff, | ) | Case No. 14 C 9442 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| EURO-PRO OPERATING LLC and | ) | |
| EURO-PRO SALES COMPANY, | ) | |
|     Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

According to the parties – competing vacuum manufacturers – their products are a popular holiday gift. Plaintiff Dyson, Inc. touts its DC65 "Animal" vacuum as having "twice the suction" of any other vacuum, including the "Shark Navigator Lift-Away" vacuum manufactured by defendant Euro-Pro Operating LLC, which is affiliated with defendant Euro-Pro Sales Company (collectively, "Euro-Pro," unless otherwise noted). Euro-Pro's advertising campaign, on the other hand, emphasizes that its "Shark Navigator Lift Away" vacuum cleans carpets better than Dyson's more expensive DC65 model. On September 26, 2014, Euro-Pro Operating LLC, which is based in Boston, filed suit against Dyson in the United States District Court for the District of Massachusetts. *Euro-Pro Operating LLC v. Dyson, Inc.*, No. 14 C 13720-IT. Dyson, which is based in Chicago, filed the instant suit against Euro-Pro on November 25, 2014. Both actions are based on the Lanham Act's prohibition against false advertising, 15 U.S.C. §§ 1125(a)(1)(B) and include related state law claims. Euro-Pro seeks to dismiss, transfer, or stay this case in favor of the Boston case. Dyson contends that the two cases are different and asks this court to issue a preliminary injunction ordering Euro-Pro to stop claiming that the "Shark Navigator Lift Away" vacuum outperforms its DC65 vacuum. It also has filed an emergency motion for leave to file a sur-reply in support of the motion for a preliminary

injunction. For the following reasons, Euro-Pro's motion to dismiss, transfer or stay and Dyson's motion for leave to file a sur-reply are denied and Dyson's motion for a preliminary injunction is entered and continued.

## I. BACKGROUND

Stripped of the rhetoric and the vituperative tone that permeate the parties' submissions, the essential facts are straightforward.

### A. The Parties' Claims About Their Vacuums

Dyson (an affiliate of the Dyson group of companies based in the United Kingdom) and Euro-Pro (which manufactures "Shark" branded products) market and sell vacuums. Dyson's advertising promotes its "cyclone" technology. According to Dyson, "[t]his suction power is a significant feature that helps Dyson's vacuums deliver some of the best pick-up performance in the industry on carpets, and to surpass all other vacuums' performance on carpets and hard floors combined." (Dkt. 1, ¶ 2.) Dyson describes its DC65 model as its "top-of-the-line full-sized upright vacuum, which improves upon Dyson's already impressive technology and features to offer the best overall cleaning performance of any Dyson vacuum cleaner to date when its performance is evaluated across the full range of floors commonly found in U.S. homes (*i.e.*, carpets, flat hard floors, and hard floors with crevices)." (*Id.*)

Dyson concedes that its long-standing claim that its vacuums have "twice the suction" of other vacuums is no longer true. Specifically, it states that while its vacuums continue to have the most suction compared to other vacuums, they do not have "twice the suction" as the "Shark Rotator Powered Lift-Away." Euro-Pro claims that "independent lab tests" show that the "Shark

Rotator Powered Lift-Away" vacuum "deep cleans carpets better than Dyson's best vacuum [the DC65]."[1] (*Id*. at ¶¶ 16, 18.)

**B.      Vacuum Testing Standards**

ASTM International is an entity that promulgates more than 12,000 standards. *See* http://www.astm.org/ABOUT/overview.html. The parties' submissions reference two of these standards: ASTM F608-13, which is a protocol used to evaluate a vacuum's effectiveness at removing embedded dirt from carpets, and ASTM F558-13, which is the "standard test method for measuring air performance characteristics" for vacuums. http://www.astm.org/Standards/F608.htm; http://www.astm.org/Standards/F558.htm.

ASTM F608-13 calls for the use of multiple sample vacuums. It tests how much embedded dirt (not surface dirt or debris) each unit picks up from four different types of carpet (shag, plush, multi-level, and level loop). As Dyson explains:

> A vacuum's "score" is the geometric mean calculated from the pick-up from the different carpet types. A higher score indicates better performance. The standard sets forth certain testing requirements, including the amount and type of debris used, the use of calibrated carpet test samples, sufficiently similar laboratory conditions, and standardized cleaning paths across carpets. The ASTM F608 protocol also requires that, when a machine has different settings for different carpet types, the machines' settings must be adjusted based on the manufacturer's instructions.

(Dkt. 1 at ¶¶ 24-25.)

---

[1] Euro-Pro does not explain the differences, if any, between the three models of the "Shark Rotator Powered Lift-Away" vacuum (the NV650, NV651, and NV652). According to Dyson, the NV650 and NV651 are identical mechanically, but are offered in different colors, while the NV652 is substantially similar to the NV650/ NV651 but is packaged with additional accessories. (Dkt. 9, at 7 n.3.) The court will refer to the models collectively, which is consistent with Dyson's undisputed claim that Euro-Pro depicts them interchangeably in its advertising.

In turn, Euro-Pro summarizes ASTM F558, which evaluates suction, as follows:

> ASTM F558 . . . is a protocol for measuring a vacuum cleaner's maximum air power. Suction is one variable of air power and is measured in terms of "air watts." Under ASTM F558, suction may be measured at one of two places on the vacuum cleaner: at the vacuum nozzle ("Cleaner Head") or at the end of the vacuum's hose (if present). The most common, industry-accepted method of performing ASTM F558 suction testing is at the end of the vacuum's hose because that method yields the most accurate test results. While there are a variety of vacuum Cleaner Heads, vacuum hoses are generally standard, removing a great deal of the variability associated with measuring suction from various Cleaner Head designs.

(Dkt. 19-1 at ¶¶ 29-30.)

In the Boston complaint, Euro-Pro explicates the connection between cleaning performance and suction, stating:

> Measuring [suction] at the vacuum's Cleaner Head is not as accurate as measuring at the vacuum's hose because the results vary greatly based upon the type of floor surface for which the Cleaner Head is optimized. For example, if a consumer were to use a vacuum on bare floors, the consumer might like a vacuum with very high suction in order to remove dirt and debris from the floor surface. However, if the same consumer were to use the high suction vacuum on a high pile carpet (*e.g.*, shag), the vacuum would be very difficult to push and pull because the suction would form a complete or nearly complete seal with the floor surface. Moreover, a seal of this type would effectively block air from moving through the vacuum, preventing the vacuum from picking up dirt. When vacuuming a higher pile carpet, a vacuum with lower suction, but a strong brush roll in the Cleaner Head of the vacuum is best for removing dirt. The brush roll aggressively agitates the dirt sending it into the nozzle where the suction collects the extracted dirt and places it in the dust bin. Vacuum manufacturers take these considerations into account when designing vacuum nozzles.

(*Id*. at ¶ 31.)

**C.     Euro-Pro's Complaint (the Boston Action)**

Euro-Pro's complaint (Dkt. 19-2, Page ID# 291-316), which was filed in federal court in Boston, takes issue with Dyson's "twice the suction" claim. In the "nature of the action" section, Euro-Pro specifically challenges Dyson's claims about the suction of its DC65 "Animal"

-4-

vacuum. It also asserts that the "Shark Powered Lift-Away" vacuum "has suction that is greater than or approximately equal to that of the advertised Dyson Animal vacuums, and in all events, well within the margin necessary to render Dyson's 'Twice the Suction' claim literally false." (*Id*. at ¶ 2.) Euro-Pro then alleges that:

> Dyson's intentionally false and misleading advertising, which claims that testing establishes the Dyson Animal's superior suction performance compared to Euro-Pro's Shark product line, is harmful to Euro-Pro and consumers alike. Dyson's deceptive comparative advertising threatens Euro-Pro with lost sales, loss of goodwill, lost market share, and irreparable harm in the marketplace. At the same time, Dyson's false and misleading claims are already causing (and unless enjoined will likely continue to cause) consumer confusion regarding the performance and efficacy of Dyson's products as compared to those of Euro-Pro.

(*Id*. at ¶ 4.)

The "facts common to all claims" section of Euro-Pro's complaint consists of forty-seven paragraphs. Euro-Pro generally describes its vacuums and Dyon's "Animal" series vacuums. It then summarizes Dyson's claims about the suction of the DC65, provides photographs of portions of the packaging of Dyson's vacuums and Dyson's store displays that make claims about suction, describes the ASTM F558 protocol used to test suction and Euro-Pro's testing of the suction of various Dyson vacuums using the ASTM F558 protocol. Next, Euro-Pro analyzes Dyson's claims about suction based on suction testing performed by Euro-Pro's testing laboratory. In addition, Euro-Pro details the interactions of counsel for Euro-Pro and Dyson regarding Euro-Pro's request for Dyson to cease using the claim of "twice the suction."

> Euro-Pro's complaint has one paragraph addressing cleaning:
>
> Euro-Pro also out performs Dyson in deep cleaning carpets pursuant to industry standard testing. ASTM F608-13 is the industry accepted test for the evaluation of embedded dirt removal effectiveness of vacuum cleaners. It is a very specific protocol using multiple units of each model and testing how much dirt each picks up using four different types of carpet (*i.e.*, shag, plush, multilevel and level

> loop). A higher score means better performance. When tested pursuant to ASTM
> F608-13, the Shark Powered Lift-Away scored an average of 36.4, while the
> Dyson DC65 scored an average of 33.5. Therefore, the Shark Powered Lift-Away
> outperforms the Dyson DC65 by a statistically significant margin in terms of deep
> cleaning carpets.

(*Id*. at ¶ 35.) This paragraph is at the end of a section entitled "Dyson's 'Twice the Suction' Claim is a Literally False Direct Comparative Superiority Claim Because the Dyson Animal Does Not Have 'Twice the Suction' of the Shark Powered Lift-Away." That section summarizes the testing performed by Euro-Pro's testing laboratory supporting Euro-Pro's position that the suction of the "Shark Powered Lift-Away" vacuum means that Dyson's "twice the suction" claim is false. The section that immediately follows the paragraph about cleaning is entitled "Dyson's 'Twice the Suction' Claim is a Literally False Establishment Claim Because Dyson Has No Reliable Testing to Support its Claim that ASTM F558 Testing Proves that the Dyson Animal Has 'Twice the Suction' of the 'Top-Performing' Shark Product.'" That section focuses again on the purported suction of Euro-Pro and Dyson vacuums.

In Count I of its complaint, Euro-Pro seeks relief under the Lanham Act based on Dyson's "twice the suction" claim. In Count II, Euro-Pro seeks relief under Massachussetts' Unfair Practices Act based on allegedly "contain false, deceptive, and misleading representations regarding the suction capabilities of the Dyson Animal compared to those of the Shark Powered Lift-Away" vacuum. (*Id*. at ¶ 58.) Finally, in Count III, Euro-Pro alleges that Dyson's claims about the suction of the Dyson "Animal" vacuum compared to the "Shark Powered Lift-Away" constitute false advertising under Massachusetts law.

### D.     Dyson's Complaint (the Chicago Action)

At the beginning of the "nature of suit" section of its complaint, Dyson touts the "suction power" of its vacuums and claims that this attribute "helps Dyson's vacuums deliver some of the best pick-up performance in the industry on carpets, and to surpass all other vacuums' performance on carpets and hard floors combined." (Dkt. 1 at 2.) Dyson alleges that its DC65 model "offer[s] the best overall cleaning performance of any Dyson vacuum cleaner to date when its performance is evaluated across the full range of floors commonly found in U.S. homes (*i.e.*, carpets, flat hard floors, and hard floors with crevices)." (*Id.*) Dyson then takes issue with Euro-Pro's claims about the cleaning ability of the "Shark Rotator Powered Lift-Away," as measured by ASTM F608.[2] The 66-paragraph complaint focuses on Euro-Pro's cleaning claims. There are four references to suction: the allegation about Dyson's "cyclone" technology in the introduction, which Dyson contends is the most widely-recognized feature of its vacuums, and then three references to Euro-Pro's multi-part claim that the Shark "Rotator Powered Lift-Away has more suction and deep-cleans carpet better than Dyson's best vacuum." (*Id.* at ¶ 17; see also ¶¶ 21, 22.) Dyson seeks relief under the Lanham Act (Count I) and Illinois' Deceptive Trade Practices Act (Count II). It also alleges that Euro-Pro's advertisements are false and violate Illinois law (Count III).

---

[2] Dyson also includes a claim about a graphic used by Euro-Pro to illustrate testing it performed on multi-level carpet using the DC65. Euro-Pro represents that on October 27, 2014, it removed the graphic from its long-form infomercials and that the graphic never appeared in the short-form infomericials. The court will, therefore, not discuss the graphic further. It is confident that if the graphic issue is not moot, Dyson will promptly make this known.

II. DISCUSSION

The parties dispute almost every aspect of the motions presently before the court, including whether the court should consider Euro-Pro's motion to dismiss, stay, or transfer prior to Dyson's motion for a preliminary injunction. It makes no sense to resolve Dyson's motion first given that Euro-Pro contends that this case should not be before the court at all. As detailed below, Euro-Pro's motion to dismiss, transfer, or stay is denied, Dyson's emergency motion for leave to file a sur-reply is denied and Dyson's motion for a preliminary injunction cannot be resolved on the present record.

A. **Euro-Pro's Motion to Dismiss, Transfer, or Stay**

   1. **Motion to Dismiss**

The district court has "significant latitude" when deciding whether to dismiss a complaint as "duplicative of a parallel action already pending in another federal court." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 888 (7th Cir. 2012) (internal quotations omitted). When considering if a suit duplicates an earlier-filed action, the court considers if the claims, parties, and available relief are significantly different. *Id*. Under this standard, suits are duplicative if they contain substantially overlapping claims. *Humphrey v. United Healthcare Serv., Inc.*, No. 14 C 1157, 2014 WL 3511498, at *2 (N.D. Ill. July 16, 2014).

The court has carefully studied the voluminous filings submitted by the parties, including a substantial amount of evidence about how to measure the suction and cleaning performance of vacuum cleaners. These materials – plus common sense – support the conclusion that suction and cleaning are inextricably linked. To state the obvious, a vacuum with poor suction cannot clean well because it lacks the ability to pick up a meaningful amount of particulate matter that is

lying on top of a hard-surface floor or is embedded in carpet fibers. Or, as Euro-Pro puts it, "[c]onsumers buy upright vacuums to clean their floors, not for bragging rights that their vacuum has better suction." (Dkt. 37 at 1.)

The parties spend a great deal of energy arguing about whether this case is about cleaning and the Boston case is about suction (Dyson) or whether both cases center on cleaning and suction (Euro-Pro). The most helpful filings in determining the scope of the parties' claims are the complaints filed in the respective lawsuits. While the parties were not required to provide extensive factual detail, they provided a thorough explanation of the alleged factual basis for their respective complaints and requested specific non-overlapping relief based on those allegations.

The court finds that the cases are not duplicative. First, as detailed in the summary of the complaints above, this case is based on Euro-Pro's representations about the ability of its "Shark Rotator Powered Lift-Away" to clean versus the cleaning power of Dyson's DC65 model. In contrast, the Boston case takes issue with the accuracy of Dyson's "twice the suction" claim and Dyson's continued use of that claim. Second, the relief sought in the two cases is different because the parties argue that their competitor's advertising about two different attributes of vacuums is inaccurate. *See Reynolds*, 694 F.3d at 888-89 (considering the nature of the relief sought in two allegedly duplicative cases). The fact that both cases are about the same two competing vacuums is a broad commonality that oversimplifies the actual claims made in the two cases.

Third, although Euro-Pro vigorously argues in many different ways that the Boston case is about cleaning *and* suction, even a cursory study of the Boston complaint shows that this is not

the case. Euro-Pro chose to sue Dyson in Boston based on its belief that Dyson's "twice the suction" advertising was false and that Dyson was not removing that advertising fast enough. In support, Euro-Pro's complaint included photographs of Dyson's packaging focusing on the "twice the suction" claim:





(Dkt. 19-1 at ¶¶ 24-25.) The court cannot fairly read Euro-Pro's allegations about Dyson's "twice the suction" marketing in the Boston case to include Dyson's claim of cleaning superiority over the "Shark Rotator Powered Lift-Away." This remains true despite the

aphorism that a vacuum with no suction is a vacuum that cannot clean. Fourth, the court is persuaded by the different ASTM standards that are used to measure suction and cleaning. In sum, these cases are about the same two vacuums but otherwise are fundamentally different.

Approaching the duplicative litigation inquiry from another angle, Euro-Pro next argues that Dyson's claims in this action are compulsory counterclaims in the Boston action, and thus should not be allowed to proceed separately. As detailed above, the cleaning claims in this case are not compulsory counterclaims in the Boston case because they do not arise out of the transaction or occurrence that is at issue in the Boston case. *See* Fed. R. Civ. P. 13(a); *see also Greene v. U.S. Dept. of Educ.*, 770 F.3d 667, 669 (7th Cir. 2014). This conclusion is not affected by the letter Dyson's counsel sent to Euro-Pro's counsel threatening to file counterclaims for unspecified false advertising in the Boston case if Euro-Pro did not dismiss that case prior to service. Dyson explains that these putative counterclaims would be based on Euro-Pro's alleged failure to discontinue purportedly false claims about the "Shark Rocket" and "Shark Navigator" vacuums. (Dkt. 31 at ¶ 13, n.2.) The court fails to see how the alleged counterclaims are connected to Euro-Pro's claim that Dyson's "twice the suction" claim is false. In any event, it cannot determine if Dyson's description of its potential counterclaims is accurate based on the present record. Regardless, the court need not consider this issue further as it has no bearing on the issue before it. Suffice it to say that regardless of the parties' litigation posturing in the Boston case, Dyson's claims in this case are not compulsory counterclaims in the Boston case because Dyson's contention that Euro-Pro's claims about the cleaning ability of the "Shark Rotator Powered Lift-Away" vacuum are inaccurate do not arise out of Euro-Pro's contention that Dyson inaccurately claimed that the DC65 has "twice the suction" of competing vacuums,

including the "Shark Rotator Powered Lift-Away." For all of these reasons, and in an exercise of its discretion, the court declines to dismiss this case as duplicative of the Boston case.

    **2.    Motion to Transfer**

Under 28 U.S.C. § 1404(a), "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." "In determining whether a forum is more convenient, the court must consider the private interests of the parties as well as the public interest of the court." *Aldridge v. Forest River, Inc.*, 436 F. Supp. 2d 959, 960 (N.D. Ill.2006). The factors related to the parties' private interests include: "(1) the plaintiff's choice of forum, (2) the situs of material events, (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience to the parties of litigating in the respective forums." *Hanley v. Omarc, Inc.*, 6 F. Supp. 2d 770, 774 (N.D. Ill.1998). The "interest of justice" is an additional inquiry that is part of the § 1404(a) transfer analysis. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220 (7th Cir. 1986). It turns on "the transferor and transferee courts' familiarity with the applicable law and the effect of transfer on the efficient administration of justice." *Aldridge*, 436 F. Supp. 2d at 962.

All of these factors militate against transfer or are in equipoise. Dyson chose to file suit in this district. Each side appears to have testing evidence about the purported cleaning ability of the DC65 and the "Shark Rotator Powered Lift-Away" in its home forum. Testing evidence relating to Dyson's "twice the suction" claim is not at issue in either forum since this case is not about that claim and the issue in the Boston case is whether Dyson removed its "twice the suction" claim quickly enough, not whether that claim is valid. Each side wants to litigate in its

own home forum. The interests of justice are not served by transferring a validly-filed case to another district. The motion to transfer is denied.

### 3. Motion to Stay

As Euro-Pro notes, "[w]hen confronted with duplicative litigation, the district court is authorized to dismiss, transfer, or stay a second-filed case under the first-to-file principle." *Askin v. Quaker Oats Co.*, 2012 WL 517491, at *3 (N.D. Ill. Feb. 15, 2012). For the reasons discussed above, the first-to-file principle is inapplicable. The motion to stay is denied.

## B. Dyson's Motion for a Preliminary Injunction

"A preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved." *Ind. Civil Liberties Union v. O'Bannon*, 259 F.3d 766 (7th Cir.2001). To obtain a preliminary injunction, Dyson show that it has: "(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). If it does so, the court then "weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id*. "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010).

The parties hotly debate the merits, accuse each other of intentionally skewing various vacuum tests in multiple ways, and claim that the other side's advertising is causing it irreparable harm by damaging its reputation and goodwill. In a nutshell, each side has repeatedly tested the

-13-

cleaning capabilities of its own vacuum and the competitor's vacuum. Each side claims that its tests are valid and attacks the tests conducted by its competitor on *numerous* grounds. It is impossible to separate out the actual data and any concrete information that either supports or discredits that data from the morass of arguments and sniping that constitute the parties' submissions. Moreover, it appears that the parties expect the court – which is not an expert in the area of ASTM vacuum testing – to sift through all of the test results and criticisms or praise of the supporting methodology to independently determine which sides's testing complies with industry standards and accurately measures the cleaning ability of the DC65 and the "Shark Rotator Powered Lift-Away" vacuums.

The court finds that an evidentiary hearing is necessary to resolve this dispute. It also declines to expand the current record further with Dyson's additional evidence and arguments in its "emergency" motion for leave to file a sur-reply. The parties are advised that the court will not tolerate further ad hominem attacks and that it expects the parties to present their positions in an orderly, succinct, and logical fashion. It does not behoove either side to continue to throw a mass of aggressive arguments about tests relating to cleaning performance at the court.

### IV. CONCLUSION

For the above reasons, Euro-Pro's motion to dismiss, transfer or stay [18] and Dyson's motion for leave to file a sur-reply [58] are denied and Dyson's motion for a preliminary injunction [8] is entered and continued. This case is set for status on December 23, 2014, at 9:30 a.m. in Courtroom 1858 to discuss further proceedings.

Date: December 22, 2014            /s/
                                   Joan B. Gottschall
                                   United States District Judge