**REDACTED**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DYSON, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No.: 1:14-cv-09442 |
| | ) | |
| v. | ) | Judge: Honorable Joan B. Gottschall |
| | ) | |
| SHARKNINJA OPERATING LLC and | ) | **JURY TRIAL DEMANDED** |
| SHARKNINJA SALES COMPANY, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**DYSON'S MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**REDACTED**

## TABLE OF CONTENTS

Page(s)

I.   Introduction ............................................................................................. 1

II.  Factual Background ................................................................................. 5

    A.   Shark's False and Unsupported "Cleans Carpets Better" Claim ............................ 5

    B.   Shark's Substantiation Testing Is Not "Independent" .......................... 6

    C.   Shark's Litigation-Inspired Manual Changes ........................................ 8

    D.   Shark Has No Testing To Support Its Claims Against The Ball Multi-Floor ............................................................................................................. 9

ARGUMENT .................................................................................................... 10

I.   Legal Standard ...................................................................................... 10

II.  Dyson Is Entitled To Summary Judgment That Shark's "Deep Cleans Carpets Better" Claim Is Literally False .............................................. 11

    A.   Shark's Accused Ad Claim Is Literally False As A Matter Of Law .................... 11

    B.   Shark's Carpet-Cleaning Superiority Claims Are Material To Consumers, And Are Likely To Influence Their Purchasing Decisions .................................. 18

    C.   Shark's False Advertising Results In Actual Or Probable Injury To Dyson ........ 19

III. Shark's Unclean Hands Defense Fails As A Matter Of Law ...................................... 20

IV.  Shark Offers Legally Insufficient Evidence To Support Its Laches, Estoppel, and Waiver Defenses, And Dyson Is Entitled To Summary Judgment On These Defenses ............................................................................................ 22

    A.   The Court Should Grant Summary Judgment On Shark's Laches Defense ........ 22

    B.   The Court Should Grant Summary Judgment On Shark's Waiver Defense ......... 23

    C.   The Court Should Grant Summary Judgment On Shark's Estoppel Defense .............................................................................................................. 24

V.   Conclusion .............................................................................................. 25

REDACTED

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albiero v. City of Kankakee*,
    246 F.3d 927 (7th Cir. 2001) ................................................................ 10

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................. 10

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*,
    168 F.3d 967 (7th Cir. 1999) ............................................................... 11

*BASF v. Old World Trading Co., Inc.*,
    41 F.3d 1081 (7th Cir. 1994) ........................................ 12, 14, 15, 17

*Castrol, Inc. v. Quaker State Corp.*,
    977 F.2d 57 (2d Cir. 1992) .................................................................. 19

*Diamond State Ins. Co. v. Duke*,
    No. 14 CV 7764, 2016 WL 1247473 (N.D. Ill. Mar. 30, 2016) ............ 24

*Doctor's Data, Inc. v. Barrett*,
    No. 10 C 03795, 2011 WL 5903508 (N.D. Ill. Nov. 22, 2011) ............. 19

*Dyson, Inc. v. Bissell Homecare, Inc.*,
    951 F. Supp. 2d 1009 (N.D. Ill. 2013) ......................................... 23, 24

*Gimix, Inc. v. JS & A Group, Inc.*,
    699 F.2d 901 (7th Cir. 1983) ............................................................... 11

*Granite State Ins. Co. v. Smart Modular Techs., Inc.*,
    76 F.3d 1023 (9th Cir. 1996) ............................................................... 22

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
    No. 14-137, 2014 WL 2002126 (W.D. Pa. May 15, 2014) ................... 14

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
    191 F.3d 813 (7th Cir. 1999) .................................................. 11, 22, 23

*Integrated Cards, LLC v. McKillip Indus., Inc.*,
    No. 06 C 2071, 2008 WL 3286981 (N.D. Ill. Aug. 8, 2008) ............... 22

*Intertek USA Inc. v. AmSpec, LLC*,
    No. 14 CV 6160, 2014 WL 4477933 (N.D. Ill. Sept. 11, 2014) ........... 21

**REDACTED**

*Isringhausen Imp., Inc. v. Nissan N. Am., Inc.*,
  No. 10-CV-3253, 2011 WL 6029733 (C.D. Ill. Dec. 5, 2011) ................................................. 24

*K&N Engineering, Inc. v. Spectre Performance*,
  No. EDCV 09–01900–VAP (DTBx), 2011 WL 6133258 (C.D. Cal. Dec. 8, 2011) ............... 14

*L.S. Health & Son, Inc. v. AT&T Info. Sys., Inc.*,
  9 F.3d 561 (7th Cir. 1993) ........................................................................................................... 19

*Lucas v. Chicago Transit Authority*,
  367 F.3d 714 (7th Cir. 2004) ...................................................................................................... 10

*Market Track, LLC v. Efficient Collaborative Retail Marketing, LLC*,
  No. 14 C 4957, 2015 WL 3637740 (N.D. Ill. June 12, 2015) ................................................. 11

*MPC Containment Sys., Ltd. v. Moreland*,
  No. 05 C 6973, 2008 WL 1775501 (N.D. Ill. Apr. 17, 2008) ................................................ 22

*Native Am. Arts, Inc. v. Chrysalis Inst., Inc.*,
  No. 01 C 5714, 2002 WL 441476 (N.D. Ill. Mar. 21, 2002) .................................................. 23

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
  290 F.3d 578 (3d Cir. 2002) ....................................................................................................... 17

*Persis Int'l, Inc. v. Burgett, Inc.*,
  No. 09-C-7451, 2012 WL 4176877 (N.D. Ill. Sept. 18, 2012) ............................................... 23

*Rhone-Poulenc Rorer Pharm., Inc.v. Marion Merrell Dow, Inc.*,
  No. 93-0144-CV-W-1, 1994 WL 16799629 (W.D. Mo. Sept. ,,30, 1994) ............................. 17

*Safe Bed Techs. Co. v. KCIUSA, Inc.*,
  No. 02 C 0097, 2003 WL 21183948 (N.D. Ill. May 20, 2003) ............................................... 21

*SB Designs v. Reebok Int'l Inc., Ltd.*,
  338 F. Supp. 2d 904 (N.D. Ill. 2004) ....................................................................................... 11

*Sullens v. Graham*,
  No. 14 CV 866, 2014 WL 6765138 (N.D. Ill. Dec. 1, 2014) .................................................. 21

*Tandy Corp. v. Malone & Hyde, Inc*,
  769 F.2d 362 (6th Cir. 1985) ...................................................................................................... 23

*Young v. Verizon's Bell Atlantic Cash Balance Plan*,
  615 F.3d 808  (7th Cir. 2010) ..................................................................................................... 21

**Rules**

Fed. R. Civ. Pro. 56(a) ................................................................................................................... 11

iii

REDACTED

## I.     INTRODUCTION

Much has changed since this Court last considered Shark's claim that "independent lab tests prove" that the Shark Rotator Powered Lift-Away ("NV650") "cleans carpets better than Dyson's best vacuum."  Although denying a preliminary injunction in March 2015, the Court aptly raised questions about whether "Intertek was, in fact, an 'independent' testing facility," "question[ed] the series of events that led to [Intertek technician Steven] Reese's July 17 email" about which settings to use, and found "flatly inconsistent" and "unconvincing" Shark's claim that it always intended consumers to use the middle/highest-suction setting as the default for all types of carpet. (Dkt. 118 at 25, 47-48, 53.)  Those questions lingered until Shark made its document production in this case on December 4, 2015.  Immediately thereafter, it became clear why Shark had delayed its production:  Shark's previously-withheld communications and emails belie the positions it took before this Court, confirm the falsity of Shark's superiority claim, and support a grant of summary judgment in Dyson's favor.

***First***, Dyson seeks summary judgment that Shark's carpet cleaning superiority claim is literally false because—despite Shark CEO Mark Rosenzweig's repeated proclamations to consumers—Shark did not have "***independent*** lab tests to back it up."  Dyson has always contended that because the NV650 directed consumers to use different settings based on whether the carpet was "high pile" or "low pile," a proper ASTM F608 test requires using different settings on the NV650 for different carpet heights.  But during the preliminary injunction stage, Shark adamantly disagreed and Shark's head of testing (Karyn Medler) went so far as to swear under oath that Intertek did not perform any NV650 testing in the lower-suction mode.  Instead, Shark testified that because its instructions were unclear, Intertek was required to ask Shark which setting was intended for use on the test carpets.  We now know that none of that was truthful.  For the first time in December 2015, █████████████████████████████

1

**REDACTED**

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ —and then acted as if none of that had ever happened during the preliminary injunction.[1]  By ***expressly instructing*** Intertek to deviate from the standard and run its ASTM F608 tests in all high-suction mode, Shark never had "independent" lab testing at all, preferring instead to use the appearance of "independence" to sway consumers about the merit of its "cleans carpets better" claim.  By building its advertising claim upon "independent lab tests," Shark's claim must be found literally false where those tests were undeniably steered by Shark personnel, ████████████████████████████████████████████████████████████████

---

[1]  Shark provided a deposition and testimony from Intertek representative Alex Porter, who also claimed to be unaware of any testing in the lower-suction mode.  Although not personally involved in Intertek's NV650 testing, it has also come to light that two days before Porter testified, ████████████████████████████████████████ ████████████████████ (SOF 41.)  Indeed, it has even come to light that Shark paid for Mr. Reese to meet with Shark's counsel and be in Chicago for the preliminary injunction hearing, yet never offered him as a witness nor even revealed that he was sitting unannounced with Shark in the back of the courtroom.  (SOF 42.)  It now appears obvious why Shark did not produce the emails reflecting Mr. Reese's determination of the settings, did not make him available as the Intertek deponent, never identified him in the courtroom, and did not call him to the stand (even though it paid him to work with Shark's lawyers in Chicago during the hearing)— because any one of those would have caused Shark's position at the preliminary injunction hearing to unravel.

**REDACTED**

███████████████████████████████████████████

In fact, we now know why Shark originally called the low-suction setting "Carpet" and just how inconsistent and incredible Shark's testimony was that it always intended consumers to use the high-suction Turbo setting as the default. Documents previously withheld or redacted during the preliminary injunction have confirmed that ████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████

███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████

As late as the day that the NV650 launched, Shark was struggling with how it could make the accused "cleans carpets better" claim against the DC65 when it knew that (i) █████████████ ███████████████████████████████████████████ ████████████████████████████████

███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████

---

[2] As the Court noted, "third-party" labs are not necessarily "independent." (Dkt. 118 n. 14.)

**REDACTED**

Shark's late-produced documents reveal why Shark issued the instructions it did and why Shark overrode Intertek's independent decision on the settings. Moreover, they reveal the lengths to which Shark went internally and before this Court to try to maintain a "cleans carpets better" claim that it knew was inconsistent with the instructions and intended use for the NV650.

*Second*, in addition to Shark's absence of "independent" testing, it is undisputed that Shark lacks *any testing* to substantiate its accused ad claim for (i) the over one-month period from the NV650's launch until Shark obtained its Intertek testing, and (ii) with respect to its claim to beat "Dyson's best vacuum," after the launch of Dyson's re-engineered Ball Multi-Floor in April 2015. Indeed, even Shark's own ASTM F608 testing shows the NV650 losing to the re-engineered Ball Multi-Floor, and Shark has no testing to support a claim to clean carpets better than that vacuum Accordingly, Dyson seeks summary judgment on liability for those two time periods.

*Third*, Shark continues to assert various affirmative defenses that have no legal or factual support and should be removed from the case at summary judgment. For instance, Shark's unclean hands defense revolves squarely around whether Dyson moved quickly and reasonably to remove its "Twice the Suction" claim from the market. Yet, that allegation (which is the subject of the separate Massachusetts litigation) has no relationship to Shark's rigged testing and false superior carpet cleaning claims. Lacking the direct nexus required for an unclean hands defense, summary judgment should be granted on that defense. Shark also pled boilerplate defenses of laches, waiver and estoppel in its Answer, yet did nothing during discovery to pursue those defenses, and its corporate representative failed to identify legally-sufficient facts to

4

support them. Without any laches, waiver or estoppel evidence, summary judgment should be granted.

## II.     FACTUAL BACKGROUND

### A.     Shark's False and Unsupported "Cleans Carpets Better" Claim

In July 2014, Shark launched the NV650[3] with a bold and pervasive advertising campaign telling consumers that "independent lab testing" proved that the NV650 "deep cleans carpets better than Dyson's best vacuum." (SOF 7-17.) That claim was ostensibly based on testing of the Shark NV650 and Dyson DC65 performed by a third-party, Intertek, pursuant to an industry-accepted standard, namely ASTM F608-13. (SOF 29.) Shark made its "cleans carpets better" claim on product packaging, its Shark Clean website, videos on its Shark Clean YouTube channel, television commercials, online banner ads, print ads in national magazines, and a 30-minute infomercial that ran repeatedly on multiple channels. (SOF 8-16.)

In the ubiquitous 30-minute infomercial, Shark repeatedly flashes imagery telling consumers that the Shark's "cleans carpets better" claim is supported by independent lab tests. (Dkt. 118 at 16-18.) In addition to the "independence" of Shark's testing being touted on screen, Shark's CEO, Mark Rosenzweig, also told consumers no less than three times that Shark's claim was based on "independent" lab tests. Indeed, Mr. Rosenzweig told consumers that "[i]n fact, my new Rotator Powered Lift-Away has more suction and ***deep cleans carpets better*** than Dyson's best vacuum," and that he had "the independent lab tests to back it up," immediately followed by imagery of a technician allegedly performing ASTM F608 tests on the NV650 and DC65. (SOF 11-12.) The demo is accompanied by Mr. Rosenzweig's voice-over stating, "[w]e

---

[3]     Shark recalled the NV650-series, which included the NV650, NV651 and NV652, due to an electrical shock risk, and replaced that vacuum with the NV750-series. (SOF 7, 49.) Shark relies upon the same testing to substantiate its NV750 claims as its NV650 claims. (SOF 49.)

REDACTED

asked ***independent testing facilities*** to conduct the ***one and only industry-recognized*** test of carpet cleaning and we went head-to-head with Dyson's best.  Both vacuums were tested on four of the most commonly-owned carpet types in America, and when all is said and done, ***the independent lab tests prove, without question, that our new Shark Rotator Powered Lift-Away deep cleans carpets better than Dyson's best $600 vacuum***." (*Id.*)  In short, Shark repeatedly claimed that "independent" lab tests prove the NV650 cleans carpets better than Dyson's "best" vacuum.

### B. Shark's Substantiation Testing Is Not "Independent"

Despite Shark's bold proclamation, it never had "independent lab tests to back it up," because, among other reasons, Intertek's testing in this case was not independent.  Shark has been working with Intertek for years, pays Intertek ██████████████ annually for testing, and as shown below, is anything but independent.   (SOF 47.)

***First***, the decision regarding what settings to use for Intertek's ASTM F608 test of the NV650 were made by Shark, ***not*** Intertek.  Indeed, Shark overrode Intertek's determination of the setting that should be used in order to achieve a better test score for Shark.  The Court will recall that the NV650 features a surface selector on the handle that allows users to choose different suction depending on the floor type on which the vacuum is being used.  (SOF 18-19.) In July 2014, when Shark launched the NV650/651, the owner's manual that shipped in the box instructed consumers to choose different settings based on carpet pile height:

**REDACTED**

| | | |
|---|---|---|
| **UPRIGHT CLEANING** | **1** | Press POWER and push the suction selector to HARD FLOOR to clean bare floors. |
| | **2** | Press POWER and push the carpet height selector to TURBO CARPET to clean low pile carpets. |
| | **3** | Press POWER and push the carpet height selector to CARPET to clean high pile carpets. |
| | **4** | Place your left foot gently on the floor nozzle and tilt the handle back to start cleaning. Note: The brushroll will only spin once the vacuum is reclined back. |

(SOF 18.)[4]  These instructions were mirrored in the Quick Start Guide in the box and a hang tag that was attached to the NV650 itself inside the box and at retail in-store displays.  (SOF 19.)

The ASTM F608 standard requires that a vacuum cleaner be tested consistent with the manufacturer's instructions in the owner's manual (SOF 28), and when Intertek's technicians reviewed those instructions, they determined that they were to use different suction settings on different ASTM test carpets based on their different pile heights.   Specifically, ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (SOF 37-39.)  ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮s

---

[4]  When Shark began production on the NV650 and NV651, those vacuums had the settings Hard Floor, Turbo, and Carpet.  (SOF 18.)  When Shark began production of the NV652, however, it changed the settings to Hard Floors, Carpet (for low pile carpets), and Thick Carpet (for high pile carpets).  (SOF 20.)

[5]  Whether ASTM plush is a low- or high-pile carpet (Intertek considered it high-pile) need not be resolved since Shark supposedly did not even consider shag/frieze to be high-pile, thereby negating its "independent" testing.

**REDACTED**

███████████████████████████████████████████ (SOF 37-39.)  In other words, the so-called "independent" lab did not run the test according to ASTM F608, *i.e.*, it did not run the test in the manner that Intertek itself determined it should be run—instead Intertek ran the test in the manner Shark ordered, which was inconsistent with the manual and was the only way that Shark could claim to "beat" Dyson. (SOF 34, 37-39.)

*Second*, additional late-produced Shark documents reveal that, in contravention of ISO standards, ███████████████████████████████████████



████████████████ (SOF 45.)  In other words, ██████████████████████████

*Third*, without prompting, ██████████████████████████████████████ (SOF 46.)  In other words, ██████████████████████████████████

### C.    Shark's Litigation-Inspired Manual Changes

From the launch of the NV650 through at least the date that Dyson filed suit, Shark instructed consumers to use the surface selector settings on the NV650 according to carpet pile height, per its original manual.  (SOF 18-20.)  After Dyson filed suit, Shark's dissembling began. As an initial matter, in an immediate response to the lawsuit, in December 2014, Shark uploaded to its website a "surface selector guide" and created a new user manual that told consumers—for the very first time—that the "Carpet / Low Pile" setting was "the default carpet setting" for cleaning "normal" carpets.  (SOF 22, 23.)  However, Shark did not notify NV650 owners about

**REDACTED**

the new instructions, did not distribute the new instructions to registered owners, and did not place the new instructions in existing product packaging in its warehouses. (SOF 24, 25.) Only after Dyson made that point and Shark faced the potential of an injunction did Shark send an email to consumers who had registered their vacuums with Shark about the new instructions, doing so on February 2, 2015, *seven months after* the product launched and the day before closing arguments at the preliminary injunction hearing. (Dkt. 92 ¶ 5a.) That delay was not inadvertent. Despite telling this Court that Shark always wanted consumers to use the "Turbo" or "Carpet / Low Pile" setting on all "normal" carpets—discovery demonstrated that to be false:

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████ (SOF 32, 34.)

> **D.  Shark Has No Testing To Support Its Claims Against The Ball Multi-Floor**

At the time that Shark launched the accused false claim, Dyson's best vacuum for carpet cleaning was the DC65, which was renamed the Ball Multi-Floor in January 2015. In April 2015, Dyson improved that machine and began selling the re-engineered Ball Multi-Floor, which replaced the DC65 as Dyson's "best" in terms of carpet-cleaning performance under ASTM F608. (SOF 26; Dkt. 308 at 9 ("Accordingly, for the purposes of this lawsuit, 'best' is a qualifier associated with (1) the DC65 and the re-engineered Ball Multi-Floor and (2) carpet cleanability comparative testing under ASTM F608 . . . ").) Although Dyson did not begin actively promoting the re-engineered Ball Multi-Floor until June 2015, in April it sent that machine into the market in order to achieve early market penetration before it officially "launched" and began advertising that new machine, because Dyson wanted to ensure that when it began actively promoting the product, retailer shelves were filled with the improved machine. (SOF 26, 27.)

Despite these updates in the market, Shark continued to expressly tell consumers that the

**REDACTED**

NV650 "cleans carpets better" than "Dyson's best vacuum" long after April 2015.  (SOF 8, 10, 58.)  But Shark concedes that it has no "reliable" testing to support its claim with respect to the re-engineered Ball Multi-Floor.  (SOF 52-56.)  In fact, the testing Shark did perform illustrated that the Ball Multi-Floor outperforms the NV650 under ASTM F608.  Despite having those tests before the summer of 2015, Shark continued to run its claims against "Dyson's best vacuum" in its infomercial until August 2015 and on its Shark Clean website until January 2016.  (SOF 8.)  And beyond its belated removal of the claim from its infomercials and website, Shark's false claim remains on the market today:  Shark's packaging for the NV650 still boldly claims that it outcleans Dyson's best vacuum, when Shark knows full well that it has no testing to support such a claim.  (SOF 10.)  Indeed, its testing shows the opposite.  (SOF 52-56.)

## ARGUMENT

### I.    LEGAL STANDARD

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(a).  After a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  A party will only be successful in opposing summary judgment "when it presents definite, competent *evidence* to rebut the motion."  *Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001) (emphasis added).  Conclusory statements ungrounded in specific facts are insufficient to avoid summary judgment.  *Anderson*, 477 U.S. at 256 (1986); *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 726 (7th Cir. 2004).

REDACTED

## II.    DYSON IS ENTITLED TO SUMMARY JUDGMENT THAT SHARK'S "DEEP CLEANS CARPETS BETTER" CLAIM IS LITERALLY FALSE

Dyson succeeds on its Lanham Act claims by proving that: (1) Shark made a false statement of fact; (2) the statement actually deceives or has the tendency to deceive a substantial segment of its audience; (3) the deception is material in that it is likely to influence the purchasing decision[6]; (4) Shark touted goods entering interstate commerce[7]; and (5) the statement results in actual or probable injury to the plaintiff.  *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999) (affirming summary judgment on a Lanham Act claim) (citing *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999)).[8]

### A.    Shark's Accused Ad Claim Is Literally False As A Matter Of Law

The accused ad claim is indisputably an establishment claim because Shark tells consumers that it had "independent lab tests" to support its claim of superiority.  (SOF 9-15.)  "A Lanham Act plaintiff bears the burden of proving literal falsity, but the proof sufficient to meet this burden will vary depending upon the statement made.  If the challenged advertisement makes implicit or explicit references to tests, the plaintiff may satisfy its burden by showing that

---

[6]    Because Dyson has alleged that the accused ad claim is literally false, if Dyson is able to prove literal falsity, it is entitled to a presumption of consumer deception.  *Market Track, LLC v. Efficient Collaborative Retail Marketing, LLC*, No. 14 C 4957, 2015 WL 3637740, at *20 (N.D. Ill. June 12, 2015) ("If the challenged statement is shown to be 'literally false,' [Plaintiff] need not show that any customer was actually deceived.") (citation omitted).

[7]    Shark does not dispute—and could not reasonably dispute—that it made the claims at-issue in commercial advertising and caused them to enter interstate commerce.  (SOF 5, 17.)

[8]    Dyson's state law claims (Counts II and III) rise and fall with Dyson's Lanham Act claim (Count I).  Because Dyson has established liability under Count I, Dyson is also entitled to summary judgment on Counts II and III.  *SB Designs v. Reebok Int'l Inc., Ltd.*, 338 F. Supp. 2d 904 (N.D. Ill. 2004) ("Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act.  Furthermore, "[a] common law unfair competition claim need not be separately addressed since it is codified by the Deceptive Trade Practices Act.") (citing *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir. 1983)).

**REDACTED**

those tests do not prove the proposition; otherwise, the plaintiff must offer affirmative proof that the advertisement is false." *BASF v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1090 (7th Cir. 1994). Here, the undisputed facts show that Dyson is entitled to summary judgment for three independent reasons. *First*, Shark had *no* substantiation testing for the entire time period that the accused ad claim was in the market because Intertek was not "independent," as Shark expressly claims in its advertising. *Second*, there can be no dispute that the accused ad claim was unsubstantiated from July 8 to August 12, 2014 because Shark had *no substantiation testing* during that time period. *Third*, Shark has *no testing* that shows that the NV650 beats the re-engineered Dyson Ball Multi-Floor under ASTM F608.

### 1.    Shark's Claim Is Literally False Because Intertek's Testing Was Not "Independent"

As the Court may recall, one of the primary disputes between the parties during the preliminary injunction hearing was whether the NV650—in view of the instructions in the product's manual—should be tested on the high-suction setting for all four ASTM F608 carpets as Shark contended, or whether it should be tested on a low-suction setting for at least shag carpet, as Dyson contended. (SOF 30, 31; Dkt. 51 at 10–11 ("It is these thicker types of carpets—which may require reduced suction to maneuver and clean effectively—for which [SharkNinja] designed its 'Thick Carpet/Area Rug' setting.").) At the preliminary injunction proceedings, both Shark and Intertek provided testimony that Intertek never tested the NV650 using the high-pile/low-suction setting, because (Shark argued) that is not the proper way to conduct the test. (SOF 35, 40.) Specifically, Karyn Medler testified ████████████████████████████████████████████████████████████████████████. (SOF 35.) Similarly, Intertek's corporate representative, Alex Porter, testified at his deposition during the preliminary injunction phase that ███████████████████████████████████████████████████████████

12

**REDACTED**

███████████████████████████████████ (SOF 40.)  Neither Ms. Medler nor Mr. Porter

was correct.

    When Shark launched the accused ad claim in July 2014, the NV650 owner's manual

instructed consumers to use the low-suction setting on "high pile" carpets, and the high-suction

setting on "low pile" carpets.  (SOF 18.)  Intertek had this manual and—as evidenced in late-

produced documents from both Shark and Intertek— ████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.[9]  (SOF 37.)

Specifically, when Shark produced documents nearly a year after the preliminary injunction

hearing—and on the very last day for document production—Dyson learned that in July 2014,

when Intertek first received the NV650 from Shark, ███████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████. (SOF 37, 39.)

██████████████████████████████████████████████

█████████████ (SOF 37, 38.)[10] ████████████████████████████████

---

[9]  ████████████████████████████████████████████████████████

████████████████████████ (SOF 38.) ████████████████

████████████████ SOF 37, 39.)

[10]  Notably, despite Shark's agreement to produce "[a]ny communications regarding the power
settings to use for ASTM F608 testing, either internal among Euro-Pro personnel or between
Euro-Pro and any third party, including but not limited to Intertek," Shark did not produce
this email during the preliminary injunction phase of this case.  (SOF 36, 37, 39).  Also
during the preliminary injunction phase, Ms. Medler—the recipient of the email and the
person who ██████████████████████████████████████████████

████████████████████████ (SOF 35.)  Moreover, documents produced by Intertek in this litigation
now show that two days prior to his deposition, Intertek's representative Alex Porter ███████
████████████████████████████████████████████████

**REDACTED**

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████. (SOF 44.)

It is disturbing that both Shark and Intertek withheld this critical information during the preliminary injunction proceedings, but even more disturbing is that Intertek apparently destroyed the testing data it had of the NV650 on multiple settings. (SOF 43.) Regardless,

██████████████████████████████████████████████████

████████████████████ demonstrates that Intertek is not "independent." *K&N Engineering, Inc. v. Spectre Performance,* No. EDCV 09–01900–VAP (DTBx), 2011 WL 6133258, at *4 (C.D. Cal. Dec. 8, 2011) (finding defendant did not have the claimed "independent lab tests" and thus was falsely advertising because defendant provided specific product and parameters for testing, and did not allow the lab to choose the parameters the lab believed appropriate in testing the products).

Because Intertek is not "independent," as Shark proclaims in its accused ad claim, Shark cannot substantiate its establishment claim, and summary judgment should be granted to Dyson. *BASF*, 41 F.3d 1081; *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, No. 14-137, 2014 WL 2002126, at *6–7 (W.D. Pa. May 15, 2014) (granting preliminary injunction where "[Shark's] disclaimers provide that said statement is 'based on independent comparative steam burst testing'

---

█████████████████████████████████████████

████████████████████████████." (SOF 40, 42.) As a result of Ms. Medler and Mr. Porter's incorrect testimony, both Dyson and the Court were deprived of important information regarding the reliability of Shark's alleged independent lab testing.

14

REDACTED

measured in grams per shot. However, [Shark] never produced any such independent comparative steam burst tests….").

### 2. Shark Had No "Independent" Testing To Support Its Claim From July 8, 2014 To August 12, 2014

Separate and apart from the fact that Intertek is not "independent," Shark indisputably had no Intertek testing from the launch of the Rotator Powered Lift-Away on July 8, 2014 through August 12, 2014.[11] As this Court already explained in its order on Dyson's preliminary injunction motion, despite launching the accused ad claim with the NV650 on July 8, 2014, "its representation that independent laboratory testing supported its cleaning superiority claim was false . . . Thus, as of July 8, 2014, [Shark] did not have third-party testing that supported its claim that the NV650 deep cleans carpets better than the DC65." (Dkt. 118 at 25; *see also* SOF 50, 51.)

Despite its lack of such testing, Shark claimed that the NV650 "Cleans Carpets Better vs. Dyson's Best Vacuum" as "Proven by Independent Lab Testing" beginning on July 8. (SOF 8.) Because Shark *did not have* independent tests to substantiate the accused ad claim for this time period, the claim is false at least from July 8, 2014 through August 12, 2014 as a matter of law. Dkt. 118 at 25; *BASF*, 41 F.3d at 1091 ("Since [defendant] did not perform the tests, its claim was literally false, and the district court did not err in finding [defendant] liable under the Lanham Act or state law.").

---

[11]   While Shark received an ASTM F608 testing report from Intertek on July 11, 2014, Shark discarded those results due to chain-of-custody issues with the DC65 vacuum cleaners. (SOF 50; Dkt. 118 at 19.)  As Ms. Medler testified, ███████████████████████████████████████████████████████ (SOF 51.) Accordingly, at Shark's direction, Intertek re-tested the DC65 using a new population of test vacuums, and sent Shark an updated report dated August 12, 2014. (*Id.*, Dkt. 118 at 20.)

REDACTED

### 3.    Shark Has No External Testing That Supports Any Superiority Claim Following Dyson's Launch Of The Re-Engineered Ball Multi-Floor

Similarly, Shark has no independent testing to support its claim that the NV650 "deep cleans carpets better" than the re-engineered Ball Multi-Floor, which became Dyson's "best" vacuum for carpet cleaning when it began selling into the market in April 2015. (SOF 26.) (Dkt. 308 at 9 ("[F]or purposes of this lawsuit, 'best' as a qualifier is associated with (1) the DC65 and the re-engineered Ball Multi-Floor . . . .") Shark takes the position that, despite advertising that it has tests showing the NV650 beats Dyson's "best" vacuum, it does not have any testing on the Ball Multi-Floor. That is only partly true. Shark produced various test reports comparing the performance of the re-engineered Ball Multi-Floor and the NV650, but Shark claims none of those tests—all of which show that the re-engineered Ball Multi-Floor out-performs the NV650 under ASTM F608—is reliable.

Shark produced ASTM F608 testing performed in May 2015 by Intertek, which shows that the ███████████████████████████████████████████████████████ ████████████████████. (SOF 52, 53, 56.) At her deposition, Ms. Medler nevertheless testified that ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████. (SOF 28, 53, 56.) Admittedly, ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████. (SOF 53, 56.)[12] In June 2015, Shark asked Intertek ████████

---

[12]   Shark also produced Intertek testing performed in June 2015 a two-unit test on the re-engineered Ball Multi-Floor and the NV650 on two of the four ASTM F608 carpets—multi--level and plush. (SOF 54, 56.) The testing similarly showed that the re-engineered Ball Multi-Floor scored higher on both the multi-level and plush carpets than the NV650. (*Id.*)

**REDACTED**



████████████████████████████████████████████. (SOF 55.) ██████

██████████████████████████████████████████████████████████████

████████████████████████████████████(SOF 55, 56 (██████████████

███████████████████████████████ ███████████████████████████████

████████████████████████████████████. (SOF 54.)  In short, Shark

has significant data on the comparative performance of the Ball Multi-Floor versus the NV650

illustrating that the Ball Multi-Floor is Dyson's best vacuum under ASTM F608 and that it

cleans carpets better than the NV650.  Despite having this information, Shark put its head in the

sand, challenged the veracity and reliability of *its own testing*, and left the false claim in the

market.

But Shark cannot avoid liability by arguing that its own testing was not reliable: The

accused ad claim is indisputably an establishment claim and Shark *must* have independent tests

in hand to substantiate the claim against the re-engineered Ball Multi-Floor.  *BASF*, 41 F.3d at

1090 (affirming district court's determination that ad claim was literally false where advertiser

"had not run all of the appropriate tests" to substantiate establishment claim); *Rhone-Poulenc*

*Rorer Pharm., Inc.v. Marion Merrell Dow, Inc.*, No. 93-0144-CV-W-1, 1994 WL 16799629, at

*5 (W.D. Mo. Sept. 30, 1994), *aff'd in part*, *vacated in part on other grounds*, 93 F.3d 511 (8th

Cir. 1996) ("An establishment claim is either true or false.  The advertiser either has the claimed

substantiation or it does not.").  Indeed, Shark has *no such testing* against the re-engineered Ball

Multi-Floor, and on this basis alone, Dyson is once again entitled to summary judgment.

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d

578, 590 (3d Cir. 2002) ("[A] court may find that a completely unsubstantiated advertising claim

by the defendant is *per se* false without additional evidence from the plaintiff to that effect.").

**REDACTED**

B.   **Shark's Carpet-Cleaning Superiority Claims Are Material To Consumers, And Are Likely To Influence Their Purchasing Decisions**

There can be no dispute in this case that Shark's accused ad claim touting that "independent lab tests prove" its superior carpet-cleaning message is material to consumer purchasing decisions. To be sure, Shark agrees—in summary judgment briefing in the separate Massachusetts case, Shark argued that it was entitled to a presumption of materiality for Dyson's "Twice the Suction" claim because the cleaning ability of a vacuum is the "*raison d'etre* for a vacuum cleaner." (Case No. 1:14-cv-13720, Dkt. 173, at 11.)

Further, multiple Shark executives and high-level employees admitted what is manifestly obvious: Carpet-cleaning ability and the so-called independent tests proving it is important to consumers' purchasing decisions for vacuum cleaners. For example, Shark's President, Mark Barrocas, testified ███████████████████████████████████████████████████ ███████████████████████ (SOF 59.) Shark's Senior VP of Product Marketing, Dan Bilger also testified ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████ (*Id.*) Shark's owner and CEO, Mark Rosenzweig, similarly testified ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████ (*Id.*) Courtney Hopkins, Shark's Vice President of Marketing for vacuum cleaners, testified ████████████████████████████████████ ████████████████████████████████████████████████████." (*Id.*) Both Mr. Rosenzweig and Mr. Barrocas also emphasized the importance to consumers of making a claim that is supported by "independent" tests. (SOF 60–63.) Indeed, Shark President, Mr. Barrocas, ██████████████████████████████████████████████████████████

18

**REDACTED**



(SOF 60.)

(SOF 61.)

### C.    Shark's False Advertising Results In Actual Or Probable Injury To Dyson

Dyson also has suffered a discernable competitive injury, and is likely to continue to be injured, as a result of Shark's accused ad claim. To show a competitive injury under the Lanham Act, a plaintiff must be a direct competitor of the defendant. *Doctor's Data, Inc. v. Barrett*, No. 10 C 03795, 2011 WL 5903508, at *5-6 (N.D. Ill. Nov. 22, 2011); *L.S. Health & Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561, 575 (7th Cir. 1993). Shark and Dyson are, undisputedly, direct competitors in the vacuum market. (SOF 64.) Indeed, Shark's accused advertising claims target Dyson's competing vacuums, and as a result, Dyson is entitled to a presumption of harm. (SOF 8-16.) *See, e.g.*, *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992) ("We will presume irreparable harm where plaintiff demonstrates a likelihood of success in showing literally false defendant's comparative advertisement which mentions plaintiff's product by name.").

Here, because Dyson's and Shark's vacuums are sold in many of the same retail environments, their vacuums often appear side-by-side on store shelves and on retailer web pages. (Dkt. 167 at 24.) As a result, consumers are able to consider both Dyson and Shark vacuums and compare their claims with one another when deciding which vacuum to purchase. Shark's literally false claim that its vacuum "cleans carpets better" than Dyson's "best vacuum" results in a discernable competitive injury to Dyson:

- Consumers in the market to purchase a Dyson vacuum may instead choose a less expensive Shark vacuum if they are induced by Shark's false advertising to believe that they can get better cleaning performance from a Shark versus a Dyson. Indeed,

19

REDACTED



- Following Shark's advertising, ████████████████████████████████████
████████████████████████████████████████████." (SOF 65.)

- ████████████████████████████████████. (SOF 66.)

- ████████████████████████████████████████████████████
████████ (SOF 67.)

- ████████████████████████████████████ (SOF 68.)

████████████████████████████████████████████████

████████████████████. (SOF 69.) Of course, the inverse is true as well.

## III.   SHARK'S UNCLEAN HANDS DEFENSE FAILS AS A MATTER OF LAW

Shark's unclean hands defense has varied from a single generic sentence in its first Answer (Dkt. 124 at 18), to a three-and-a-half page narrative in its Amended Answer that sought to bring several unrelated vacuums and advertising claims into this case. (Dkt. 167 at 22–26.) On a motion from Dyson, the Court struck Shark's newly-raised bases for its unclean hands defense, leaving Shark's original basis for its unclean hands defense—that Dyson failed to remove its "Twice the Suction" claim from the market quickly enough following the release of the NV650. (Dkt. 187.) Dyson did not include that basis for the defense in its motion to strike because that argument did not suffer from the same procedural defects as the newly-raised allegations, and thus Dyson believed a Rule 12 motion was inappropriate at that juncture. However, in its Order, the Court "question[ed] the closeness of the link between the merits of SharkNinja's comparative carpet cleaning claims in this case and the speed of Dyson's removal." (Dkt. 187 at 6.) The Court was correct to be skeptical about the nexus between Shark's defense

20

**REDACTED**

and the issues in this case, as none exists. Dyson's voluntary removal of a previously-true suction claim, on the one hand, and Shark's ongoing false carpet-cleaning claims, on the other, bear no relation to each other. Summary judgment is therefore appropriate as a matter of law.

The doctrine of unclean hands "only applies when there is a direct nexus between the bad conduct and the activities sought to be enjoined." *Intertek USA Inc. v. AmSpec, LLC*, No. 14 CV 6160, 2014 WL 4477933, at *7 (N.D. Ill. Sept. 11, 2014); *see also Sullens v. Graham*, No. 14 CV 866, 2014 WL 6765138, at *2 (N.D. Ill. Dec. 1, 2014) ("[T]he plaintiff's wrong must be a willful act **concerning the cause of action** such that plaintiff is tainted with inequitableness or bad faith **relative to the matter in which he seeks relief**.") (emphasis added, internal quotation and citation omitted). "The goal of the unclean hands defense is to prevent the plaintiff from acting unfairly, deceitfully, or in bad faith, and then coming to court to seek to gain **from his transgression**." *Sullens*, 2014 WL 6765138, at *2 (emphasis added) (citing *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 615 F.3d 808, 822 (7th Cir. 2010)). Shark cannot establish a "direct nexus" as a matter of law. Dyson's claim for relief against Shark relates to Shark's false carpet-cleaning advertising claims, whereas Shark's unclean hands defense relates to Dyson's voluntary removal of its "Twice the Suction" claim. The **only** connection between Dyson's claim against Shark and Shark's defense is that Dyson's claim relates to the falsity of the accused ad claim made in connection with the NV650, while Shark's defense relates to the speed of Dyson's removal of a suction-related ad claim from the market following the release of the NV650. (Dkt. 187.) But the mere fact that both Dyson's claim and Shark's defense involve the NV650 is not sufficient for Shark to show that its defense arises out of the same transaction or occurrence as Dyson's pled false advertising claim. *See, e.g.*, *Safe Bed Techs. Co. v. KCIUSA, Inc.*, No. 02 C 0097, 2003 WL 21183948, at *2 (N.D. Ill. May 20, 2003) (granting motion to

21

REDACTED

strike unclean hands defense where the alleged misconduct is not "directly related to the transaction at issue"); *MPC Containment Sys., Ltd. v. Moreland*, No. 05 C 6973, 2008 WL 1775501, at *6 (N.D. Ill. Apr. 17, 2008) ("[T]he alleged misconduct dirtying the hands of the plaintiff must occur in the context of the present lawsuit."). Indeed, this Court has ***already held*** that "Dyson's contention that Euro-Pro's claims about the cleaning ability of the 'Shark Rotator Powered Lift-Away' vacuum are inaccurate do not arise out of Euro-Pro's contention that Dyson inaccurately claimed that the DC65 has 'twice the suction' of competing vacuums, including the 'Shark Rotator Powered Lift-Away.'" (Dkt. 65 at 11-12.) Thus, as a matter of law, Shark's unclean hands defense fails and summary judgment should be granted to Dyson.

## IV.   SHARK OFFERS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT ITS LACHES, ESTOPPEL, AND WAIVER DEFENSES, AND DYSON IS ENTITLED TO SUMMARY JUDGMENT ON THESE DEFENSES

The Court also can dispose of several of Shark's affirmative defenses, as fact and expert discovery have closed and Shark presented legally insufficient evidence to support the defenses. *See, e.g.*, *Integrated Cards, LLC v. McKillip Indus., Inc.*, No. 06 C 2071, 2008 WL 3286981, at *2, *7 (N.D. Ill. Aug. 8, 2008) (deciding laches and estoppel on summary judgment); *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1027 (9th Cir. 1996) ("A litigant is not entitled to have a jury resolve a disputed affirmative defense if the defense is equitable in nature.").

### A.   The Court Should Grant Summary Judgment On Shark's Laches Defense

Shark cannot meet its "burden of demonstrating that laches should apply." *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 27 F. Supp. 2d 1043, 1050 (N.D. Ill. 1998). To prevail on its laches defense, Shark must show both that:  (1) Dyson delayed filing suit for an unreasonable and inexcusable length of time from the time it knew or reasonably should have known of its claim against Shark; *and* (2) the delay operated to the prejudice or injury of Shark. *See Dyson, Inc. v.*

REDACTED

*Bissell Homecare, Inc.*, 951 F. Supp. 2d 1009, 1036 (N.D. Ill. 2013) (granting Dyson's motion for summary judgment on laches defense); *Hot Wax*, 191 F.3d at 822. Shark cannot prove either.

*First*, Shark made the advertising claims at issue in the Complaint, at the earliest, in July 2014. (SOF 7.) For the purpose of proving laches under both the Lanham Act and Dyson's state law claims, courts apply the closest relevant state-law statute (in Illinois, three years) for determining whether the delay was presumptively unreasonable. *See Hot Wax*, 191 F.3d at 821 ("[C]ourts have used [] analogous [state] limitations period as a baseline for determining whether a presumption of laches exists."); *Native Am. Arts, Inc. v. Chrysalis Inst., Inc.*, No. 01 C 5714, 2002 WL 441476, at *3 (N.D. Ill. Mar. 21, 2002) (Illinois Consumer Fraud Act provides a three-year period and is the closest state statute to the Lanham Act). Dyson filed its Complaint on November 25, 2014, (Dkt. 1), and is well within the three-year statutory period as a matter of law. *Hot Wax*, 191 F.3d at 821 ("[Laches] 'presumes' that an action is barred if not brought within the period of the statute of limitations and is alive if brought within the period.").

*Second*, Shark has not identified a basis for any alleged prejudice that it has suffered as a result of Dyson's alleged delay, and its corporate representative on the defense was ***entirely silent on the issue of prejudice***. (SOF 70-72.) This was for good reason—Shark could not credibly allege that it would have changed its actions had Dyson sued earlier, because Shark continued its false advertising after Dyson *did* sue. (SOF 8, 10, 58.) Summary judgment is appropriate. *Persis Int'l, Inc. v. Burgett, Inc.*, No. 09-C-7451, 2012 WL 4176877, at *4 (N.D. Ill. Sept. 18, 2012) (denying laches claim at summary judgment where no evidence of prejudice was alleged or presented).

### B. The Court Should Grant Summary Judgment On Shark's Waiver Defense

Shark must establish both that Dyson "intentional[ly] relinquish[ed] a known right" and that Dyson "manifested [that intention to Shark] in an unequivocal manner" to prevail on its

**REDACTED**

waiver defense. *Isringhausen Imp., Inc. v. Nissan N. Am., Inc.*, No. 10-CV-3253, 2011 WL 6029733, at *3 (C.D. Ill. Dec. 5, 2011) (granting motion to dismiss waiver defense in Lanham Act case). "A waiver can be express or implied." *Diamond State Ins. Co. v. Duke*, No. 14 CV 7764, 2016 WL 1247473, at *4 (N.D. Ill. Mar. 30, 2016). Waiver is a "question of law that may be decided on summary judgment." *Id.*

Shark points to the same evidence in support of its waiver defense that it used to support its laches defense. (SOF 75.) Shark's evidence is facially deficient. ***First***, Shark relies on a letter it sent to Dyson in May 2014 ████████████████████████████████████. (SOF 70.) Shark decision to send a letter is not an "intentional relinquishment" of a known right by Dyson. And, as Shark, not Dyson, sent the letter, Dyson did not "manifest" anything. (SOF 71.) ***Second***, Shark relies upon Dyson's purchase of NV650 units in July 2014. (SOF 70.) If anything, those facts should indicate to Shark that Dyson intended to test Shark's performance claims, not that it acquiesced to them. Because Shark cannot show that Dyson's vacuum purchase is "inconsistent with any intention other than to waive" a right to challenge Shark's claims, Shark's defense fails as a matter of law. *Diamond State*, 2016 WL 1247473, at *4.

C. **The Court Should Grant Summary Judgment On Shark's Estoppel Defense**

To prevail on its estoppel defense, Shark must show: (1) an act or misrepresentation made by Dyson; (2) Shark reasonably relied on the act or misrepresentation; and (3) Shark thereby changed its position for the worse. *Dyson*, 951 F. Supp. 2d at 1036 (granting summary judgment on estoppel defense).

The only evidence Shark cites to support its estoppel defense is its contention that Dyson ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ (SOF 73.) At

REDACTED

best, Shark cited only an "act" by Dyson.  Dyson is unsure how Shark could rely to its detriment upon Dyson's use of a disclaimer on its own, unrelated claims.  Indeed, Shark provides no evidence that Shark "reasonably relied" upon Dyson's disclaimers, or that Shark "changed its position for the worse" in response to Dyson's disclaimers.  (SOF 73, 74.)  Because Shark does not have any evidence to support the elements of its estoppel defense, summary judgment is appropriate.

## V.   CONCLUSION

For the reasons stated herein, Dyson respectfully asks that this Court grant Summary Judgment in its favor.

Dated: April 25, 2016                     Respectfully submitted,

By: */s/ Robin A. McCue*
Robin A. McCue (IL Bar No. 6256551)
rmccue@kirkland.com
Ian J. Block (IL Bar No. 6299117)
ian.block@kirkland.com
Megan M. New (IL Bar No. 6300442)
megan.new@kirkland.com
Brian A. Verbus (IL Bar No. 6314193)
brian.verbus@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Gregg F. LoCascio, P.C. (admitted *pro hac vice*)
glocascio@kirkland.com
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

*Counsel for Plaintiff Dyson, Inc.*

REDACTED

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2016, the foregoing document was filed electronically through the Court's Electronic Case Filing System. Service of this document is being made upon all counsel of record in this case by the Notice of Electronic Filing issued through the Court's Electronic Case Filing System on this date.


By: */s/ Robin A. McCue*