# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DYSON, INC., | ) | |
| Plaintiff, | ) | Case No. 14 C 9442 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| SHARKNINJA OPERATING LLC and | ) | |
| SHARKNINJA SALES COMPANY, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The Lanham Act does not protect sellers from competition from better or cheaper products, but it does protect sellers "from having their customers lured away from them by deceptive ads." *Schering-Plough Healthcare Prod., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512 (7th Cir. 2009). Believing it was losing too many customers to the allegedly false and misleading claims of its competitor, plaintiff Dyson, Inc. filed this suit against defendants Sharkninja Operating LLC and Sharkninja Sales Company (together "Shark").[1] The parties have filed cross-motions for summary judgment. For the reasons set forth below, the court grants in part and denies in part plaintiff's motion for summary judgment. The court grants defendants' motion for partial summary judgment.

## I. BACKGROUND

For purposes of these cross-motions for summary judgment, the following facts are undisputed unless otherwise noted.[2]

---

[1]Although there are two defendants, the court refers to them collectively as "Shark," in the singular.

[2]Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The court enforces Local Rule 56.1 strictly. Where one party supports a fact with admissible evidence and the other party fails

Plaintiff Dyson, like Shark, designs and sells vacuum cleaners, and the two compete against each other. Dyson's vacuums were quite lucrative until Shark's vacuums hit the market. In the three months beginning September 2014 (when, as we shall see, Shark began running an infomercial for its competing vacuum), Dyson's margin on its DC65 vacuum fell from $300 per vacuum to less than $100 per vacuum.

Dyson had launched its lucrative DC65 vacuum in the United States in January 2014. About six months later, on or about July 8, 2014, Shark began offering for sale on its website its NV650-series vacuums, which it also referred to as "Rotator Powered Lift-Away" vacuums. The packaging on the NV650 made direct claims against Dyson's DC65. Specifically, the NV650 packaging stated, among other things, "CLEANS CARPETS BETTER VS. Dyson's Best Vacuum Proven by Independent Lab Testing. **Based on ASTM F608 in Turbo/Carpet Mode vs. Dyson DC65."

Shark also made claims about its vacuum on its website at some point. The parties have not included in their statements of facts any evidence as to when the advertisements

---

to controvert the fact with citation to admissible evidence, the court deems the fact admitted. *See Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of its duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). Failure to comply with Local Rule 56.1 results in facts being deemed admitted. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015). The court will not consider facts the parties failed to include in their statements of facts, because to do so would rob the other party of the opportunity to show that the fact is disputed and to object to the admissibility of the evidence.

commenced,[3] but at some point until January 8, 2016, Shark's website had the following to say about its NV650 vacuum:

> Cleans Carpets Better ** Compared to Dyson's Best Vacuum!
> **Based on the ASTM F608 in Carpet/Low Pile Mode vs. Dyson DC65.

In September 2014, Shark began advertising its NV650 Powered Lift-Away vacuum on a 30-minute infomercial. During the infomercial, Shark's CEO says, "In fact, my new Rotator Powered Lift-Away has more suction and deep cleans carpets better than Dyson's best vacuum." While the CEO says the quoted words, the screen reads, "Shark NV650 v. Dyson DC65 based on ASTM F558 measured at the hose and ASTM F608 embedded dirt." The CEO added, "I have the independent lab tests to back it up. We asked independent testing facilities to conduct the one and only industry-recognized test of carpet cleaning, and we went head to head with Dyson's best. Both vacuums were tested on four of the most commonly owned carpet types in America. And when all was said and done, the independent lab tests proved without question that our new Shark Rotator Powered Lift-Away deep cleans carpets better than Dyson's best $600 vacuum." At the time, the screen read, "Independent LAB TESTS PROVE . . . Dramatization footage of ASTM F608 embedded dirt (NV650 in carpet/low pile mode) Shark NV650 vs. Dyson DC65."

On or about October 27, 2014, Shark began airing a revised infomercial. In this one, when Shark's CEO says, "In fact, my new Rotator Powered Lift-Away has more suction and deep cleans carpets better than Dyson's best vacuum," the screen says "SHARK DEEP CLEANS CARPETS BETTER THAN DYSON'S BEST VACUUM DC65" and "Shark NV650

---

[3]Paragraph 8 of Dyson's Statement of Facts says, "Until at Least January 8, 2016, Shark's website for the Rotator Powered Lift-Away vacuum featured the claim, 'Cleans Carpets Better Compared to Dyson's Best Vacuum!'" Dyson cites a screen shot from January 8, 2016. Dyson cites no evidence as to when the advertising claim commenced.

v. Dyson DC65 based on ASTM F558 measured at the hose & ASTM F608 embedded dirt (NV650 in carpet/low pile mode)."  In August 2015, Shark removed these statements from the infomercials.

In addition to the infomercials, Shark ran print advertisements.  On November 17, 2014, Shark ran an advertisement in People Magazine that claimed Shark's Rotator Powered Lift-Away vacuum provides "MORE Suction Power & Cleaner Carpets** vs. Dyson's Best Vacuum (Proven by Independent lab testing!)   **Based on NV650 vs. Dyson DC65: ASTM F608 (embedded dirt in carpet)."

Shark also ran short commercials.  At some point (the parties do not say when), Shark ran a 15-second commercial that said, "Independent lab tests prove that Shark's new Powered Lift-Away deep cleans carpets better than a $600 Dyson."  The print on the screen stated, "Based on ASTM F608 in carpet/low pile mode vs. Dyson DC65."  In a 30-second commercial (the parties do not say when it aired), Shark's voiceover stated that the Powered Lift-Away vacuum "Cleans carpets better than a $600 Dyson" while the screen stated "Shark NV650 vs. Dyson DC65 based on ASTM F558 measured at the hose & ASTM F608 embedded dirt (NV650 in carpet/low pile mode)."

## ASTM F608

The advertising Dyson challenges in this case references independent testing, specifically testing under ASTM F608.  ASTM is an organization that sets standards for product testing. ASTM F608 is (according to its own label) the "Standard Test Method for Evaluation of Carpet Embedded Dirt Removal Effectiveness of Household/Commercial Vacuum Cleaners."  The parties recognize ASTM F608 as essentially the gold standard for testing the ability of vacuums

to remove embedded dirt from carpet.  The following portions of the 20-paged, single spaced

ASTM F608 are relevant to the parties' arguments:

**4.      Significance and Use**

4.1 This test method provides an indication of the capability of the vacuum cleaner to remove embedded dirt from carpeting.  This test method is based upon results of home cleaning tests so that, in most cases a reasonable correlation exists between home and laboratory results.  The amount of dirt picked up in the laboratory test may not be the same as in the home; however, it will show that, in most cases, a vacuum cleaner that performs well in the laboratory will perform well in a home.  Laboratory results may differ due to variations in the homes, carpets, dirt, and other factors . . .

*   *   *

**7.      Sampling**

7.1 A minimum of three units of the same model vacuum cleaner selected at random in accordance with good statistical practice shall constitute the population sample.

7.1.1 To determine the best estimate of cleaning ability effectiveness for the population of the vacuum cleaner model being tested, the arithmetic mean of the cleaning ability rating of the sample from the population shall be established by testing it to a 90% confidence level within ±5% of the mean value of the cleaning ability rating.

7.1.2.  Annex A3 provides a procedural example for determining the 90% confidence level and when the sample size shall be increased.

*   *   *

9.2.2 *Used Test Vacuum Cleaners:*

9.2.2.1 Recondition a used test vacuum cleaner, prior to each test run, as follows:

*   *   *

(4) For vacuum cleaners using non-disposable dirt receptacles, empty in accordance with the manufacturer's instructions after each test run and clean the receptacle until its weight is within 0.07 oz (2 g) of its original weight.  Weigh the receptacle to the nearest 0.0035 oz (0.10 g) and install it as recommended by the vacuum cleaner manufacturer.

*   *   *

9.2.3 *Test Vacuum Cleaner Settings:*

9.2.3.1 If various settings are provided, set the motor speed setting, suction regulator, nozzle height, or combination thereof using the manufacturer's specifications as provided in the instruction manual for each type of carpet. Contact the manufacturer if no instructions are given, or if the instructions are unclear or inadequate.

*   *   *

9.3 *Test Carpet Calibration*
9.3.1 The purpose of calibration is to determine when the test carpet needs to be replaced by establishing a reference rating for each new preconditioned test carpet and to check this rating 50 or fewer test runs.

\* \* \*

9.3.4 When the embedded dirt rating for either reference cleaner varies by 0.14 oz (4 g) from the original reference rating for the carpet, replace the carpet.

Note 6–Carpet pick up changes over time as the test carpet panel is used due to normal carpet wear. General laboratory practice is to track and record the number of test runs on each carpet panel. It is recommended to estimate, as closely as possible, the number of required test runs on all carpet panels intended to be used prior to starting any test program in order to establish that the selected carpet panels have a sufficient number of test runs left to complete the test program. All products being tested in a comparison test must be tested on the same calibrated carpet panel throughout the test program. If a particular carpet panel is found to no longer be acceptable for testing due to the 0.14 oz (4 g) limit being exceeded during a calibration check, all products tested on that particular carpet panel during the test program must be retested on the new carpet panel to insure proper comparison.

\* \* \*

9.4 *Carpet Embedded Dirt Removal Effectiveness Test:*
\* \* \*

9.4.23 The percent carpet-embedded dirt removal effectiveness for the population of vacuum cleaner model being tested is the arithmetic mean of geometric mean values of the percent carpet-embedded dirt removal effectiveness from a sample of the population meeting the requirements of the sampling statement (Section 7).
\* \* \*

ANNEXES

\* \* \*

**A2.1  TEST CLEANING PATTERN AND TIME**
A2.1 *General*–All vacuum cleaners, regardless of the width of their nozzles, shall be moved back and forth in a specified pattern on the 54 by 18-in. (1370 by 460-mm) test area of the carpet for a total of exactly 16 strokes at the rate of 2.5 s per stroke, for a total time of 40±1 s, using any acceptable laboratory method to assure that these specifications are met. Examples of methods that have been found acceptable are visible-marked [sic] timing belt or a stopwatch to measure stroke time and cumulative time.
\* \* \*

**A.3.1 Theory**
A3.1.1 The most common and ordinarily the best estimate of the population mean $\mu$ is simply the arithmetic mean, $\bar{x}$, of the individual scores (measurements) of the units comprising a sample taken from the population. The average score of these units will seldom be exactly the same as the population mean; however, it is

expected to be fairly close so that in using the following procedure it can be stated with 90% confidence that the true mean of the population, $\mu$, lies within 5% of the calculated mean, $\bar{x}$, of the sample taken form the population.

\* \* \*

$\bar{x}$ = mean score of the sample taken from the population

\* \* \*

**A3.2 Procedure**

\* \* \*

A3.2.8 [If the desired 90% confidence level has been obtained,] [t]he value of the final $\bar{x}$ may be used as the best estimate of the cleaning ability rating for the population.

\* \* \*

A3.3.8 *Testing the 90% Confidence Interval for Individual Carpet Scores:*

\* \* \*

[If the 90% confidence interval is not achieved, then] an additional test unit from the population shall be tested.

\* \* \*

A3.3.10 *Testing the 90% Confidence Interval for Geometric Mean Scores:*

\* \* \*

[If the 90% confidence interval is not achieved, then] an additional test unit from the population shall be tested.

ASTM F608.[4]

Tests performed under the ASTM F608 standard result in a geometric mean

("geomean") score (which is to say cleanability rating) that represents the quantity of embedded

dirt the vacuum removed from a set of four types of test carpets (plush, multi-level, level loop

---

[4]The parties agree that tests performed in accordance with ASTM F608 are reliable and generally sufficient to establish superiority of one vacuum over another at removing embedded dirt. Because ASTM F608 selects a 90% confidence level for establishing the statistical significance of testing, the court considers testing that did not achieve a 90% confidence level to be irrelevant to the question of whether one vacuum had superior cleaning ability relative to another.

Dyson asserted in its statement of facts that the ASTM F608 requires testing to be performed by a single operator. Dyson did not cite any section of ASTM F608 to support the fact. The evidence Dyson cited instead did not support the assertion, so the court ignores the asserted fact. The court notes that it looked (which it need not have done) in the text of ASTM F608 for any reference to a required number of operators and found no such requirement.

and shag).  The parties agree that when the testing protocols have been followed, a higher final geomean score represents better removal of embedded dirt from carpets.

## Vacuum changes as it relates to testing

Over the course of time relevant to this case, Shark made a few changes to its NV650 Rotator Powered Lift-Away vacuum handle and the owner's manual.  Some of these changes are relevant to the comparative testing of the vacuums.

The handle of the Shark NV650 Rotator Powered Lift-Away has a selector switch that allows the consumer to select the level of suction used by the vacuum.  (Dyson DC65, on the other hand, does not have a selector switch.)  Consumers can use the selector switch to engage any one of three different modes on the Rotator Powered Lift-Away vacuum.  The first mode (which has always been labeled "Hardfloor") is described in Shark's quick-start guide as being for "[b]are floor cleaning or wand cleaning[.]"  It utilizes the full suction power of the vacuum but with the brush roller turned off.  The second mode (which was formerly called "Turbo" but is now called "Carpet/Low pile") is described in Shark's quick-start guide as being for "[l]ow pile carpet cleaning[.]"  It utilizes both the highest suction and the roller brush.  The final mode (which was formerly called "Carpet" but now is called "Thick Carpet/Area Rug") is described in Shark's quick-start guide as being for "[h]igh pile carpet cleaning[.]"  It utilizes the roller brush with lower suction than the other two modes.

The final mode uses less suction in order to prevent either the vacuum from becoming stuck to the carpet or an area rug from being sucked into the vacuum.  The purpose of the selector switch is to allow consumers to vacuum thick, dense carpets without the vacuum being

too difficult to push.  The Rotator Powered Lift-Away does not get stuck on ASTM carpets when used in Carpet/Low pile mode.

The instruction manual for the NV650-series Rotator Powered Lift-Away has changed over time.  On or about December 2014, Shark uploaded to its website the current version of the manual.  It says, among other things:

> Press POWER and push the surface selector to THICK CARPET/AREA RUG for the best setting for High Pile and Thick Carpets, Area Rugs, and Specialty Carpets if the vacuum is difficult to push or pull due to high suction.  This setting produces reduced suction with motorized brush roll.

> Press POWER and push the surface selector to CARPET/LOW PILE for the best setting for low pile and normal carpet types.  High suction with motorized brush roll.  This is the default carpet setting.

> **NOTE:** For deep cleaning per ASTM F608 (embedded dirt in carpet) please set to CARPET/LOW PILE.

Also in December 2014, Shark uploaded to its website "Surface Selector Instructions."  They say, among other things, that "'Carpet/Low Pile' is the default carpet setting and gives you the greatest suction and deep cleaning power."  By February 2, 2015, Shark stopped packaging older versions of the hard-copy manual with vacuums.  On February 2, 2015, Shark sent an email with the new owner's manual to customers who had purchased the NV650 Powered Rotator Lift-Away directly from Shark.

### Intertek testing

When Shark said, in its advertising, that "independent" tests supported its claims, it was referring to tests performed by a third-party called Intertek.  Shark hired Intertek to perform a number of tests that are relevant to this case.  The following three tests met the 90% confidence level and showed that Shark's NV650 and NV651 vacuums outperformed Dyson's DC65

vacuum.  In a report ("101690840 CRT-002") originally dated July 11, 2014 and revised August 12, 2014, Intertek determined that the DC65 had a geomean score of 33.5.  In a report ("101690840 CRT-002B") dated July 17, 2014, Intertek determined that the NV650 had a geomean score of 36.4.  In a report ("101690840 CRT-002D") dated July 24, 2014, Intertek determined that the NV651 had a geomean score of 37.0.  Intertek used two different operators when performing the tests.

The reason the report on the test of the DC65 was revised is because when Intertek originally conducted the test, it used DC65 vacuums procured by Electrolux, rather than DC65 vacuums procured by Shark or Intertek.  Good lab practice requires that the laboratory know where the tested products came from, i.e., that the laboratory understand the chain of custody.  It is unclear from the parties' statements of facts when or why the error was discovered.  It is also not clear from the record what the results of the original test were.[5]  Intertek procured additional DC65 vacuums to conduct the test again and issued a revised report.

In its July/August 2014 tests of the Shark vacuums, Intertek tested the vacuums in their highest-suction mode (the mode originally called turbo but now called carpet/low pile).  Before it ran the tests, Intertek contacted Shark to clarify the mode in which to run the tests.  Intertek was unsure what mode to test because the instructions were unclear.  For one thing, the notes on the vacuum handle did not match the instructions on the web.  Also, the manual Intertek was looking at reversed the setting designations, such that the center turbo (high-suction) mode was

---

[5]At ¶ 14 of Shark's Statement of Additional Facts in Opposition to Dyson's Motion for Summary Judgment, Shark asserts that the DC65 units procured by Electrolux performed the same as the other DC65 units and that the testing met the repeatability requirements of ASTM F608.  The cited evidence, however, did not support the asserted facts, so the court ignores that "fact" as unsupported.

designated for high pile carpet and the carpet (low-suction) mode was designated for low pile carpet. The two Shark vacuums also used different names for the three different settings. An Intertek employee sent an email asking which mode to test in, and a Shark employee instructed Intertek to test in the middle (highest-suction) setting.

Intertek charged Shark for the tests it performed at Shark's request. In 2013, Shark paid Intertek $1,054,186.16; in 2014, $1,001,649.29; and, in 2015, $988,437.90. On October 16, 2013, an Intertek employee sent a Shark employee an email to which he attached a copy of a Dyson advertisement. In the email, the Intertek employee stated, "I saw the above advertisement in the November 2013 issue of Popular Science on Page 12 and thought it might be of interest to you."

### IBR testing

Like Shark, Dyson hired a third-party testing facility (in its case, IBR) to conduct tests comparing the vacuums. In testing that occurred in the fall of 2014 and met the 90% confidence level, IBR concluded that the DC65 had a geomean score of 34.3 (test "15389I"). At about the same time, IBR also tested the Shark NV651 and the Shark NV652. The parties agree that in IBR's test ("15530C") of the NV652 (which met the 90% confidence level), IBR tested the vacuum in the turbo/carpet mode and established a geomean score of 36.5, which was higher than the score for the Dyson DC65. The parties also agree that IBR's test ("15389B") of the NV651 (which met the 90% confidence level) established a geomean score of 28.9 (i.e., lower than the DC65), but the parties dispute whether IBR tested the NV651 in the high-suction mode or in the low-suction mode.

**Dyson's new Ball Multi-Floor**

For a while, the DC65 was Dyson's "top of the line" full-sized upright vacuum. At some point, Dyson changed the name of its DC65 to "Dyson Ball Multi-Floor," which the parties usually shorten to "Ball Multi-Floor." At first, only the name changed; eventually, Dyson also improved the vacuum by re-engineering the cleaner head. In April or June 2015, Dyson launched the Dyson Ball Multi-Floor with the re-engineered cleaner head.[6] Even after the launch, retailers continued to describe the DC65 as "clean[ing] better than any other vacuum" and as "the most powerful."

In May 2015, Intertek performed tests for Shark on three vacuums: NV650, NV650W and Dyson Ball Multi-Floor. The tests did not meet the 90% confidence level, and Shark did not request that Intertek test additional units (i.e., increase the sample size) in an attempt to meet the 90% confidence level. In June 2015, Intertek performed additional tests on the Ball Multi-Floor and the NV650, but each test had a sample size of fewer than three units, meaning that the tests did not comply with ASTM F608.

Dyson, too, tested its Ball Multi-Floor against the NV650. Dyson, as before, hired IBR, which performed the requested tests in November and December 2015. In test 16547C (which met the 90% confidence level), IBR determined that the Ball Multi-Floor had a geomean score of 40.9. In test 16574A (which met the 90% confidence level), IBR determined that the DC65 had a geomean score of 35.1. In test 16574D (which met the 90% confidence level), IBR determined that the NV650 had a geomean score of 33.5. In conducting these three tests, IBR was unable to

---

[6]The parties dispute whether the launch was April or June. Dyson put forth evidence that it was April, although, as Shark points out, Dyson admitted in the pleadings that it was June. Ultimately, the difference does not matter to the outcome of these motions.

empty the dust receptacle on the Dyson vacuums to within 2 grams of their original weights. IBR noted the discrepancy on the report by saying, "An increase of greater than 2g was measured over the entirety of the test for all three samples due to dust collecting in inaccessible areas of the cyclones." IBR had been able to empty the receptacles sufficiently in prior testing of Dyson vacuums.

As to the ASTM F608 standard of returning the receptacle to within 2 grams of its original weight, the parties dispute whether that guideline's purpose is to make sure the vacuum is clean before each test run or to make sure the vacuum is "approximately" clean before each run. Dyson has put forth disputed evidence that the increase in the weight of the Dyson vacuum receptacles was due to dust trapped in the cyclones of the vacuum. The parties dispute whether the excess dust in the receptacles affects the reliability of the tests.

### Expert conclusions regarding DC65 vs. NV650

Dyson hired a number of expert witnesses to opine on the test results in the reports by Intertek and IBR. Dan Miller ("Miller"), a Dyson expert, opined that "it is not clear whether one machine [DC65 or NV650] is better than the other." In so opining, Miller assumed that in test 15389B, IBR tested the Shark vacuum in high-suction turbo mode. The parties dispute whether that test was done in turbo mode or the lower-suction mode. Likewise, Susan Goldsmith ("Goldsmith"), another of Dyson's experts, assumed test 15389B was conducted in turbo mode. Goldsmith's conclusion was similar to Miller's. Goldsmith concluded, "The tests reflect a range of scores for both the Rotator Powered Lift-Away and the DC 65 that appear to overlap substantially, such that it would not be possible to declare the broader population of one model as superior over the other." Finally, Dyson hired Laurentius Marais ("Marais") to conduct a

Wilcoxon rank-sum test and two-sample *t*-test to compare the data from the Intertek and IBR

tests. Marais concluded that, when the Shark vacuums were tested in high-suction mode, the

cleaning ability of the DC65 was statistically indistinguishable from the Rotator Powered Lift-

Away. In reaching this conclusion, Marais included in his calculations the data from test

15389B, and the parties dispute whether that test was performed with the Shark vacuums in

high-suction or low-suction mode.

Shark, too, hired an expert witness, Arnold Barnett ("Barnett"). Unlike Dyson's experts,

Barnett did not include in his calculations the test (15389B) with respect to which the parties

dispute the suction mode employed. Barnett concluded that statistically significant tests show

that the NV650 cleans better than the DC65.

### Parties' other litigation

This is not the only forum where Dyson and Shark have battled over the content of their

advertising. The parties have a case pending in the United States District Court for the District

of Massachusetts. In that case, the parties are litigating whether Dyson's claim that its vacuum

had "Twice the Suction" of any other vacuum was false.

As it relates to this case and for purposes of this motion for summary judgment only, it is

undisputed that by August 2014, Dyson had concluded that its "Twice the Suction" claim was

stale. It seems that Shark had contacted Dyson in or about May 2014, two months before Shark

released its Rotator Powered Lift-Away in July 2014, to inform Dyson that Shark's new vacuum

would render the "Twice the Suction" claims false. Dyson did not begin removing the "Twice

the Suction" claims from stores until November 2014. Even then, Dyson left the claim on

vacuum boxes shipped directly to customers who purchased vacuums on its website, because

consumers would not see the claim until after they made their purchase decision. As a Dyson employee described it:

> The reasoning behind that is consumers are buying the product from dyson.com. The "Twice the Suction" claims were removed from dyson.com in September, and the consumer was making a decision not based on a "Twice the Suction" claim.

(Dyson's Response to Shark's Statement of Additional Facts ¶ 30).

## II.     STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When considering a motion for summary judgment, the court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III.    ANALYSIS

In its first amended complaint, Dyson asserts three counts for false advertising: Count I under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); Count II under the Illinois Uniform Deceptive Practices Act, 815 ILCS 510/1, et seq.; and Count III under the common law of Illinois.

At the preliminary injunction stage, the parties spent significant time disputing the validity of each other's tests. Many of the disputes involved the proper mode for testing Shark vacuums (high suction vs. low suction) and whether Intertek should have consulted Shark on the decision of what mode to test the Shark vacuums. The parties seem to agree that issues of fact regarding the validity of Shark's third-party testing preclude either party from obtaining summary judgment on *that* issue for the period of time between August 12, 2014 and December 2014. The parties' motions for summary judgment address other issues.

## A.     Motions to supplement

Before the court considers the merits of the cross-motions for summary judgment, the court must consider the parties' motions to file supplemental information. Both parties have filed motions to add additional material to the summary judgment record, and, naturally, both sides are against their opponent's motion to supplement.

Generally, the court is against supplementing the summary judgment record. Local Rule 56.1, in addition to limiting the quantity of facts a party can put into the record, sets out a fair process that allows parties to make it clear to the court which facts are disputed and which are undisputed. Adding things later makes it more difficult for the court to determine which facts are disputed.

In the case of Dyson's motion to supplement, Dyson has good reason for failing to introduce the evidence sooner: the evidence was produced to Dyson after Dyson filed its motion for summary judgment. Still, Dyson has not bothered in its motion to state what facts in its statement of facts are supported by the supplemental evidence. This makes it impossible for Shark to respond with contradictory evidence and makes it difficult for the court to determine

whether the new evidence affects the analysis of which facts in this case are disputed. Furthermore, the evidence Dyson seeks to add is relevant to the question of the validity of Shark's third-party testing before Shark changed its owner's manual in December 2014, an issue which is not relevant to either party's motion for summary judgment. Dyson's additional evidence seems designed more to throw (extra) mud at Shark than to enlighten the court's decision on Dyson's motion for summary judgment. For these reasons, Dyson's motion to supplement is denied.

Shark's motion to supplement is an improvement on Dyson's in that Shark states explicitly which fact its supplemental evidence supports. The problem with Shark's motion, though, is that it has offered no good reason why the evidence it wants to add now could not have been included with its original response to Dyson's motion for summary judgment. Both pieces of evidence (excerpts of a deposition transcript and an exhibit used at a deposition) that Shark wants to add now were available to Shark in time to include them in its original response. Shark should have included the evidence in its original response, and allowing the evidence now would be inconsistent with the spirit of Local Rule 56.1. The court will not allow it. The court will, however, allow Shark to make its additional legal argument. Dyson has already responded and will not be prejudiced. Accordingly, Shark's motion is granted in part and denied in part.

### B.     Dyson's motion for summary judgment on the merits

Dyson moves for summary judgment on the merits of its claims that Shark's advertising was false. First, Dyson argues that Shark's advertisements referencing "independent" tests were false, because the tests were performed by an entity that was not independent of Shark. Second, Dyson argues that it is entitled to judgment as a matter of law with respect to Shark's alleged

claims about Dyson's Ball Multi-Floor.  Finally, Dyson argues that it is entitled to summary

judgment for the time period between July 8, 2014 and August 12, 2014.  The court will consider

each argument in turn.

Section 43(a) of the Lanham Act provides a private right of action to persons injured by a

competitor's use of false or misleading representations in advertising.  15 U.S.C. § 1125(a).  To

prevail, a plaintiff must prove:

> (1)     a false statement of fact by the defendant in a commercial advertisement about its own or another's product;
> (2)     the statement actually deceived or has the tendency to deceive a substantial segment of its audience;
> (3)     the deception is material, in that it is likely to influence the purchasing decision;
> (4)     the defendant caused its false statement to enter interstate commerce; and
> (5)     the plaintiff has been or is likely to be injured as a result . . .

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999).  Dyson's other claims are

evaluated on the same standards as its Lanham Act claim.  *Dyson, Inc. v. Bissell Homecare, Inc.*,

951 F Supp.2d 1009, 1028-29 (N.D. Ill. 2013).

As to the first element–the false statement–a plaintiff has two options for proving its

claim.  One option is for the plaintiff to show that the statement is literally false.  *BASF Corp. v.

Old World Trading Co., Inc.*, 41 F.3d 1081, 1088-89 (7th Cir. 1994).  If, on the other hand, the

statement is literally true or ambiguous, then the plaintiff must demonstrate that the statement is

misleading, by establishing that actual customers have been misled.  *BASF*, 41 F.3d at 1089.

In this case, plaintiff argues that Shark's statements were literally false.  As the Seventh

Circuit held in *BASF*, "the proof sufficient to meet [plaintiff's burden of proving falsity] will

vary depending upon the statement made."  *BASF*, 41 F.3d at 1091.  In this case, plaintiff's claim

falls within a branch of literal falseness known as an "establishment" claim, which is to say the

claim is based on "advertisements in the form of 'tests show x.'" *BASF*, 41 F.3d at 1090. Where, as here, "the challenged advertisement makes implicit or explicit references to tests, the plaintiff may satisfy its burden by showing that those tests do not prove the proposition[.]" *BASF*, 41 F.3d at 1091.

### 1.    Intertek's independence

Dyson first argues that Shark's advertisements were false, because Intertek was not independent of Shark. As is described above, Shark, on numerous occasions, advertised that its NV650 Rotator Powered Lift-Away vacuum "cleans carpets better than" Dyson's vacuum. In most cases, Shark added that the claim was supported by "independent" testing. Shark further explained the nature of the testing, by adding words to the effect of (the exact words varied in different ads): "Shark NV650 v. Dyson DC65 based on ASTM F558 measured at the hose & ASTM F608 embedded dirt (NV650 in carpet/low pile mode)." In its motion for summary judgment, Dyson does not challenge whether the independent testing Shark advertises actually proves that the Shark NV650 removed more embedded dirt than Dyson DC 65 using ASTM F608 procedures.

Instead, Dyson argues that those advertisements were false on their face, because Intertek is not independent of Shark. In considering whether Dyson has established Shark's statements are false, the court considers what "a linguistically competent" person would think independent means "according to ordinary usage." *Schering-Plough*, 586 F.3d at 513 ("The proper domain of 'literal falsity' as a doctrine that dispenses with proof that anyone was misled or likely to be misled is the patently false statement that means what it says to any linguistically competent person."); *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 884 (7th Cir. 2000) (considering

statement "according to ordinary usage" and explaining, "In English, 'first' is ordinal.  It denotes rank in a series.").

According to ordinary usage, "independent" means "free from outside control" and "not beholden to."  The question, then, is whether Dyson has shown that Intertek was beholden to or controlled by Shark.  Dyson bears the burden on this (and every) element, but Dyson has not put forth sufficient evidence from which a reasonable jury would have to find for Dyson that this issue.

Dyson first argues that Intertek is dependent upon Shark because Shark paid Intertek for Intertek's services.  This is not compelling.  One does not expect a provider of services, whether those services be drafting a will, frying a hamburger or testing a product, to perform work for free, so the mere fact that a customer pays for a service does not mean the service provider is controlled by the customer.  In considering independence, the issue is not whether Intertek is paid but whether Shark is such an important customer as to make up a material portion of Intertek's business.  *Cf. In re: IAC/Interactive Securities Lit'n.*, 478 F. Supp.2d 574, 602 (S.D. N.Y. 2007) (fees paid to outside directors did not mean they could not be called "independent" directors absent a showing that the payments "were so material as to taint the director's judgment").  Here, it is undisputed that Shark paid Intertek roughly $1,000,000 per year over the course of three years.  Dyson has put forth no evidence from which a jury could conclude that the amount Shark paid Intertek was material to Intertek or would affect its judgment.[7]

[7]Shark argues Intertek had revenues of $3 billion in 2015, which, if true, would establish that the amount Shark paid Intertek was *not material* to Intertek; but, that fact was not included in Shark's statement of facts, so the court does not consider it.

Next, Dyson argues that Intertek's contacts with Shark, its customer, show that Intertek was beholden to or controlled by Shark. First, Intertek points to an email in October 2013 where an Intertek employee brings to the attention of a Shark employee an advertisement by Dyson. The email does not persuade the court that Shark controls Intertek. It is routine customer-relationship management and routine marketing for a service provider to inform a potential customer about a happening which might prompt that potential customer to hire the service provider. Dyson also argues that Intertek's contact with Shark regarding the proper mode for testing the NV650 and NV651 vacuums shows that Intertek is controlled by Shark. The court disagrees, as could a reasonable jury. ASTM F608 explicitly allows testers to contact manufacturers. ASTM F608 at 9.2.3.1 ("If various settings are provided, set the motor speed setting, suction regulator, nozzle height, or combination thereof using the manufacturer's specifications as provided in the instruction manual for each type of carpet. *Contact the manufacturer* if no instructions are given, or if the instructions are unclear or inadequate.") (emphasis added).

In sum, a reasonable jury could conclude that Intertek was independent of Shark, so Dyson's motion for summary judgment on this issue is denied.

### 2. Ball Multi-Floor

Next, Dyson argues that it is entitled to judgment as a matter of law on its false advertising claim, because, as Dyson argues in its brief, "Shark has no independent testing to support its claim that the NV650 'deep cleans carpets better than the re-engineered Ball Multi-Floor, which became Dyson's 'best' vacuum for carpet cleaning when it began selling in the market in April 2015." (Dyson's Memorandum in Support of its MSJ at 16).

The court agrees with Dyson that the undisputed evidence shows Shark has no independent testing to show that the NV650 is better than the Ball Multi-Floor. Dyson has not, though, put forth *any* (let alone undisputed) evidence that the Ball Multi-Floor became its best vacuum at any point relevant to this lawsuit. Even if it had, the evidence would not be material. The evidence necessary to show that an advertisement is false depends on what the advertisement says. *BASF*, 41 F.3d at 1091 ("the proof sufficient to meet [plaintiff's burden of proving falsity] will vary depending upon the statement made.").

Shark's ads never compared Shark's vacuums to the Ball Multi-Floor. Dyson has put forth undisputed evidence of several instances when Shark advertised that its NV650 "cleans carpets better" than "Dyson's best vacuum." Every time, however, Shark included language explaining its statement. Although not every explanation was identical, in every instance, Shark explained that its claim was based on the performance of its NV650 "vs. Dyson DC65." Not once in any advertisement that Dyson put in its statement of facts did Shark say it was comparing its vacuum to the Ball Multi-Floor. Dyson seems to expect the court to read into Shark's advertisement that Shark must have meant Ball Multi-Floor when it said "Dyson's best vacuum" merely because Dyson asserts (with no evidence) that the Ball Multi-Floor was its best vacuum. That makes no sense to the court. In evaluating whether an advertisement is literally false, the court looks to the actual words in the advertisement.[8] For the same reason, the court will not ignore the portion of Shark's ad that explicitly states that DC65 is the Dyson vacuum to which

_____

[8]If Dyson is arguing that consumers could be confused into thinking Shark was referring to the Ball Multi-Floor, then that is a claim for misleading advertising, which Dyson would need to support with evidence of surveys of actual consumers. Not only has Dyson failed to put forth such evidence; it has explicitly disavowed that it is attempting to make out such a claim.

Shark was referring. *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 200 (3rd Cir. 2014). Nowhere did Shark compare its vacuum to the Ball Multi-Floor.

Because Dyson has not put forth any evidence that Shark ever advertised that its vacuum was better than the Ball Multi-Floor, Dyson cannot prevail on its claim that Shark falsely advertised the superiority of Shark vacuums over the Ball Multi-Floor. Dyson's motion for summary judgment as to this issue is denied.

### 3.    July 8 to August 12, 2014

Finally, Dyson argues that it is entitled to summary judgment on its false advertising claims against Shark for the time period of July 8 to August 12, 2014. Dyson's theory is that Shark had no independent tests to prove the superiority of its vacuum over Dyson's during this time period, because Shark did not receive the final report establishing that its vacuum was superior until August 12, 2014. Shark, of course, disagrees.

As noted above, in order to prevail on this claim, Dyson must show, among other things, that Shark made a false statement in advertising that was material (in that it is likely to influence the purchasing decision) and that Dyson has been injured. *Hot Wax,* 191 F.3d at 819.

The court agrees with Dyson that it has shown the first element: a false statement. Dyson has put forth undisputed evidence that on or about July 8, 2014, Shark began shipping its NV650 vacuums. Dyson has also put forth undisputed evidence that those packages stated, among other things, "CLEANS CARPETS BETTER VS. Dyson's Best Vacuum Proven by Independent Lab Testing. **Based on ASTM F608 in Turbo/Carpet Mode vs. Dyson DC65." The undisputed facts also show that on August 12, 2014, Shark received from Intertek a report establishing that the geomean score for the DC65 was lower than the geomean scores for its NV650 and NV651

vacuums.  As Shark points out, the August 12, 2014 report was originally issued on July 11, 2014 but was revised.  The reason the report was revised is that Intertek originally tested DC65 vacuums procured by Electrolux, rather than DC65 vacuums procured by Shark or Intertek. Shark, however, has not put forth any evidence from which a reasonable jury could conclude that the July 11, 2014 report supported its claim.  Shark did not the include results of the early test in its statement of facts, so, for purposes of this summary judgment motion, Dyson has shown the statement on the packaging was false from July 8, 2014 to August 12, 2014.[9]

Shark, though, also argues that the information on the packaging could not have affected the purchasing decision of customers.  The evidence is undisputed that, during this time, the vacuums were available for sale only on the website, so customers would not have seen the claim on the box until after they had made the purchase decision.  Dyson has put forth no evidence as to what the website said about the vacuums at the time.  A reasonable jury could conclude that a statement on a box that the customer could not see until after he purchased the vacuum was not material to the purchase decision.[10]  Accordingly, Dyson is not entitled to judgment as a matter of law as to the time period of July 8 to August 12, 2014.

---

[9]The court notes that Shark's expert report includes the data from the July 11 report, which, in fact, showed that the DC65 had a lower geomean score than the Shark vacuums. Because Shark did not cite that in its statement of facts, the court will not consider it for purposes of this motion.

[10]It seems at least one Dyson employee would agree.  (Dyson's Response to Shark's Statement of Additional Facts ¶ 30) ("The reasoning behind [the decision to leave the stale claims on the box] is consumers are buying the product from dyson.com.  The 'Twice the Suction' claims were removed from dyson.com in September, and the consumer was making a decision not based on a 'Twice the Suction' claim.")

Dyson's motion for summary judgment as to the July 8 to August 12, 2014 time period is denied.

### C.    Shark's motion for partial summary judgment on the merits

#### 1.    Ball Multi-Floor

Like Dyson, Shark moves for summary judgment on the issue of whether Shark made false claims that its NV650 Powered Rotator Lift-Away vacuums were better than Dyson's Ball Multi-Floor vacuums.  As the court explained above, Dyson has failed to put forth evidence that Shark made any claims that its NV650 Powered Rotator Lift-Away vacuums were better than Dyson's Ball Multi-Floor vacuums.  Accordingly, Dyson has failed to put forth evidence from which a reasonable jury could find in its favor on this issue.  Shark is entitled to judgment as a matter of law as to the Ball Multi-Floor.  Shark's motion for summary judgment on this issue is granted.

#### 2.    Implied falsity/misleading advertising

Where a plaintiff cannot establish that an advertisement is literally false, it can still prevail by showing that the claim is misleading.  To do so, it must, however, put forth evidence that actual customers have been misled.  *BASF*, 41 F.3d at 1089.

In its briefs in connection with an earlier motion to dismiss, Dyson suggested that it was making a claim that Shark's ads were misleading.  Shark moves for summary judgment on Dyson's claim that Shark's ads were misleading, because Dyson has put forth no evidence that customers were misled.  Dyson agrees and states that it is not pursuing a claim for misleading ads.

Accordingly, Shark is entitled to judgment as a matter of law as to Dyson's claim that Shark's ads were misleading. The court grants Shark's motion for summary judgment on this issue.

### 3. Shark's motion for summary judgment as to the time period beginning December 2014

Finally, Shark moves for summary judgment on Dyson's false advertising claims for the time period beginning December 2014. To understand Shark's argument, one must understand why the parties disputed the validity of Shark's testing at the preliminary injunction stage of this litigation.

The parties agree that tests conducted in accordance with ASTM F608 are valid evidence that one product removes embedded dirt better than another product. As explained above, by August 12, 2014, Shark had received from Intertek reports that showed its NV650 and NV651 Rotator Powered Lift-Away vacuums had higher geomean scores (i.e., removed dirt better) than Dyson's DC65. At the preliminary injunction stage of these proceedings, Dyson argued that tests Shark received from Intertek did not comply with ASTM F608 even though the tests met the 90% confidence level. Specifically, Dyson challenged Intertek's decision to test Shark's vacuums using the high-suction setting, which Dyson argued was inconsistent with ASTM F608. ASTM F608 states:

> If various settings are provided, set the motor speed setting, suction regulator, nozzle height, or combination thereof using the manufacturer's specifications as provided in the instruction manual for each type of carpet. Contact the manufacturer if no instructions are given, or if the instructions are unclear or inadequate.

ASTM F608 at § 9.2.3.1. Although that section allows the tester to contact the manufacturer under certain circumstances, Dyson argued that Intertek should not have contacted Shark to

clarify which suction setting to use for the tests, because the manual was not sufficiently confusing.  In addition, Dyson argued that the owner's manual required the tests to be conducted using Shark's lower-suction setting on one of the four types of carpet that are used for ASTM testing.

The parties seem to agree that disputes of fact regarding these issues preclude summary judgment for the time period between August 12, 2014 (when Shark received the reports from Intertek) and December 2014 (when Shark changed its manual).  As this court noted in its decision denying Dyson's motion for preliminary injunction, "as of the date in December when the latest instructions and quick start guide were released, [Shark's] revisions cured any defects in the prior versions of its product documentation." [Docket 118 at 51].

Shark argues that it is entitled to summary judgment for the period beginning December 2014, because, by that time, it had corrected the manual.  For purposes of this motion for summary judgment, the evidence is undisputed that by December 2014, Shark had changed its owner's manual to state that the "default carpet setting" is "CARPET/LOW PILE," i.e, the mode that engaged both high suction and the roller brush.  The manual also said that for "deep cleaning per ASTM F608," the carpet/low pile (i.e., high suction) mode should be used.  These changes would make clear that ASTM F608 testing of a Powered Rotator Lift-Away vacuum should be done in the high-suction mode, which is what Intertek used in its tests that showed the NV650 and NV651 vacuums had higher geomean scores than the Dyson DC65.  Thus, Shark argues, Dyson's concerns about the validity of the independent testing were no longer relevant by December 2014.  Accordingly, Shark argues that even though the facts are disputed as to the

validity of its independent tests for the time period before it changed its manual, the facts are undisputed as to the validity of its testing as of the date it changed its manual.

Dyson disagrees. For starters, Dyson argues that the Intertek tests have an additional flaw. Specifically, Dyson argues that Intertek's tests are invalid, because Intertek used more than one operator to test the vacuums. The court does not find this argument compelling. The parties agree that testing that conforms to the requirements of ASTM F608 is valid, and nothing in ASTM F608 requires the testing to be performed by a single operator. Accordingly, the court rejects this argument.

Dyson also argus that even if it fails to establish that Shark's test is invalid, Dyson can still win by putting forth its own tests showing that the Rotator Powered Lift-Away is no better than the DC65. In other words, even if Shark's independent testing supports Shark's advertising claims, Dyson believes it can still win by putting forth evidence of competing independent tests showing the Shark vacuum is no better. Shark thinks Dyson is misreading the law. Shark argues that the only way to prove a claim that "tests prove x" is false is by showing the tests do not prove x. According to Shark, if the tests do, in fact, prove x, the challenger cannot win, because the statement is not false.

The difference is important, because if Dyson is correct about the law, then its claims survive summary judgment as to the time period beginning December 2014. The reason is that it has put forth sufficient evidence from which a reasonable jury could conclude that the Shark vacuums are no better than the DC65. Specifically, Dyson put forth the testimony of three expert witnesses, all of whom opine that the Shark vacuums are no better than the DC65. Of course, those three experts' conclusions are based on the assumption that IBR test 15389B was

conducted in high-suction mode, even though the parties dispute whether that test was conducted

in high-suction or low-suction mode. Shark's expert, who did not rely on the disputed test,

concluded that the Shark vacuums are better than the DC65 and that the difference is

statistically-significant. Thus, there is a dispute of fact as to whether Dyson could show the

Shark vacuums are no better than the DC65. The question is whether that evidence would be

material to the jury, and that depends on the law.

In *BASF v. Old World Trading Co., Inc.*, the Seventh Circuit considered the evidence

necessary to prove a false claim under the Lanham Act. *BASF*, 41 F.3d 1089. The defendant

had argued that plaintiff was required to supply affirmative proof of falsity, while plaintiff

argued it was enough to show that the tests upon which defendant relied were insufficient. *Id.*

The Seventh Circuit recognized:

> a fundamental point: since the conditions under which a statement is true or false
> vary according to the statement at issue, a plaintiff's burden of proof may be
> satisfied in different ways with respect to different statements. Statements in the
> form of 'tests show x' are literally false if tests do not establish 'x.' But more
> general comparative claims can only be proven false by affirmative evidence of
> falsity.

*BASF*, 41 F.3d at 1091 (citing *Castrol Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir.

1992)). The court went on to hold:

> that a Lanham Act plaintiff bears the burden of proving literal falsity, but that the
> proof sufficient to meet this burden will vary depending upon the statement made.
> If the challenged advertisement makes implicit or explicit references to tests, the
> plaintiff may satisfy its burden by showing that *those tests* do not prove the
> proposition; *otherwise*, the plaintiff must offer affirmative proof that the
> advertisement is false.

*BASF*, 41 F.3d at 1091 (emphasis added). Dyson reads the "otherwise" as meaning "if the tests

prove x" then plaintiff can still prove falsity with affirmative evidence.

The court disagrees with Dyson. If the evidence required to prove falsity is, as the Seventh Circuit says, to meet the substance of the claim, then a claim that the "test proves x' is literally false *only* if the test does not (reliably) prove x. *See C.B. Fleet Co., Inc. v. SmithKline Beecham Consumer Healthcare, LP*, 131 F.3d 430, 435 (4th Cir. 1997) ("When an advertising claim of favorable fact either expressly or impliedly asserts that the fact is test or study-validated, the fact of the validation becomes an integral and critical part of the claim. Such a claim may therefore be proven literally false by showing only that the test asserted to validate it did not in fact do so."); *Johnson & Johnson Vision Care v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1248 (11th Cir. 2002) ("To prove an establishment claim literally false, the movant must 'prove that these tests did not establish the proposition for which they were cited.'") (citing *Quaker State*, 977 F.2d at 63); *cf. Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp.2d 963, 972 (2010) (questioning whether a showing that tests are unreliable should be considered sufficient to establish falsity and worrying that such proof could "lead[] to a conclusion that a statement in the form of 'test shows x' is literally false even if the test *really does* show x") (emphasis in original).

A critical part of the advertisements Dyson challenges is that independent tests prove the claim. The court cannot agree that a claim that 'tests prove x' could be literally false when the tests do, in fact, prove x. Here, it is undisputed as of December 2014, Shark had valid independent tests that showed its statements (that the Rotator Powered Lift-Away vacuums cleaned better than the DC65) were true. That Dyson conducted other tests that reached a different conclusion does not make Shark's statements about its tests false.

Because Dyson has not put forth sufficient evidence from which a reasonable jury could find in its favor on its false advertising claims for the period beginning December 2014, the court grants Shark's motion for summary judgment as to that time period.

**D.      Dyson's Motion for Summary Judgment on Shark's Affirmative Defenses**

Finally, Dyson moves for summary judgment with respect to four of Shark's affirmative defenses: laches, unclean hands, estoppel and waiver.

**1.      Laches**

With respect to its laches defense, Shark argues that Dyson intentionally slept on its rights to sue.  According to Shark, Dyson knew by the fall of 2014 that it had an actionable claim for false advertising against Shark but waited until the day before Thanksgiving that year to file suit.  Shark argues that the timing was designed to disrupt the busy holiday shopping season that was set to begin two days later (if not sooner).  Dyson seeks summary judgment on this defense.

To establish the defense of laches, plaintiff must show: "(a) an unreasonable lack of diligence by the party; and (2) prejudice arising therefrom." *Hot Wax*, 191 F.3d at 820.  It is hard to see how a delay of a few months or a strategic decision to sue before a busy shopping season demonstrates a lack of diligence.  In any case, Shark has put forth no evidence of prejudice.  Because Shark has not put forth sufficient evidence from which a reasonable jury could find in its favor on its laches defense, the court grants plaintiff Dyson summary judgment on defendant's laches defense.

**2.      Unclean hands**

Dyson also seeks summary judgment on Shark's unclean hands affirmative defense. As the Seventh Circuit has described it:

> [t]he doctrine of 'unclean hands'–colorfully named, equitable in origin, and reflecting, in its name at least, the moralistic background of equity . . . during the middle ages–nowadays just means that equitable relief will be refused if it would give the plaintiff a wrongful gain.

*Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1021 (7th Cir. 2002). The parties agree that unclean hands applies only "where there is a direct nexus between the bad conduct and the activities sought to be enjoined." *Intertek USA Inc. v. AmSpec, LLC*, Case No. 14 CV 6160, 2014 WL 4477933 at *7 (N.D. Ill. Sept. 11, 2014).

Shark argues that Dyson has unclean hands due to Dyson's continued use of the phrase "Twice the Suction" to describe its vacuums after that claim became stale. The court cannot agree that the doctrine of unclean hands applies to this case. First, as Dyson points out, the conduct does not arise out of the same transaction from which this case arises. This case is about statements Shark made about Shark vacuums, while Dyson's hands are supposedly unclean due to statements Dyson made about Dyson vacuums, i.e., a different transaction. That alone is reason enough to grant Dyson summary judgment on Shark's unclean hands defense.

The court has an additional reason, too. Unclean hands is an equitable doctrine, and applying it here would not be just. The conduct about which Shark complains in its affirmative defense is conduct the parties are already fighting about in another lawsuit. To apply the unclean hands doctrine here (or there) would leave the alleged wrongs without remedy. It is better that each party attempt to prove its claims on the merits in its forum. For that additional reason, the court concludes that Shark's unclean hands defense must fail as a matter of law. *See Nestle Purina Petcare Co. v. The Blue Buffalo Co., Ltd.*, Case No. 14 CV 859, 2016 WL 4272241 at *5

(E.D. Mo. Aug. 12, 2016) (rejecting an unclean hands defense, telling defendant to bring the claims separately and explaining, "I would also conclude that application of the doctrine as proposed would not do justice. . . . [C]ourts will not apply the doctrine where doing so would 'leave two wrongs at large[.]"); *cf. Frost v. Shipowners & Merchants Towboat Co., Ltd.*, 1974-1 Trade Cases P 75,121, 1974 WL 888 at *4 (N.D. Cal. June 18, 1974) ("alleged unlawful antitrust activity conduct on the part of the antitrust plaintiff does not form the basis of an affirmative defense, whether called 'unclean hands' or 'illegality,' but rather . . . such conduct must be attacked by a separate action").

Accordingly, the court grants Dyson's motion for summary judgment as to Shark's unclean hands affirmative defense.

### 3.       Estoppel and waiver

Finally, Dyson seeks summary judgment on Shark's estoppel and waiver affirmative defenses.  Shark argues that its defenses of estoppel and waiver are essentially the same.  With respect to both, Shark asserts that because Dyson has claimed its DC65 vacuum was its best vacuum that Dyson is now both judicially estopped from arguing that its Ball Multi-Floor is its best vacuum and has waived the right to argue that its Ball Multi-Floor is its best vacuum.  Dyson argues that it is entitled to judgment as a matter of law on these affirmative defenses.

The court need not wade into this debate, because these affirmative defenses are moot.  These affirmative defenses are asserted with respect to only one part of Dyson's claim:  that Shark falsely advertised that its vacuum was superior to Dyson's Ball Multi-Floor.  The court has already granted Shark judgment as a matter of law on that claim, so the affirmative defenses are moot.

Accordingly, the court dismisses as moot Shark's affirmative defenses of estoppel and waiver.

## IV.    CONCLUSION

For the reasons set forth above, the court denies Dyson's motion [386, 388] to supplement.  The court grants in part and denies in part Dyson's motion [313] for summary judgment.  The court grants Dyson summary judgment as to Shark's unclean hands and laches affirmative defenses.  The court dismisses as moot Shark's estoppel and waiver affirmative defenses.

The court grants in part and denies in part defendants' motion [402, 404] to supplement. Defendants' motion [357] for partial summary judgment is granted.  Defendants are granted summary judgment on Dyson's implied falsity claims.  Defendants are granted summary judgment on Dyson's claims that defendants falsely advertised the Rotator Powered Lift-Away vacuum as being better than Dyson's Ball Multi-Floor.  The court grants defendants summary judgment as to Dyson's false advertising claims for the time period beginning December 2014.

Date:  April 26, 2017                                    _____/s/_____
                                                        Joan B. Gottschall
                                                        United States District Judge

-34-