# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DYSON, INC., | ) |
| *Plaintiff*, | ) Case No.: 1:14-cv-09442 |
| v. | ) Judge: Hon. Gary S. Feinerman |
| SHARKNINJA OPERATING LLC and SHARKNINJA SALES COMPANY, | ) **JURY TRIAL DEMANDED** |
| *Defendants*. | ) |

## DYSON'S MOTION FOR JUDGMENT AS A MATTER OF LAW REGARDING SHARK'S CLEANABILITY BAR GRAPH AND APPORTIONMENT

Dyson moves, at the close of the evidence and pursuant to Fed. R. Civ. P. 50(a), for judgment as a matter of law. Despite having been fully heard, Shark has presented insufficient evidence for a reasonable jury to conclude that (1) Shark's "Bar Graph" claim in its infomercial was not a false advertisement under Section 43(a) of the Lanham Act, and (2) Shark's profits on the NV650 should be apportioned. Dyson requests that the Court issue judgment as a matter of law that Shark is liable for false advertising under the Lanham Act, and that Shark's profits may not be apportioned based on the alleged "drivers of demand" identified by Shark in this case.

## I.   LEGAL STANDARD

Under Rule 50(a), judgment as a matter of law should be granted if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). In a Rule 50(a) motion, "the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson*

*Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000).

## II. ARGUMENT

### A. Dyson Is Entitled To Judgment As A Matter Of Law That Shark's Bar Graph Is A False Advertisement

To prevail on Counts I, II, and III of its First Amended Complaint,[1] Dyson must prove: (1) that Shark made a false statement of fact in a commercial advertisement about its NV650; and (2) that Dyson has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.[2] *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999). In view of the evidence presented at trial, no reasonable jury could find that the infomercial portion displaying the carpet

---

[1] The parties agree that Dyson's state law claims, Counts II and III, rise and fall with its Lanham Act claim, Count I. (05/29/2018 9:37 pm M. New email to L. Ross.)

[2] *Hot Wax* sets out five elements that a plaintiff must prove to establish false advertising liability: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." 191 F.3d at 819. Here, Shark does not challenge factors (2)–(4). (*See* Dkt. 707 at 3 ("The parties agree that the second and fourth factors are inapplicable in this case."); *id.* at 3 n.1 ("With the Court's determination that the period of alleged liability begins on August 25, 2014, SharkNinja submits that the third factor is also no longer at issue.").) In its Renewed Motion for Directed Verdict, Shark purports to contest materiality. (Renewed Motion at 3 n.1.) Shark's backpedaling should be rejected. ***First***, Shark admitted in a document filed with the Court that this factor "is … no longer at issue." (Dkt. 707 at 3 n.1.) ***Second***, Shark stated to the U.S. District Court for the District of Massachusetts that "Suction ***and, relatedly, cleaning ability are the raisons d'etre for a vacuum cleaner***, and as such, the materiality of the ['Twice the Suction'] claim is presumed." *SharkNinja Operating LLC v. Dyson, Inc.*, No. 1:14-cv-1372, Dkt. 173 at 11 (D. Mass. Feb. 29, 2016). ***Third***, the evidence shows that Shark's claim that its vacuum cleaner "cleans carpets better" than Dyson's DC65 was "likely to influence the purchasing decision." (*See, e.g.*, (Trial Tr. (Barrocas) at 1253:8- 1254:4 (describing carpet cleaning as a "very important" aspect of a vacuum cleaner); Trial Tr. (Rosenzweig) at 1690:3-18 (admitting that Shark thought the claim would be "impactful to consumers"); *see also* Trial Tr. (Bilger) at 730:17 – 731:1.)

2

cleanability bar graph—which claims that independent lab tests show that Shark's NV650 out-cleaned the Dyson DC65 by a margin of 42 grams to 37 grams ("Bar Graph")—does not constitute false advertising. Further, based on the evidence presented, no reasonable jury could find that this false claim did not harm Dyson.

### 1. The Bar Graph Was A False Statement Of Fact

Shark tells consumers that "independent lab tests prove" that the Shark Rotator Powered Lift-Away actually deep cleans carpets better than "the latest $600 Dyson" and simultaneously displays the Bar Graph purporting to show the alleged *extent* to which the Shark cleans better. (*See* TX-13 at 11:16-19; TX-12 at 10:03-10:15; TX-11 (screenshot of Bar Graph from TX-12).) Specifically, the Bar Graph purports to show the results of a carpet cleaning test where the NV650 picked up 42 grams of dirt, as compared to the DC65's 37 grams of dirt:



(*Id.*)[3] Mr. Rosenzweig's voiceover and the visually contemporaneous Bar Graph inform consumers

---

[3] Shark's counsel has suggested that this claim is not a "literal falsity" claim, but rather would only be impliedly false, because according to Shark's counsel the Bar Graph "didn't on its face claim to be based on independent testing." (Trial Tr. 2527:19-22.) Setting aside that this argument cannot pass the straight-face test, it is demonstrably wrong. The infomercial itself states "independent lab tests prove" and the exact same time the Bar Graph is displayed. It is

3

that independent lab tests proved the NV650's carpet-cleaning superiority over the DC65 to the specific and substantial degree represented in the graph itself. The evidence has shown *without question* that the Bar Graph was a false statement of fact.

*First*, as quoted above, the advertisement says that the Bar Graph claim is based on independent lab tests. That is indisputably false. In fact, Mr. Rosenzweig admitted that "[t]here's *no doubt* this is wrong." (Trial Tr. (Rosenzweig) at 1783:12–13 (emphasis added).) Shark witnesses testified that the data that Shark relied upon to generate and produce the Bar Graph was actually the result of *internal*—as opposed to "independent"—testing conducted by Shark itself. For example, Shark's director of testing, Karyn Medler, admitted after watching the Bar Graph segment of Shark's infomercial that the Bar Graph was not based on independent testing but was instead "supported from internal testing." (Trial Tr. (Medler) at 814:8–16.) Shark's former general counsel, Jennifer McCabe, who was responsible for reviewing and approving Shark's infomercial, confirmed that the Bar Graph was never supported by independent tests. (Trial Tr. (McCabe) at 1947:2-4.)

*Second*, and importantly, the actual third-party testing that Shark received from Intertek *contradicts* the internal testing that Shark relied on to support its Bar Graph, and actually shows that the DC65 *outperformed the NV650* on the one carpet panel Shark used in creating the Bar Graph (*i.e.*, multi-level carpet). (*Cf.* TX-129 (resulting in an average 50.8 geomean for the DC65 on multi-level carpet) *with* TX-127 (resulting in an average 46.3 geomean for the NV650 on multi-

---

clear and unambiguous that Shark is telling consumers that "independent lab tests prove" the NV650 outcleaned Dyson by a margin of 42 to 37 grams. As Shark's counsel is well-aware, advertisements must be considered in their full context. (Dkt. 526 at 1 (Shark's motion *in limine* No. 10 to exclude certified transcripts of its own infomercials because "[a]dvertisements must be considered in their entirety") (quoting *Aronberg v. F.T.C.*, 132 F.2d 165, 167 (7th Cir. 1942).)

4

level carpet).) In other words, the "independent" tests that Shark refers to in the advertisement show that the DC65 actually picked up more dirt than Shark's NV650 on the carpet reflected in Shark's Bar Graph, a fact that both Ms. Medler and Mr, Rosenzweig admitted. (Trial Tr. at 815:6–10; 1690:22–1691:18.) Shark's statement that the independent lab tests "prove without question" that the NV650 removed 42 grams of dirt and the DC65 removed 37 grams of dirt from multi-level carpet is false.

In view of this unqualified testimony from Shark's head of testing, its former General Counsel, and its CEO that the Bar Graph is based on internal, not "independent," tests, and in view of the Intertek test reports that contradict the Bar Graph, no reasonable jury could find that the Bar Graph was true.[4]

### 2. *Dyson Has Been Injured As A Result Of The Bar Graph*

Shark does not dispute that its carpet-cleaning claim, as presented in graphical form, is harmful to Dyson. Indeed, Mr. Rosenzweig admitted that it "would be impactful to consumers" to "show visually the amount of dirt that we each pick up" so that "the consumer could see it." (Trial Tr. (Rosenzweig) at 1690:3–18.) And, of course, as both logic and the testimony of Shark's President confirm, carpet cleaning is one of the principle performance criteria for a vacuum cleaner. (Trial Tr. (Barrocas) at 1253:8-13; *see also* Trial Tr. (Rosenzweig) at 1690:3-18 (admitting that Shark thought the claim would be "impactful to consumers"); Trial Tr. (Bilger) at

---

[4] There is no dispute that the Bar Graph was shown in a commercial advertisement. As noted above, Shark included the Bar Graph in its infomercial, which Shark admits it caused to run nationwide. (TX 11 (screenshot); *see also* TX 12 at 10:03–10:15 (video segment); Trial Tr. (Barrocas) at 1519:18-20 (admitting that the infomercial "ran hundreds of times in the fourth quarter of 2014"). Shark witnesses also admit that the Bar Graph ran on television for at least a month and on Shark's webpage and Shark's YouTube channel throughout the liability period. (Trial Tr. (Rosenzweig) at 1893:4-8 ("[T]he commercial was taken down 30 days afterwards."); Trial Tr. (McCabe) at 1943:14-18.)

5

730:17 – 731:1 (cleanability claims are impactful).)

Nor could Shark dispute that its carpet-cleaning superiority claims, including the Bar Graph, are likely to and have harmed Dyson. Dyson has offered substantial evidence that it was injured as a result of Shark's infomercial, by direct diversion of sales from Dyson to Shark, and by a loss of goodwill associated with its products. Specifically, then-President of Dyson, Mr. Ed Culley, explained that Dyson "lost 2.4 percentage points" of market share in "the fourth quarter of 2014" immediately following the launch of Shark's advertising campaign. (Trial Tr. at 438:19–23; TX-353 at Dyson_IL12533.) Despite a slight decline in upright sales from 2011 to 2013 (10.1% market share vs. 9.7% market share), Dyson suffered a "drastic ... fall" in market share in November 2014, "dipp[ing] to 7.9 percent market share." (Trial Tr. (Culley) at 439:6-18; TX-353 at Dyson_IL12533 ("Our 12 month share data is now showing a steeper decline at the expense of our lead competitor Shark."); *id.* at 427:21-428:2 (testifying that "there had been a long-term decline in our upright business, and I would say it was a gradual decline over the last few years, but what I was trying to say was we'd seen a sudden acceleration of that decline"); *see also* TX-334 at Dyson_IL5236.) Further, "[i]n the three months ending October 2014 Dyson registered 6.5% volume share, the lowest quarter on record." (TX-353 at Dyson_IL12533.) These sharp declines occurred despite (1) "[a] record level of Dyson Investment in Black Friday 2014: $12M in November 2014 vs. $8M in November 2013"; (2) "[m]ore competitive pricing at Black Friday versus prior year"; (3) "[n]o loss of distribution and high levels of retail execution" in 2014; and (4) additional price promotions. (*Id.*)

Additionally, Dyson's vice president of marketing, Clare Dunbar, testified that Shark's false cleanability claim "impacted [Dyson] in a number of ways." (Trial. Tr. at 1160:19–1161:6.) Specifically, Ms. Dunbar established that Dyson's "market share started to drop when that claim

6

came out on the market," that sales of the DC65 "started to drop off." (Trial Tr. (Dunbar) at 1160:19-1161:6.) In addition to harm to Dyson's sales, Ms. Dunbar testified about the "impact of those claims on the overall Dyson reputation." (*Id.* at 1161:3-6.) A third-party brand health study conducted by BrainJuicer in 2014 shows that Shark's carpet-cleaning superiority claim harmed Dyson and led consumers to believe that Dyson's products are "overpriced." (*Id.* at 1170:21-1171:9.)

In short, the evidence proved without question that Shark's Bar Graph is false, and it caused harm to Dyson. Dyson is entitled to judgment as a matter of law on this advertisement.[5]

### B. Shark Has Not Introduced Legally Sufficient Evidence To Meet Its Burden On Apportionment Of Profits

If Shark is found liable for false advertising, Dyson "shall be entitled … subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by [Dyson], and (3) the costs of the action." 15 U.S.C. § 1117(a). In this case, Dyson seeks disgorgement of Shark's profits.[6]

"In assessing profits the plaintiff shall be required to prove defendant's sales only; ***defendant must prove all elements of cost or deduction claimed***." *Id.* Consistent with this clear statutory mandate, the Seventh Circuit has held that "the plaintiff is required to present proof of the infringer's gross revenues, **with the burden on the infringer** to establish any deductions for expenses or to demonstrate that the profits introduced by the plaintiff were … not attributable to infringing use under the Lanham Act" or, in this case, to false advertising. *Roulo v. Russ Berrie*

---

[5] Per the Court's request, Dyson will provide a proposed modified jury instruction to be used if the Court grants this portion of Dyson's motion.

[6] "Profits are awarded under different rationales including unjust enrichment, deterrence, and compensation," and Dyson may properly recover under any of these theories. *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 941 (7th Cir. 1989).

*& Co., Inc.*, 886 F.2d 931, 940-41 (7th Cir. 1989). This burden includes proving any apportionment of profits based on sales of the product due to something other than the false claim. *Rexall Sundown, Inc. v. Perrigo Co.*, 707 F. Supp. 2d 357, 359 (E.D.N.Y. 2010) (noting that "[c]ase law applying § 1117(a) also supports requiring the defendant to prove any apportionment. Numerous cases have placed this burden on the defendant" and holding that defendant "bears the burden of apportionment" in false advertising cases) (collecting cases); *see also WMS Gaming Inc. v. WPC Productions Ltd.*, 542 F.3d 601, 608-09 (7th Cir. 2008) ("The burden was therefore on [defendant] to show that certain portions of its revenues ... were not obtained through its infringement of [plaintiff's] marks."). Consistent with this legal framework, the Court's proposed jury instruction on "Remedy – Profits" states: "SharkNinja bears the burden of proving that factors other than its false advertising resulted in its profits." (Dkt. 713, Court's Draft 6/7/2018 10:30 pm.)

Shark has not introduced evidence to meet its burden of proving apportionment. Shark—through its expert, Dr. Matthew Lynde and its President, Mark Barrocas—has done nothing more than identify a handful of factors that could potentially drive sales of a product, without identifying any evidence that would allow the jury to determine to what extent, if any, sales of the NV650 specifically were due to those factors and not attributable to the false advertising. Indeed, the testimony offered by Dr. Lynde and Mr. Barrocas amounts to nothing more than speculation, and that is insufficient for Shark to meet its burden of proof. *Neurovision Medical Prods., Inc. v. NuVasive, Inc.*, No. CV 09-6988 DSF (JEMx), 2014 WL 12544830, at *9–10 (C.D. Cal. Aug. 5, 2014) (rejecting defendant's expert opinion that 3.5% of defendant's profits were attributable to the use of the infringing mark where defendant's expert offered the "highly speculative" opinion that defendant's revenue was due to noninfringing factors such as "marketing, research and

development, etc."); *see also Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 64 (1st Cir. 2008) ("Venture met its burden by introducing tax returns showing Venture's [sic, McGills'] gross sales over the relevant time period. McGills then had the burden of producing evidentiary documentation that some of those sales were unrelated to and unaided by McGills' illicit use of Venture's marks. The company produced no such evidence."); *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1539 (2d Cir. 1992) ("Under this rule, profits from defendant's proven sales are awarded to the plaintiff unless the defendant can show 'that the infringement had no relationship' to those earnings. This shifts the burden of proving economic injury off the innocent party, and places the hardship of disproving economic gain onto the infringer.") (citations omitted).[7]

***First***, Dr. Lynde testified that four alleged "demand drivers" could have driven sales of the NV650 (in addition to the false advertising claim): (1) price (or "product proposition"); (2) product reviews; (3) brand recognition; and (4) retailer advertising and promotions. (Trial Tr. (Lynde) at 2423:13-2424:21.) But Shark did not introduce any evidence establishing that any portion of its profits is actually attributable to these "drivers" as opposed to the false advertising claim. Dr. Lynde admits that he has not done any analysis—and was unable to do any analysis—to

---

[7] The Court questioned "[h]ow do you distinguish this from a case involving [] pain and suffering damages where it doesn't have to be calculated." (Trial Tr. at 2520:2-4.) Here, the damages relief is statutory, 15 U.S.C. § 1117(a), and the burden is expressly placed upon defendant to establish that "that the profits introduced by the plaintiff were … not attributable to infringing use under the Lanham Act." (*Id.*) That is an inherently objective inquiry—indeed, economic modeling or consumer surveys can be done to show this amount. (Trial Tr. (Lynde) at 2476:24-2478:7.) In contrast, "[p]inning dollar amounts to suffering is inherently subjective, and peculiarly within the province of the jury." *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 832, 853 (2d Cir. 1992); *accord Waldorf v. Shuta*, 142 F.3d 601, 623 (3d Cir. 1998) ("The determination of an appropriate award for pain and suffering is inherently subjective."); *Knight v. Texaco, Inc.*, 786 F.2d 1296, 1301 (5th Cir. 1986) (recognizing that "a pain and suffering award 'is inherently subjective in large part, involving the interplay of experience and emotions as well as calculation'").

demonstrate how the four alleged "demand drivers" could be used to apportion profits in this case:

> Q. [S]ir, you have not formed a conclusion about what the quantitative values of the relevant drivers of demand are for the Powered Lift-Away, have you?
>
> A. That is correct. I have not.
>
> ...
>
> Q. And, sir, with respect to the drivers of demand you have identified to the jury, ***you do not provide any analysis of how those demand drivers can be used to apportion profits, do you?***
>
> A. ***That is correct. I was unable to do so from the surveys provided to me***.
>
> …
>
> Q. Well, sir, you have not provided any quantitative conclusion about the portion of profit if any that would be attributed to the challenged claim, correct?
>
> A. That is correct.

(*Id.* at 2483:16-19; 2489:16-21; 2490:2-5.) Indeed, he is unaware of any evidence that would permit him to make such a calculation. (*Id.* at 2478:23-2479:3 ("Q. [Y]ou knew that if you wanted to actually show or explain to this jury why customers bought or didn't buy the product and was it because of the ad claim or something else, you needed some data to back that up, right? A. Yes. As I explained for demand model, it requires a great deal of differential data, which didn't exist.").) As such, his opinions on this issue cannot support any apportionment, and courts facing such attempted speculative "apportionment" have rejected it. *See, e.g.*, *Hi Ltd. P'ship v. Winghouse of Fla., Inc.*, No. 6:03–cv–116, 2004 WL 5486964, at *4–5 (M.D. Fla. Oct. 5, 2004) (excluding as "highly speculative and unreliable" an expert opinion on apportionment of profits where the expert "identified what [he] thought were the more important financial operational factors" but admitted, *e.g.*, that he could not state that any factor "contributes to X percent of WingHouse profits").

***Second***, Shark's apportionment theory relies on two surveys, as well as Dr. Lynde's testimony about a one-page summary of a study by NPD. Critically, none of these studies are

10

directed to the NV650 vacuum at issue in this case. Instead, Dr. Lynde relies on (1) an in-house Shark survey done for a stick vacuum (HV300) that is in a different category and sells for significantly less money than the NV650 (TX-316; Trial Tr. (Lynde) at 2479:12-2480:3); (2) a JD Power survey regarding Shark's entire upright vacuum cleaner line up, which includes multiple SKUs at various price points and for which Dr. Lynde knows neither the questions asked of respondents nor the timeframe of the survey (TX-768; Trial Tr. (Lynde) at 2489:9-13); and (3) NPD data related to the entire vacuum cleaner market—which includes uprights, stick vacuums and canister vacuums—from 2011 to 2015 (Trial Tr. (Lynde) at 2488:10-2489:8). Despite relying on and discussing these surveys, Dr. Lynde admitted that he is not aware of *any* data, quantitative or qualitative, showing the reasons why consumers purchased the NV650:

> Q: Were you asked this question and did you give this answer:
>
> "Are you aware of any quantitative or qualitative data showing the reasons why consumers purchase the Shark Rotator Powered Lift-Away?
>
> "A. I'm not aware of any evidence exactly like that."
>
> Were you asked that question and did you give that answer?
>
> A. Yes.
>
> Q. Were you also asked if you relied on any such evidence in reaching your opinions in this case, and you said you had not?
>
> A. That's what I said, yes.
>
> Q. Under oath in your deposition, correct?
>
> A. Yes.

(*Id.* at 2482:25-2483:15; *see also id.* at 2485:17-21 ("Q. But you are not aware and you haven't seen any consumer study showing why consumers purchased the Shark Rotator Powered Lift-Away. True? A. I have not.").)

*Third*, Dr. Lynde further admitted that he is well-aware of the fact that surveys assessing

11

drivers of demand for particular products are often done in false advertising cases. (*See* Trial Tr. (Lynde) at 2476:24-2477:2 (admitting that "in a lot of cases … it is done through a survey of consumers of the actual product … if the information is available"); *id.* at 2477:5-17 (admitting that parties may hire a survey expert to show consumers the box with and without the claim to analyze impact of the claim); *id.* at 2477:18-2478:1 (admitting that it is possible to "ask those people [who actually purchased the product at issue] in this lawsuit why you did purchase it").) Here, despite knowing that such studies are applicable and appropriate in litigation matters, and despite admitting that the surveys he does rely on are insufficient to assess the factors impacting purchasing decisions for the NV650, Dr. Lynde admitted that there is no actual survey of NV650 purchasers in this case. *Id.* at 2478:2-7 ("Q. And you know that in this case Shark hasn't relied upon or presented anyone here with a survey of its actual NV650 customers to say, we have asked, and here is why they bought the product. That does not exist in this case, does it? A. Not to my knowledge. It was not provided to me.").) Shark could have—and should have—commissioned such a study if it wished to support an apportionment argument, but it did not. Alternatively, as an economist, Dr. Lynde could have attempted to construct a demand model to demonstrate which proportion of Shark's sales of the NV650 are attributable to factors other than the false advertising claim, such as, for example, price. But Dr. Lynde testified that he did not do so because "it requires a great deal of differential data which didn't exist." (*Id.* at 2478:23-2479:3.)

In short, the evidence that Shark has submitted does not support any apportionment of Shark's profits for the NV650, because none of that information relates to the NV650 specifically and none of the data has any bearing on which portion, if any, of Shark's profits *for the NV650*

resulted from factors other than the false advertising claim.[8]

### III. CONCLUSION

For the foregoing reasons, Dyson respectfully requests that the Court enter judgment as a matter of law that Shark's Bar Graph constitutes false advertising in violation of the Lanham Act, and that Shark has not established its entitlement to any apportionment of damages.

---

[8] During his testimony, Dr. Lynde suggested that Dyson's damages expert, Julie Davis, agreed with him that other alleged "demand drivers" ***actually*** drove sales of the Rotator Powered Lift-Away. (*See* Trial Tr. (Lynde) at 2509:8-14 ("I think she agreed with me that these other factors are indeed part of the drivers of are demand.").) Ms. Davis agreed, generally, that other factors ***could have*** driven sales, but explained that no one in this case has actually quantified that to prove it. (*See* Trial Tr. (Davis) at 1322:25-1323:3 ("Q. And each of those factors could have driven sales in this case for the NV650; isn't that correct? A. It's possible. To my knowledge, no one has quantified that.").) It was Shark's burden to do so, 15 U.S.C. § 1117(a), and Shark has not offered any evidence to meet that burden.

Dated: June 9, 2018                                    Respectfully submitted,


                                                By: */s/ Megan M. New*
                                                    Robin A. McCue (IL Bar No. 6256551)
                                                    rmccue@kirkland.com
                                                    Megan M. New (IL Bar No. 6300442)
                                                    megan.new@kirkland.com
                                                    Brian A. Verbus (IL Bar No. 6314193)
                                                    brian.verbus@kirkland.com
                                                    Greg Polins (IL Bar No. 6309928)
                                                    KIRKLAND & ELLIS LLP
                                                    300 North LaSalle
                                                    Chicago, Illinois 60654
                                                    Telephone:  (312) 862-2000
                                                    Facsimile:  (312) 862-2200

                                                    Gregg F. LoCascio, P.C. (admitted *pro hac vice*)
                                                    glocascio@kirkland.com
                                                    KIRKLAND & ELLIS LLP
                                                    655 Fifteenth Street, N.W.
                                                    Washington, D.C. 20005-5793
                                                    Telephone:  (202) 879-5000
                                                    Facsimile:  (202) 879-5200

                                                    *Counsel for Plaintiff Dyson, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2018, the foregoing document was filed electronically through the Court's Electronic Case Filing System.  Service of this document is being made upon all counsel of record in this case by the Notice of Electronic Filing issued through the Court's Electronic Case Filing System on this date.


By: */s/  Megan M. New*