**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DYSON, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No. 1:14-cv-09442 |
| v. | ) | |
| | ) | Judge: Honorable Gary Feinerman |
| SHARKNINJA OPERATING LLC and | ) | |
| SHARKNINJA SALES COMPANY, | ) | |
| | ) | |
| *Defendants*. | ) | |

## <u>DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW</u>

# TABLE OF CONTENTS

**Page**

LEGAL STANDARD.................................................................................................. 1

ARGUMENT .......................................................................................................... 1

I.     SHARKNINJA'S STATEMENTS WERE NOT LITERALLY FALSE ......................... 2

     A.     No Reasonable Jury Could Conclude That SharkNinja's Representation of Independent Testing Was Literally False .............................. 3

     B.     No Reasonable Jury Could Conclude That SharkNinja's Representation That Testing Was Done In Compliance With ASTM Standards Was Literally False ....................................................... 5

II.    THE GRAMS GRAPHIC IS NOT LITERALLY FALSE AS A MATTER OF LAW ...................................................................................................... 8

     A.     Because the Grams Graphic Is (At Worst) Ambiguous, No Reasonable Jury Could Have Found It Literally False.............................. 8

     B.     Dyson Proved No Injury As A Result Of The Grams Graphic........................... 10

III.   DYSON IS NOT ENTITLED TO ANY RECOVERY OF DAMAGES ....................... 11

     A.     SharkNinja Proved Its Incremental Profits For The Relevant Time Period Were Less Than Zero, And Dyson Failed To Rebut That Evidence .................. 11

     B.     No Rational Jury Could Have Returned A Damage Verdict Of $16,410,681.................................................................................... 13

CONCLUSION...................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

**CASES**

BASF Corp. v Old World Trading Co.,
    41 F.3d 1081 (7th Cir. 1994) ...............................................................................2, 3, 6

Borden, Inc. v. Kraft, Inc.,
    1984 WL 1458 (N.D. Ill. Sept. 28, 1984) ..............................................................10

Boyle v. United Techs. Corp.,
    487 U.S. 500 (1988)....................................................................................................1

Castrol, Inc. v. Quaker State Corp.,
    977 F.2d 57 (2d Cir. 1992)...................................................................................3, 6, 9

Cream Records, Inc. v. Jos. Schlitz Brewing Co.,
    754 F.2d 826 (9th Cir. 1985) ..................................................................................15

Edge Games, LLC v. Houghton Mifflin Harcourt Publ'g Co.,
    2015 WL 3498607 (C.D. Cal. June 2, 2015) ......................................................12, 13

In re Century 21-Re/MAX Real Estate Advertising Litig.,
    882 F.Supp. 915 (C.D. Cal. 1994) .........................................................................10

Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.,
    299 F.3d 1242 (11th Cir. 2002) ..............................................................................6

Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.,
    428 F.3d 706 (7th Cir. 2005) ...............................................................................3, 8

L&F Prods. v. Procter & Gamble Co.,
    845 F. Supp. 984 (S.D.N.Y. 1994) .........................................................................6

Not Dead Yet Mfg. Inc. v. Pride Solns., LLC,
    265 F. Supp. 3d 811 (N.D. Ill. 2017) ...................................................................10

Novartis Consumer Health, Inc. v. Johnson & Johnson—Merck Consumer
    Pharms. Co.,
    290 F.3d 578 (3d Cir. 2002)..............................................................................3, 8, 9

*Roulo v. Russ Berrie & Co.*,
    886 F.2d 931 (7th Cir. 1989) .........................................................................11, 15

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
    930 F. Supp. 753 (E.D.N.Y. 1996) .......................................................................6

*Schering-Plough Healthcare Prods. Inc. v. Schwarz Pharma, Inc.*,
    586 F.3d 500 (7th Cir. 2013) ....................................................................... passim

*Scotts Co. v. United Indus. Corp.*,
    315 F.3d 264 (4th Cir. 2002) .......................................................................2, 8, 9

*Sheehan v. Donlen Corp.*,
    173 F.3d 1039 (7th Cir. 1999) .............................................................................1

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
    106 F.2d 45 (2d Cir. 1939), *aff'd*, 309 U.S. 390 (1940) ..................................14, 15

*Skil Corp. v. Rockwell Int'l Corp.*,
    375 F. Supp. 777 (N.D. Ill. 1974) ........................................................................8

*United Indus. Corp. v. Clorox Co.*,
    140 F.3d 1175 (8th Cir. 1998) .........................................................................9, 10

**OTHER AUTHORITY**

Fed. R. Civ. P. 50 ............................................................................................... passim

## EXHIBIT CROSS-REFERENCE

| Bradley Declaration Exhibit No. | Trial Exhibit No. |
|---|---|
| A | Cited Pages from Trial Transcripts ("Tr.") |
| B | 9 |
| C | 13 |
| D | 89 |
| E | 110 |
| F | 127 |
| G | 128 |
| H | 129 |
| I | 149 |
| J | 316 |
| K | 327 |
| L | 334 |
| M | 519 |
| N | 523 |
| O | 525 |
| P | 529 |
| Q | 530 |
| R | 531 |
| S | 532 |
| T | 549 |
| U | 562 |
| V | 661 |
| W | 680 |
| X | 688 |
| Y | 690 |
| Z | 694 |
| AA | 701 |
| AB | 705 |
| AC | 722 |
| AD | 727b |
| AE | 759 |
| AF | 768 |
| AG | 784 |
| AH | 809 |

In this Lanham Act case, where liability is premised strictly on a claim of "literal falsity"—defined by the Seventh Circuit as "a bald-faced, egregious, undeniable, over the top" lie, *Schering-Plough Healthcare Prods. Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009)—defendants ("SharkNinja") move for judgment as a matter of law, or "JMOL." Dyson failed to present sufficient evidence from which a reasonable jury could find that the challenged establishment claim was literally false: The undisputed trial evidence shows that the Intertek tests were conducted both in an independent manner, and in compliance with the ASTM F608 standard. Moreover, the combination of two literally true statements (here, the literally true voiceover based on the Intertek testing, and the literally true "Grams Graphic" based on internal testing) cannot yield a "literally false" statement, as a matter of law. Finally, Dyson is not entitled to any disgorgement of profits because SharkNinja proved its incremental profits for the liability period were zero. Therefore, SharkNinja requests that the Court issue judgment as a matter of law that SharkNinja did not violate § 43(a) of the Lanham Act, and that Dyson is not entitled to any damages.

## LEGAL STANDARD

The role of the Court on Rule 50(b) is to test "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict" as a matter of law. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043-44 (7th Cir. 1999). The Court is obligated to apply the correct law, and in so doing is not limited by the law as given in the jury's instructions. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 514 (1988).

## ARGUMENT

None of the evidence in this case—none of it—proves a case of "literal falsity" under the Lanham Act. Indeed, Dyson's theory of the case has long sought to flip the Lanham Act on its head. Here, the statement that "independent tests show that the NV650 cleans carpets better than the Dyson DC65" is not *literally* false, and the Court so held when it granted summary judgment in SharkNinja's favor that the Intertek testing was both independent and valid for the period beginning December 15, 2014. (Dkt. No. 424 at 27, 30-31.)

That statement was also literally true for the period prior to that, because Intertek's July-August 2014 tests (Exs. F-H) (and the settings used therein, which were identified in Ms. Medler's July 2014 responsive e-mails (Exs. AG, AA) and memorialized in the December 15 manual change (Dkt. 359-6, p. 7 note)) confirm that the challenged statements were indeed accurate—and certainly not "literally false."[1]  It would defy logic, the Congressional intent behind the Lanham Act, and First Amendment principles if the *same* Intertek tests that were not literally false post-December 2014 could sustain this jury verdict of literal falsity.  Shark Ninja's statements were not literally false then; they are not literally false now; and they provide no basis for multimillion-dollar liability.  The verdict should be set aside, and JMOL for SharkNinja granted.

## I.    SHARKNINJA'S STATEMENTS WERE NOT LITERALLY FALSE

The Court need not be reminded that this case went to the jury strictly on a theory of *literal falsity*.  As this Court instructed the jury, the challenged statements could be found "literally false" *only* if the tests SharkNinja relied upon were not conducted "in an independent manner" or not "in compliance with the ASTM F608 standard."  (Tr. 2616:21-2617:5.)  *See also BASF Corp. v Old World Trading Co.,* 41 F.3d 1081, 1091 (7th Cir. 1994) ("If the challenged advertisement makes implicit or explicit references to tests, the plaintiff may satisfy its burden by showing that the tests do not prove the proposition; otherwise, the plaintiff must offer affirmative proof that the advertisement is false.").  Dyson's case did not show that the ASTM F608 tests "do not prove the proposition"; it was instead focused on trying to show that the Intertek testing did not follow every jot and tittle of the ASTM standard.  But that is nowhere near enough to prove "literal falsity, which requires "a bald-faced, egregious, undeniable, over the top" lie.  *Schering-Plough*, 586 F.3d at 513.  *See also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 274 (4th Cir. 2002) ("In analyzing whether an advertisement . . . is literally false, a court must determine, first, the unambiguous claims made by the advertisement . . ., and second, whether those claims are false.") (quoting

---

[1] All citations are to the exhibits attached to the Declaration of Jessica D. Bradley being filed concurrently herewith.  Excerpts from the trial transcript are Bradley Decl. Ex. A and cited herein as "Tr.".

*Novartis Consumer Health, Inc. v. Johnson & Johnson—Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). "What the cases mean when they say that proof of literal falsity allows the plaintiff to dispense with evidence that anyone was misled or likely to be misled is that the seller who places *an indisputably false statement* in his advertising or labeling probably did so for a malign purpose . . .." *Schering-Plough*, 586 F.3d at 512-13 (emphasis added); *see BASF Corp.*, 41 F.3d at 1091 ("adopt[ing] the logic of [*Castrol Inc. v.*] *Quaker State* [*Corp.*, 977 F.2d 57, 63 (2d Cir. 1992)]," which "agreed that implicit establishment claims might give rise to liability *upon proof that the underlying data cannot support the stated proposition*") (emphasis supplied).

As the Court considers SharkNinja's JMOL motion, it should keep in mind that Dyson's case focused on trying to cast doubt upon the quality of (and the randomness of product sourcing for) the Intertek tests; Dyson presented no evidence that the SharkNinja vacuums in fact did not clean better on high suction than their own product, as shown by the Intertek tests. This is important: The high bar of proving "literal falsity" allows a plaintiff to "dispense with evidence that anyone was misled or likely to be misled." *Schering-Plough*, 586 F.3d at 512. But why would anyone have been misled by *accurate* claims of SharkNinja's better cleaning power? Accordingly, the Court should grant JMOL to SharkNinja. *See, e.g.*, *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 716 (7th Cir. 2005) (finding error in denying Rule 50 motion because "there is no evidence that [defendant] said anything dishonest or false to their customers.").

### A. No Reasonable Jury Could Conclude That SharkNinja's Representation of Independent Testing Was Literally False

As this Court held on summary judgment, "ASTM F608 *explicitly* allows testers to contact manufacturers." (Dkt. No. 424 at 21 (emphasis added).) Section 9.2.3.1 of ASTM F608 explicitly instructs testers that, if they view the instructions provided as either "unclear or inadequate," the proper protocol is to "contact the manufacturer." (Ex. I at 5.) Intertek followed this instruction and sought clarification: On July 13, 2014, Intertek's Mark Titus wrote to SharkNinja's Karyn Medler asking which setting to use for the testing. (Ex. AG.) Ms. Medler responded, on July 14, 2014, that all carpet cleaning should be in turbo setting. (*Id.*) Yet Intertek's confusion persisted.

So, on July 17, 2014, Intertek's Steven Reese wrote to Ms. Medler:

> I see that the NV651 has two carpet settings. Carpet & Thick Carpet, OMG, wait a second I just looked at the 651 again and see a problem. Look at the attached photos, 2 of the units show Carpet & Thick Carpet on the controls and 1 has Turbo & Carpets like the 650. Huh????

(Ex. AE.) Ms. Medler responded with the instruction to use the "Turbo" setting (*i.e.*, the "center setting" which was the same as the instructions in the Dec. 2014 manual which the court held literally true (Dkt. 359-6, p. 7 note ("For deep cleaning per ASTM F608 (embedded dirt in carpets) please set to CARPET/LOW PILE", i.e. the middle setting); Dkt. 424 at 27, 30-31), and concluded with: "Thank you and sorry for the confusion." (Ex. AA.)

Dyson's expert, Mr. Miller, agreed that these emails "confirm[] that there was some confusion" about which settings Intertek was to use. (Tr. 650:20-25 (regarding Ex AA).) Other evidence compounded the lack of clarity: The vacuums had different instructions on the handles (Ex. AE at 2-3; Ex. V at 6015), and Intertek was in possession of an instruction manual for the SharkNinja vacuums that was unclear and indeed self-contradictory (*see* Ex. Z at 54409 (instructing to use "TURBO CARPET" in step 2 for "upright cleaning") and mistakenly switched the instructions. (*See* Exs. W, X at 23621 (*cf.,* Ex. Z at 54409), Ex. Y; Tr. 904:23-906:3, 1073:8-1077:1, 1127:7-1128:25 (Reese confirming that Dep. Ex. 179 (Ex. X) is the manual Intertek had), 1444:18-1446:14, 2045:9-2050:12, 674:19-675:8 (Miller confirming that it would be incorrect to test LL and ML carpets on low suction).) Intertek was in fact confused—a point demonstrated by undisputed evidence—so it was not just allowed, but *required* by the ASTM F608 standard to contact SharkNinja for clarification. Intertek's Mr. Porter explained this: "If the instructions were unclear, then it would be absolutely appropriate and actually required for the technician to contact the manufacturer." (Tr. 2214:7-13.)

To show that the Intertek testing was not truly "independent testing," Dyson was required to prove not just that Intertek and SharkNinja had contact with each other (which was permissible, as a matter of law, under the ASTM standard), but "that Intertek was beholden to or controlled by Shark[Ninja]." (Dkt. No. 424 at 20.) Dyson offered no evidence that would allow a reasonable

jury to conclude that Intertek, an accredited, indisputably separate, $4-billion-a-year company that counted not just SharkNinja, but *Dyson* among its many customers, was "beholden to or controlled by" SharkNinja. (Tr. 2176:11-24, 2177:9-2183:3; Ex. AH.)[2] Dyson's evidence about Intertek's communications with SharkNinja regarding the proper vacuum settings shows only that the two entities followed the F608 standard by its terms; they do not show a lack of independence, as a matter of law.

**B.** **No Reasonable Jury Could Conclude That SharkNinja's Representation That Testing Was Done In Compliance With ASTM Standards Was Literally False**

Absent a showing of literal falsity with respect to the "independent testing" claim, Dyson, to prevail, would have had to have shown that Intertek's testing was "not conducted in compliance with the ASTM F608 standard." (Tr. 2617:3-5.) Its expert, Mr. Miller, agreed that Intertek "followed the procedure for running the tests" under ASTM F608. (Tr. 630:14-22.) Intertek's Mr. Porter also confirmed that Intertek's F608 testing for SharkNinja was both "valid" and independently conducted. (*Id.* at 2230:5-12; Exs. F-H, Tr. 2273:18-2274:6.)

Dyson, again, tried to pick apart the Intertek testing as not being in perfect compliance with the ASTM standard.[3] None of these criticisms meet the extremely high standard for "literal falsity" embraced by the Seventh Circuit: "A 'literal' falsehood is bald-faced, egregious, undeniable, over the top." *Schering-Plough, Inc.*, 586 F.3d at 513. It is not satisfied by picking

---

[2] To the extent Dyson alleges SharkNinja's conduct somehow usurped Intertek's independence, Ms. Susan Goldsmith, the president and managing director of IBR, testified that Dyson and its own lab, IBR—which Mr. Miller represented was an independent lab—regularly engages in the same conduct: "Q. So you don't run *any* F608 test without somebody telling you exactly what settings to use? A. Correct." (Tr. 2326:13-15 (emphasis added); *see also id.* at 2337:3-13 (explaining IBR's practice of getting instructions from Dyson); *id* at 530:19-21 ("IBR is an independent test laboratory[.]"); *id.* at 626:21-24 (describing IBR's testing as "independent").) And it defies reality to think that Intertek, a corporation with over $4 billion in annual revenue, which relies on its reputation for reliable testing, could be bludgeoned into compromising the independence and validity of its testing protocols with other customers—Dyson among them—in an e-mail that *Intertek itself initiated* with Karyn Medler. (*Id.* at 2176:11-21; 2182:14-16.)

[3] *E.g.,* Tr. 1131:7-1132:7 (discussing Intertek's deletion of the July 2014 data from earlier testing mistakenly done on the low suction setting); *id* at 1062:1-20 (discussing Ex. E, in which Ms. Medler stated that SharkNinja hoped the "third party lab confirms that our NV650 out cleans the Dyson DC65.").

criticisms with the precise testing protocols followed by an undisputedly independent testing authority. Accordingly, Dyson cannot "meet its burden of proof by merely exposing the methodical weaknesses of defendant's tests or by simply alleging that the tests are unpersuasive." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 930 F. Supp. 753, 780 (E.D.N.Y. 1996) (citation omitted). *See also Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1249 (11th Cir. 2002) ("The fact that a study's design is imperfect, however, does not render 1-800's advertisements false."). Rather, Dyson had to prove that "the underlying data cannot support the stated proposition." *BASF*, 41 F.3d at 1091 (citing *Quaker State*, 977 F.2d 586 F.3d 500 at 63)**.** The Intertek tests need not have been "perfect" in order to be "sufficiently reliable to support [a] superiority claim." *L&F Prods. v. Procter & Gamble Co.*, 845 F. Supp. 984, 1001 (S.D.N.Y. 1994).

Viewed in the light shed by case law, particularly that of the Seventh Circuit, it is plain that Dyson's evidence related to the Intertek testing does not demonstrate "literal falsity" as a matter of law. Rather, the underlying data supports the stated proposition. Dyson's claim that the Intertek tests were somehow unreliable because of sourcing issues (*see, e.g.,* Tr. 328:13-18; *id.* 2634:1-2635:3), illustrates that Dyson showed, at most, imperfection in the tests, but not literal falsity in the claim. ASTM F608 provides that a "minimum of three units of the sample model vacuum cleaner selected at random in accordance with good statistical practice shall constitute the population sample." (Ex. I at 2 § 7.1.) But F608 does not define "good statistical practice" or "selected at random." (*See, e.g.,* Tr. 660:4-10 (Miller); Tr. 2007:16-21, 2014:12-2015:23 (Kaplan, Dyson's Competitive Intelligence Manager (and 30(b)(6) witness) testified that she doesn't think there is a way to confirm if samples provided from Dyson's warehouses to IBR are random); *see also id*. at 2018:17-2019:15.) Dyson contended that the tested vacuums failed to meet this standard, whatever it meant. But Dyson's own expert, Mr. Miller, testified that sourcing from the open market is not required by ASTM F608, nor does that standard "say how large the available population of products has to be." (*Id.* at 664:2-23, 2014:16-23 (Kaplan confirmed that if a product is not currently available on the open market it might come from Dyson's warehouse).) The

undisputed evidence shows that the vacuums Intertek received came from two separate factories in China. (*See id.* 1499:24-1500:5, 775:25-776:4, 829:8-830:17; *see also id.* at 2334:22-2335:11 (Goldsmith testimony that it does not create an issue if vacuums were from the same factory).) And, while Dyson argued that the SharkNinja vacuums tested were mere prototypes because they were allegedly "pilot production" units, it came forward with only attorney argument, but no evidence, on that issue—and the evidence is unrebutted that pilot productions were "functionally the same" as mass production units. (Tr. 1644:2-6, 2044:23-2045:8, 2096:18-2097:12, 2105:12-18; *see also id.* at 1500:6-12, 1501:4-1502:2, 1561:4-14.) Furthermore, among the vacuums Intertek received, there were *two different* selector switch user interfaces, further demonstrating randomness. (*See, e.g.,* Ex. AE at 2-3.) Dyson developed no evidence to the contrary. As Mr. Miller testified, absent such evidence "we have to assume that they are using a good, random statistical plan when they're pulling those samples." (Tr. 664:17-20.) Dyson's randomness critique does not prove the ASTM F608 tests unreliable.

Moreover, Dyson's criticism that the Intertek testing was done using the wrong vacuum-cleaner setting fails: Dyson's own expert confirmed (as explained above) that there was confusion and, accordingly, under ASTM F608 it was proper for Intertek to seek instructions from SharkNinja on which settings to use. Furthermore, even if Intertek had used and reported accurate results from an undisputedly incorrect setting, Dyson would at most have a "misleading, but true" claim, which does not rise to the level of literal falsity—and which Dyson abandoned on summary judgment. In all events, ticky-tack criticisms of testing protocols do not sustain a plaintiff's burden to prove unreliability and thus literal falsity as a matter of law—a conclusion confirmed all the more by the fact that SharkNinja's commercial statements said that the test results were "based on . . . ASTM F608" (Exs. B, D, N, O)—which they undeniably were, even accepting all of Dyson's criticisms as true and viable.

In sum, SharkNinja's claim that independent tests show that the NV650 cleans carpets better than the Dyson DC65 is *literally true*. It is certainly not "literally false," as Dyson's claim requires. The Lanham Act required a far greater showing from Dyson: "Quite clearly, the

Congressional intention was to allow a private suit by a competitor to stop the kind of unfair competition that consists of *lying* about goods or services." *Skil Corp. v. Rockwell Int'l Corp.*, 375 F. Supp. 777, 784-85 (N.D. Ill. 1974) (emphasis added). The Court accordingly should enter JMOL for SharkNinja. *See, e.g.*, *Kempner Mobile Elecs.,* 428 F.3d at 716 (ordering JMOL on appeal and holding "there is no evidence that [defendant] said anything dishonest or false").

## II. THE GRAMS GRAPHIC IS NOT LITERALLY FALSE AS A MATTER OF LAW

After losing its motion to reconsider, Dyson attempted to backdoor what is at most a *misleading* advertising claim by disguising its claim based on the "Grams Graphic" as one of literal falsity. However, when a literal falsity argument relies on the placement and combination of separate elements in an advertisement, the message must be viewed in context; if the message is merely ambiguous, it cannot (by definition) be literally false. *See Scotts Co.*, 315 F.3d at 275 (quoting *Novartis Consumer Health*, 290 F.3d at 587).

### A. Because the Grams Graphic Is (At Worst) Ambiguous, No Reasonable Jury Could Have Found It Literally False

Every single element of the "Grams Graphic" is substantiated by valid F608 testing, and, as this Court instructed the jury: "For purposes of this case, a statement that is literally true but misleading is not false." (Tr. 2617:8-10.) The note at the bottom of the graphic truthfully states that the numbers in the graph are "based on" ASTM F608 testing "in carpet/low pile mode embedded dirt in multi-level carpet sample." The graphic, as explained by this note, is also substantiated and true, based on SharkNinja's internal testing. (Tr. 814:8-13; *id.* at 925:25-932:7; Exs. T, P-S.)[4]

---

[4] The fact that Intertek's testing yielded a different result on the multi-level carpet sample alone does not make the data in the Grams Graphic false when SharkNinja's internal testing substantiates the data in the graph. (Tr. 2617:6-8 ("That other tests might have reached a different conclusion does not make SharkNinja's statement about the advertised tests literally false.").)



The voice-over narration accompanying this graphic stated:  Independent lab tests prove the "new Rotator Powered Lift-Away has more suction power and actually deep cleans carpets better than the latest $600 Dyson."  (Ex. C at 8:3-6.)  The audio says *nothing* about the *amount* of dirt removed by the competing vacuums; it says, truthfully, that independent lab tests prove the SharkNinja "deep cleans carpets better."  (*Id.*)  That true statement was substantiated by Intertek's testing.  (Dkt. No. 424 at 31.)

Dyson seized upon the combination of the audio with the graphic in an effort to prove its case of "literal falsity," but at most, that combination of true statements might be said to be ambiguous or misleading.  That is not enough to prove Dyson's case.  *Schering-Plough*, 586 F.3d at 513 ("patently false statement" required); *Quaker State*, 977 F.2d at 63.   "[O]nly an *unambiguous* message can be literally false."  *Novartis Consumer Health*, 290 F.3d at 587 (emphasis in original).  *See also Scotts Co.,* 315 F.3d at 275 ("Because the graphic can reasonably be understood as conveying different messages, [plaintiff's] literal falsity argument must fail.");  *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1181 (8th Cir. 1998) ("The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported.").

Dyson's case of "literal falsity" was premised on the notion that the voiceover's claim of "independent tests prove" was necessarily a reference to the "Grams Graphic," which was actually (when created) based on SharkNinja's internal tests.  But that is not enough to prove literal falsity

for two reasons:  *One*, the relationship between the claim of independence and the graphic is at best ambiguous, yet "specific false claims of a literal nature," must be "explicit" or "unambiguous." *United Indus. Corp.*, 140 F.3d at 1182; *see also Not Dead Yet Mfg. Inc. v. Pride Solns., LLC,* 265 F. Supp. 3d 811, 839 (N.D. Ill. 2017).  And *two*, independent tests *did* in fact prove that SharkNinja's vacuum deep-cleaned carpets better.  Where is the "bald-faced, egregious, undeniable, over the top" lie?  *Schering-Plough*, 586 F.3d at 513.  Not here.

**B.     Dyson Proved No Injury or Materiality As A Result Of The Grams Graphic**.

"Dyson has to prove not only falsity, but also harm," and materiality.  (Tr. 2575:3-4, 2616:8-13.)  Dyson did not carry its burden of proving materiality or harm from the Grams Graphic because there was *zero evidence* that this portion of the graphic—which was viewable a total of 22 seconds—actually influenced any consumer buying decisions.  *See, e.g., In re Century 21-Re/MAX Real Estate Advertising Litig.*, 882 F.Supp. 915, 924 (C.D. Cal. 1994) ("Thus, without any relevant evidence that the claims at issue in the ad and the letter were likely to affect the purchasing decision of consumers, [defendant] prevails on this element."); *see also Borden, Inc. v. Kraft, Inc.,* 1984 WL 1458, at *12 (N.D. Ill. Sept. 28, 1984) ("The fact that some of Kraft's 2/3 oz. slices have slightly less than 5.0 ounces of milk is not of sufficient substance that the minuscule difference would affect a consumer's purchasing decision."); Dkt. No. 321, Ex. 8 (manually filed CD with infomercial that is the same as admitted Trial Ex. 12) at 6:07-6:18 and 10:04-10:15.

This is yet another demonstration of the thinness of Dyson's case.  If SharkNinja had replaced the data in the Grams Graphic with data from Intertek's testing reflecting the total grams from all of the carpets (*see* Tr. 1783:1-9), it would have had the *same* visual impact on consumers. Why?  Because Intertek's testing on all four ASTM carpet types showed a nearly identical performance difference as did the Grams Graphic on multilevel carpet.  (Ex. F at 2, 11; Ex. H at 2, 11.)[5]  Given that the results from the independent testing are virtually identical to the Grams

---

[5] The Grams Graphic showed a 5 gram difference on multilevel carpet (42 grams for the NV650, and 37 grams for the DC65), and the Intertek tests for the NV650 for all four carpets showed a 4.1 gram difference (170.9 grams vs. 166.8 (calculated in the same manner by adding the three

Graphic, and given that the visual impact of the graphic would not have changed in any material way, Dyson failed to prove that SharkNinja's failure to replace the placeholder image had any impact on consumers' purchasing decisions.[6]

## III.   DYSON IS NOT ENTITLED TO ANY RECOVERY OF DAMAGES

Dyson sought disgorgement of 100% of SharkNinja's NV650-series profits during the relevant timeframe.  Under the Lanham Act, SharkNinja was required to, and did, come forward with evidence of both its incremental selling expenses to calculate incremental profits, and other drivers of demand showing that a portion of its profits were "not attributable to [the alleged] infringing use under the Lanham Act."  *Roulo v. Russ Berrie & Co.,* 886 F.2d 931, 941 (7th Cir. 1989).  Dyson failed to rebut SharkNinja's evidence, so SharkNinja is entitled to JMOL that it has no profits attributable to the challenged ad to disgorge.

### A.     SharkNinja Proved Its Incremental Profits For The Relevant Time Period Were Less Than Zero, And Dyson Failed To Rebut That Evidence

Dyson's expert, Julie Davis, testified that she was *only* asked to determine the amount of SharkNinja's net sales and gross profits earned from the NV650, even though she agreed that incremental profits were the correct measure when calculating disgorgement of profits.  (*See* Tr. 1313:5-7; *see id.* at 1292:2-4 ("My assignment was to determine the amount of net sales and gross profits that Shark earned as a result of selling the NV650.").)  SharkNinja's expert, Dr. Matthew Lynde, introduced substantial evidence of SharkNinja's incremental selling expenses, identifying ten categories of expenses.  (Ex. AD.)  Six of the categories—commissions, delivery expenses, customer services call centers, fulfillment, credit card processing fees, and payment plan for bad debt expense—are unrelated to advertising.  The remaining four categories—media short form, media print, media digital, and media long form—are advertising expenses.  Dr. Lynde testified that when all of these categories of expenses are deducted from gross profits, the product line's

---

amounts for each carpet type and dividing by three, and then adding that amount for each of the four carpets). (Tr. 811:6-812:13.))

[6] Moreover, there was no testimony or evidence that any consumer bought or considered a vacuum based on performance on multilevel carpet alone.

incremental profit for this period was a *loss* of $5,041,172. (Tr. 2508:1-2; *id*. at 2418:8-2420:22.)

Dyson failed to offer any evidence to rebut SharkNinja's proof that incremental profits for the accused products from August 25, 2014 to December 15, 2014 were negative. Ms. Davis testified that she agreed that the categories of expenses Dr. Lynde deducted were properly denominated as incremental or variable expenses. (*Id*. at 1316:17-1318:11.) And, when asked "is there any doubt in your mind that Shark has spent money to advertise the Rotator Powered Lift-Away," Ms. Davis testified, "None whatsoever." (*Id*. at 1311:6-9.) Indeed, Ms. Davis's only criticism of Dr. Lynde's deductions was her view that the *amount* of expenses reported in SharkNinja's financials was "a little concerning." (*Id*. 1303:2-11.) But Ms. Davis admitted she had no reason to believe that the financials Dr. Lynde used for his calculations are inaccurate. (*Id*.; *see also id*. 1318:12-16, 1329:14-1330:3.)

SharkNinja's Mr. Lagarto provided concrete evidence confirming that the financial data underlying Dr. Lynde's incremental-profits calculation are, in fact, reliable. SharkNinja maintains its financial data in accordance with Generally Accepted Accounting Principles ("GAAP"). (Tr. 2348:23-2351:8.) The data produced in this litigation came from SharkNinja's general ledger. (*Id*. at 2354:24-25, 2358:5-7, 2369:3-8.) That data is regularly audited by Ernst and Young, and SharkNinja has never failed an audit. (*Id*. at 2351:9-18, 2353:4-7.) For purposes of this litigation, SharkNinja queried data from the general ledger and compiled financial information for the specific products at issue in this case.[7] (*Id*. at 2353:8-2354:2, 2355:1-25.) In Dr. Lynde's experience and opinion, the audited data from SharkNinja's general ledger is reliable, and the financial data produced in this case is similarly reliable. (*Id*. at 2421:2-2423:6, 2498:21-2499:15.)

As a matter of law, a plaintiff is not entitled to disgorgement of profits when it fails to rebut the defendant's proof that incremental profits were at a loss. *Edge Games, LLC v. Houghton Mifflin Harcourt Publ'g Co.,* 2015 WL 3498607, at *6 (C.D. Cal. June 2, 2015). In *Edge Games,*

---

[7] Because SharkNinja does not maintain its financial data by product, some of the data had to be allocated to specific products, or among the product's distribution channels. (*Id*. at 2360:11-2364:18.) But even though certain expenses had been allocated, the totals reported came from the general ledger and correlate with that data. (*Id*. at 2357:17-2358:7.)

like here, the defendant submitted evidence that it earned no profit from the textbook series accused of infringing plaintiff's trademark. The trial court granted summary judgment of no damages because, like here, "[p]laintiff has offered no expert evidence to dispute any of the opinions offered by [defendant's] accounting expert regarding [defendant's] lack of profit on the accused product." *Id.* Here, too, the evidence of SharkNinja's losses stands unrebutted.

**B.     No Rational Jury Could Have Returned A Damage Verdict Of $16,410,681**

The parties agreed on the amount of gross profits, and the jury was instructed "that the resulting gross profit is $18,138,000." (Tr. 2618:12-13.) The jury was further instructed how to calculate the amount of profits for disgorgement purposes:

> SharkNinja is required to prove any incremental selling expenses that it argues should be additionally deducted in determining its profits.
>
> Once you have calculated SharkNinja's profits, if any, from selling its Rotator Powered Lift-Away vacuum cleaners from August 25th, 2014, through December 15th, 2014, in all distribution channels, you must determine the amount, if any, of those profits that resulted from SharkNinja's false advertising.
>
> Dyson is entitled to recover SharkNinja's total profits, if any, from its false advertising, unless SharkNinja proves that a portion of the profit, if any, is due to factors other than false advertising. That's the apportionment issue that the lawyers had been discussing with the witnesses. It is that amount that will consider the damages, if any, that SharkNinja must pay Dyson.

(*Id*. at 2618:16-2619:6.)

At trial, SharkNinja proved its incremental selling expenses through Dr. Lynde's calculations (Ex. AD) and the testimony of Dr. Lynde and Mr. Lagarto. The expenses for the six non-advertising categories totaled $1,727,319; the remaining four advertising categories totaled $21,514,164. (*Id.*) There is no question that what the jury did was to deduct the incremental non-advertising expenses, but not a single dollar for SharkNinja's advertising expenses—the jury's $16,410,681 verdict is *to the dollar* the stipulated gross profits of $18,138,000 minus the non-advertising incremental expenses of $1,727,319. There is no rational basis for the jury to have deducted zero dollars of SharkNinja's $21 million in advertising expenses—particularly in light of the fact that Dyson's claim is that SharkNinja's advertising was what caused it to garner all of its disgorgable profits.

Long ago, Judge Learned Hand wrote, of the equitable remedy of disgorgement, that courts must "avoid the one certainly unjust course of giving the plaintiffs everything." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 51 (2d Cir. 1939), *aff'd*, 309 U.S. 390 (1940). Here, the jury's verdict did just that, not just by failing to deduct the advertising costs (which would have brought the verdict to zero), but by failing to give any account to the drivers of demand other than the challenged advertising. In other words, the assumption underlying the jury's verdict here is that 100% of SharkNinja's profits were attributable to SharkNinja's advertising claim, and none of the profits attributable to SharkNinja's designs, its research and development, its competitive pricing, product reviews, or other matters untied to the advertising claim at issue in this case. The evidence was without dispute on this point: Dr. Lynde analyzed the vacuum cleaner market to identify "the so-called drivers or factors, as economists call them, influencing consumer demand for the vacuum cleaner in question, the NV650 family of SKUs," and concluded that the drivers of demand included price, customer reviews, brand awareness, and retailer ads/promotions—all of which have a significant impact on sales, apart from the challenged claim. (*Id.* at 2423:13-2436:4; Ex. J at 95301, Ex. AF at 142340.) Dr. Lynde's evidence is also supported by testimony from SharkNinja witnesses and documents.[8]

Dr. Lynde's evidence was corroborated by Dyson's Ms. Davis, who agreed that "generally speaking there are factors other than the challenged claim that can drive sales," including price, product reviews, brand recognition, claims other than the challenged claim on the product packaging, and claims other than the challenged claim in an infomercial. (*Id.* at 1321:25-1322:24.) And, she agreed, "it is possible" that "each of those factors could have driven sales in this case for the NV650." (*Id.* at 1322:25-1323:5.) Dr. Lynde's evidence was further corroborated by Dyson witnesses and documents.[9]

---

[8] Tr. 1446:16-1448:22, 1457:14-1461:19, 1462:18-1468:14, 1473:24-1474:23; Exs. J, AF, M, AB.

[9] *See* Culley testimony (Tr. 388:7-12, 471:13-20; Ex. AC at 2, Tr. 459:4-6, 462:3-22, 464:3-16; Tr. 465:9-467:20; Ex. AC at 2-3; Tr. 473:12-474:13; Ex. L at Dyson_IL 929, Tr. 468:4-470:4, 1163:1-2;); Dunbar testimony (Tr. 1151:20-23, 1184:22-25; Ex. K at DYS 285, Tr. 1190:6-23, 1192:5-9; 1205:8-10, 1206:5-10, 1185:20-25, 1186:19-1187:5; Ex. K at DYS 304; Tr. 1187:23-1188:3,

In the face of this unrebutted evidence, Dyson was not entitled to recover all of SharkNinja's incremental profits on its NV650-series vacuums as a matter of law. "[W]here it is clear, as it is in this case, that not all of the profits are attributable to the infringing material, the [plaintiff] is not entitled to recover all of those profits merely because the infringer fails to establish with certainty the portion attributable to the non-infringing elements." *Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 828 (9th Cir. 1985).[10] To the contrary, where there is proof— as there is here—that the defendant's profits "are not entirely due to the infringement, and the evidence suggests some division which may rationally be used as a springboard[,] it is the duty of the court to make some apportionment." *Id.* at 828-829. SharkNinja introduced substantial evidence that drivers of demand other than the challenged advertising are responsible for a portion of SharkNinja's sales, and because Dyson offered *no* evidence in response**,** the jury had no rational basis for failing to do any apportionment. *See Cream Records*, 754 F.2d at 828. On this record, apportionment was required.

Had advertising expenses been deducted, and profits apportioned, the appropriate verdict would be zero. The Court should alternatively grant JMOL to this effect.

## CONCLUSION

The Court should, under Rule 50(b), order judgment as a matter of law for SharkNinja and order that Dyson take nothing by way of its complaint.

Dated: July 9, 2018                    Respectfully submitted,

/s/ John G. Froemming
John G. Froemming (admitted *pro hac vice*)
Gregory A. Castanias (*pro hac vice* pending)
Jessica D. Bradley (admitted *pro hac vice*)
jfroemming@jonesday.com

---

1188:7-18; Tr. 1213:10-1214:3, 1217:4-1218:4; Ex. U at 25692; Tr. 1218:5-12, 1219:6-1220:1; Ex. U at 25729; Tr. 1220:20-1222:9, 1224:24-1226:4.)

[10] "[B]oth the Lanham Act and the Copyright Act provide for the same measure of damages under like circumstances," including the requirement to prove apportionment. *Roulo*, 886 F.2d at 941. So copyright cases like *Cream Records* and *Sheldon v. Metro-Goldwyn-Mayer* apply with full force in this case.

gcastanias@jonesday.com
jbradley@jonesday.com
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Kristina Katz Cercone
kcercone@jonesday.com
JONES DAY
77 West Wacker Drive
Chicago, IL  60601-1692
Telephone:  (312) 782-3939

*Counsel for Defendants SharkNinja
Operating LLC and SharkNinja Sales
Company*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on July 9, 2018, the foregoing document was filed electronically through the Court's Electronic Case Filing System. Service of this document is being made upon all counsel of record in this case by the Notice of Electronic filing issued through the Court's Electronic Case Filing system on this date.

<u>/s/ John G. Froemming</u>
John G. Froemming