IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DYSON, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> SHARKNINJA OPERATING LLC and SHARKNINJA SALES COMPANY, <br><br> *Defendants*. | Case No. 1:14-cv-09442 <br><br> Judge: Honorable Gary Feinerman |

**DEFENDANTS' MOTION FOR A NEW TRIAL OR REMITTITUR**

## TABLE OF CONTENTS

Page

APPLICABLE LAW ............................................................................................................. 1

ARGUMENT .......................................................................................................................... 2

I. THE COURT SHOULD ORDER A NEW TRIAL ON LIABILITY ............................... 2

    A. The Liability Verdict Was Against The Weight Of The Evidence ...................... 2

    B. The Jury Failed To Follow The Court's Instructions ............................................ 3

    C. The Jury's Verdict Is Inconsistent With The Court's Rulings .............................. 4

II. THE DISGORGEMENT AWARD IS EXCESSIVE AND SHOULD BE REMITTED ...................................................................................................................... 6

CONCLUSION ....................................................................................................................... 13

# TABLE OF AUTHORITIES

Page

**CASES**

*Badger Meter, Inc. v. Grinnell Corp.*,
 13 F.3d 1145 (7th Cir. 1994) ...................................................................................................9

*Black & Decker Corp. v. Positec USA Inc.*,
 No. 11-cv-5426, 2017 WL 4010922 (N.D. Ill. Sept. 11, 2017).................................................1

*Cream Records, Inc. v. Jos. Schlitz Brewing Co.*,
 754 F.2d 826 (9th Cir. 1985) ................................................................................................9, 12

*Grove Fresh Distributors, Inc. v. New England Apple Prods. Co., Inc.*,
 969 F.2d 552 (7th Cir. 1992) .................................................................................................1, 2

*Jabat v. Smith*,
 201 F.3d 852 (7th Cir. 2000) .....................................................................................................6

*Lawndale Nat'l Bank v. American Cas. Co. of Reading, Pennsylvania*,
 489 F.2d 1384 (7th Cir. 1973) ...................................................................................................3

*Libco Corp. v. Dusek*,
 No. 77 C 4386, 1986 U.S. Dist. LEXIS 26155 (N.D. Ill. Apr. 29, 1986)..................................4

*Lippo v. Mobil Oil Corp.*,
 776 F.2d 706 (7th Cir. 1985) .....................................................................................................2

*Roulo v. Russ Berrie & Co.*,
 886 F.2d 931 (7th Cir. 1989) .....................................................................................................9

*Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*,
 586 F.3d 500 (7th Cir. 2009) .....................................................................................................2

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
 106 F.2d 45 (2d Cir. 1939), *aff'd*, 309 U.S. 390 (1940) .......................................................7, 12

*Shor-Line Rambler, Inc. v. Am. Motors Sales Corp.*,
 543 F.2d 601 (7th Cir. 1976) .....................................................................................................4

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*,
 370 U.S. 19 (1962).....................................................................................................................3

*Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Elecs. Am., Inc.*,
 888 F.3d 1322 (Fed. Cir. 2018) ........................................................................................... 3

*Thomas v. Askew*,
 No. 09 C 1885, 2010 U.S. Dist. LEXIS 92640 (N.D. Ill. Sep. 2, 2010) .................................. 4

*Turyna v. Martam Constr. Co.*,
 83 F.3d 178 (7th Cir. 1996) ................................................................................................... 4

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50(b) ................................................................................................... passim

Fed. R. Civ. P. 59 ................................................................................................................. 1

## EXHIBIT CROSS-REFERENCE

| Bradley Declaration Exhibit No. | Trial Exhibit No. |
|---|---|
| A | Cited Pages from Trial Transcripts ("Tr.") |
| B | 127 |
| C | 128 |
| D | 129 |
| E | 327 |
| F | 316 |
| G | 334 |
| H | 372 |
| I | 519 |
| J | 529 |
| K | 530 |
| L | 531 |
| M | 532 |
| N | 549 |
| O | 562 |
| P | 701 |
| Q | 705 |
| R | 722 |
| S | 727b |
| T | 768 |
| U | 784 |
| V | 757 |

Defendants ("SharkNinja") move for a new trial or remittitur under Rule 59 on the following grounds:

*First*, if SharkNinja's motion for JMOL under Rule 50(b) is not granted in its entirety, a new trial still should be granted because at least one of the possible grounds for liability is not legally viable, and the verdict form does not allow the Court to determine which ground or grounds the jury relied upon. And that general verdict of "literal falsity," if it is not held evidentially unsupported under Rule 50(b), is at the very least against the great weight of the evidence.

*Second*, the jury's finding of willfulness, and its disgorgement award of $16,410,681, are both against the great weight of the evidence. Dyson's literal falsity case did not demonstrate any "literal falsity," and so the willfulness determination would evaporate if the Court grants SharkNinja's Rule 50(b) motion. Even if the Court does not grant that motion, though, Dyson's "literal falsity" case would be, best case for Dyson, a close call, and the jury's finding of willfulness goes against the great weight of the evidence. As to the disgorgement award, SharkNinja's Rule 50(b) motion demonstrates that the jury unreasonably failed to deduct *any* advertising costs, and unreasonably failed to apportion the award to limit it to the contribution of the challenged portions of the advertising to SharkNinja's profits. If the Court does not eliminate the damages award by concluding that these proper deductions reduce Dyson's excessive disgorgement award to zero, then the Court should equitably adjust that award downward under the Lanham Act in order to account for these proper deductions, and alternatively order a remittitur with the alternative of a new trial at Dyson's election.

## APPLICABLE LAW

After a jury trial, the Federal Rules authorize this Court to, "on motion, grant a new trial on all or some of the issues—and to any party … for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Black & Decker Corp. v. Positec USA Inc.*, No. 11-cv-5426, 2017 WL 4010922, at *2 (N.D. Ill. Sept. 11, 2017) (granting motion); *see also Grove Fresh*

1

*Distributors, Inc. v. New England Apple Prods. Co.*, 969 F.2d 552, 558 (7th Cir. 1992) (explaining that the bases for granting a new trial include "whether the verdict is against the weight of the evidence, the damages were excessive, or that, for other reasons, the trial was not fair to the party moving"). A jury's damages verdict should be set aside when "there [is] no rational connection between the evidence on damages and the verdict." *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 716-717 (7th Cir. 1985) (remanding with instructions to the district court to "offer the plaintiff an appropriate remittitur and, if the remittitur is not accepted, order a new trial" on damages issue).

## ARGUMENT

**I.      THE COURT SHOULD ORDER A NEW TRIAL ON LIABILITY**

**A.      The Liability Verdict Was Against The Weight Of The Evidence**

As SharkNinja showed in its Rule 50(b) motion (being filed concurrently herewith ("Mot.")), none of SharkNinja's accused statements were literally false: The claim that SharkNinja's NV650 cleans carpets better than the DC65 is supported by independent tests performed by Intertek. (Exs. B-D.)[1] And its visual claims made in the so-called "Grams Graphic" were also not literally false: SharkNinja's products outcleaned Dyson's, as advertised, in tests "based on" the ASTM F608 standard. (Tr. 814:8-13, 925:25-932:7; Exs. N, J-M.) This is why the Court should grant JMOL to SharkNinja, and we incorporate those showings by reference here so as not to burden the Court twice. (Mot. at 2-11.)

But this new-trial motion proceeds on the basis that this Court finds unsustainable at least one, but not all, possible grounds of liability. For example, it is logically impossible that the combination of a literally true audio voiceover and a literally true graphic could yield a "literally false" statement—which is to say a "bald-faced, egregious, undeniable, over the top" lie. *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009). Or perhaps the jury found the claim about independent testing to be false (because of Dyson's niggling

---

[1] All citations are to the exhibits attached to the Declaration of Jessica D. Bradley being filed concurrently herewith. Excerpts from the trial transcript are Bradley Decl. Ex. A and cited herein as "Tr.".

2

critiques about Intertek's performance of those tests), or found the Grams Graphic false, even though every single representation on that graphic was true. The jury's general verdict does not tell us which ground or grounds the jury relied upon, so if one is legally deficient, a new trial is the proper remedy. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 29-30 (1962) ("Since we hold erroneous one theory of liability upon which the general verdict may have rested . . . it is unnecessary for us to explore the legality of the other theories."); *Lawndale Nat'l Bank v. American Cas. Co. of Reading, Pennsylvania*, 489 F.2d 1384, 1389 (7th Cir. 1973) (finding new trial necessary because general verdict form did not indicate the basis for jury's verdict, and one possible basis was legally erroneous); *see also Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Elecs. Am., Inc.*, 888 F.3d 1322, 1334 (Fed. Cir. 2018) ("if a jury could find liability according to multiple theories, and one of them is [legally] erroneous, we reverse unless we can tell that the jury came to its decision using only correct legal theories. If it is impossible to tell whether a correct theory has been used, we reverse for a new trial.").

A new trial is particularly warranted here. Dyson chose to forego giving special interrogatories to the jury despite this Court's prescient warning:

> You just have to know what the risks are if you don't have the special interrogatory. Let's say you don't have the special interrogatory, and let's say I deny the motion for judgment on the independence issue. And let's say . . . you get a plaintiff's verdict, and let's say it goes up to the Seventh Circuit and the Seventh Circuit holds that I made a mistake on not taking the independence issue away from the jury. If you have special interrogatories, you can conceivably solve that problem. If you don't then there's a retrial.

(Tr. 2240:1-12.) Here, the verdict form does not indicate the basis for the jury's verdict, but an objective view of the evidence shows that the jury found SharkNinja liable against the weight of the evidence presented—if not on all grounds, as SharkNinja shows in its motion for JMOL under Rule 50(b), then on at least some grounds.

### B. The Jury Failed To Follow The Court's Instructions

SharkNinja's Rule 50(b) motion showed that every element of the so-called "Grams Graphic" is substantiated by valid F608 testing, performed either by Intertek or in SharkNinja's

3

own lab. (Mot. at 8-11.) The juxtaposition of the voiceover element, the cleans-carpets-better claim on the right side of the graphic, the bar graph, and its associated footnote, creates, at most, an ambiguous message. Perhaps an ambiguous message could be confusing or misleading, but it cannot be literally false. Yet the jury here was properly instructed that "[f]or purposes of this case, a statement that is literally true but misleading is not false." (Tr. 2617:8-10.) To the extent that the jury's verdict of liability might have rested on the jury's mistaken belief that, *e.g.*, the Grams Graphic was literally false (which, again, the Court cannot determine without the special interrogatories it suggested), a new trial should be ordered to remedy this error. *Shor-Line Rambler, Inc. v. Am. Motors Sales Corp.*, 543 F.2d 601, 602-603 (7th Cir. 1976) (affirming trial court's finding that the jury had disregarded the court's instructions and upholding decision to condition re-trial upon plaintiff's acceptance of a remittitur); *Thomas v. Askew*, No. 09 C 1885, 2010 U.S. Dist. LEXIS 92640, at *2 (N.D. Ill. Sep. 2, 2010) (granting motion for a new trial because "[t]he jury either misunderstood the instruction or decided to ignore it."); *Libco Corp. v. Dusek*, No. 77 C 4386, 1986 U.S. Dist. LEXIS 26155, at *9 (N.D. Ill. Apr. 29, 1986) (denying motion to reinstate jury verdict because it was possible jury disregarded or misunderstood instruction and excessive verdict was "grossly unjust and against the weight of the evidence").

### C. The Jury's Verdict Is Inconsistent With The Court's Rulings

The jury's verdict is inconsistent and irreconcilable with the rest of the record in this case. "When a jury returns a factually inconsistent general verdict, the verdict cannot stand." *Turyna v. Martam Constr. Co.*, 83 F.3d 178, 181 (7th Cir. 1996) (reversing and remanding case for new trial). Here, in order for the jury to have found SharkNinja liable, it had to conclude that the independent-testing-shows-Shark-cleans-carpet-better claim was literally false, *and* that SharkNinja made the claim knowing it was false—or recklessly disregarding whether it was false. (Tr. 2619:7-13.) But, this Court has held—as a matter of law—that the claim is literally true, beginning on December 15, 2014. (Dkt. No. 424 at 27, 30-31.) The very same July-Aug. 2014 Intertek testing (Exs. B-D) and very same instructions (in Ms. Medler's July 2014 responsive emails (Exs. U, P (instructing

4

to use "Turbo" identified as the "center setting") and in the revised December 2014 manual (Dkt. 359-6, p. 7 note ("For deep cleaning per ASTM F608 (embedded dirt in carpets) please set to CARPET/LOW PILE", *i.e.* the middle setting)) that support this Court's summary-judgment ruling that the claim is literally true serve as the basis of the jury's verdict that the claim is literally false. These two conclusions are irreconcilable.

In addition to this objective evidence, the jury's finding that SharkNinja engaged in willfully false advertising is either against the great weight of, or devoid of support by substantial evidence. SharkNinja witnesses testified that the graphic included in the Grams Graphic claim was intended to be a placeholder that should have been replaced with the intended graphic—demonstrating the results from Intertek's July 2014 testing—before the infomercial aired, and as soon as SharkNinja realized the mistake, it pulled the graphic from television on its own motion, without prompting before Dyson filed this lawsuit. (Tr. 1785:16-1786:8 ("And then we realized, 'Oh, my god, why did somebody leave that placeholder there,' we took it down after 30 days. . . . Dyson didn't say anything. It just happens to be a placeholder graphic. . . that shouldn't have been there."), 1916:7-1921:13, 1925:8-20, 1926:22-1927:20 (as of Oct. 27, 2014, the Grams Graphic was removed from the infomercial), 1938:20-1941:2. *See also* Ex. V (the replacement graphic at pp. 2-3), Tr. 1927:21-1930:11, 1935:19-1936:10.) Mark Barrocas similarly testified that the inclusion of the placeholder graphic was "not at all intentional. In fact, again, we proactively found [the mistake] ourselves." (Tr. 1544:25-1545:9.) This evidence shows that by including the Grams Graphic in the infomercial, the company made an unintentional, honest mistake—a mistake that nonetheless reflected an accurate statement with respect to SharkNinja's relative cleaning powers—and which SharkNinja, itself, discovered and remedied. Whatever the reason for the jury's verdict, the record here certainly does not support a claim that SharkNinja engaged in *willful* false advertising.

## II. THE DISGORGEMENT AWARD IS EXCESSIVE AND SHOULD BE REMITTED

SharkNinja's Rule 50(b) motion for JMOL showed that the jury awarded Dyson disgorgement of all of its NV650-series profits, minus a relatively modest amount of incremental selling expenses, but with no deductions whatsoever for SharkNinja's advertising expenses, which in sum total were greater than its profits for the relevant time frame. (Mot. at 11-15.) Aside from the failure of the jury to deduct any amount attributable to the *cost* of advertising—ironic, to say the least, given that this is a false advertising claim—the jury's award also shows that the jury failed to do any apportionment of profits to account for drivers of demand other than the challenged advertising.

If the award is not eliminated, as SharkNinja asks in its JMOL motion, then it should be substantially remitted. *Jabat v. Smith*, 201 F.3d 852, 858 (7th Cir. 2000) (affirming remittitur). Any remittitur should be based on a recalculation of the amount of incremental profits where a reasonable amount of SharkNinja's incremental advertising expenses is deducted, *and* that amount should be further reduced by apportioning the award to take into account other drivers of demand consistent with this Court's instructions to the jury. (Tr. 2618:16-2619:6.) If Dyson does not accept this remittitur, the Court should order a new trial.

As is common in cases involving disgorgement claims, plaintiff's expert—here, Ms. Davis—claimed that she could not reliably subtract any amount of incremental costs, in this case, costs attributable to SharkNinja's advertising purchases: "I do not believe that the information we have available to us right now anyway is sufficient to subtract any amount of media expense." (Tr. 1309:13-15.) Her conclusion was ostensibly based on a critique of the reliability of SharkNinja's financial documents—yet when asked if she formed an opinion as to whether SharkNinja's financial documents produced in this case are reliable, the most Ms. Davis could say about the data is that "it's a little concerning." (Tr. 1303:2-11; *see also* 1318:12-16.)[2] She claimed, at trial, a

---

[2] In response to a jury question, Ms. Davis also admitted that some of the differences between SharkNinja's sales documents were because "there were various categories of sales missing, various SKUs . . . . So there were certain SKUs there were omitted or there were certain SKUs that

need for access to SharkNinja's general ledger or CFO in order to formulate a reliable opinion about the SharkNinja financials. (Tr. 1320:6-12.) Yet, at the same time, Ms. Davis repeatedly disavowed any responsibility for deducting incremental expenses, testifying that it was not part of her assignment to deduct *any* costs or expenses (*i.e.*, incremental expenses) from gross profits, and that her sole assignment and purpose in appearing at trial was "to address the amount of the net sales and gross profits that Shark earned as a result of selling the NV650." (Tr. 1287:21-25, 1291:23-1292:4, 1307:20-1308:23 (subtracting incremental expenses is "the job of the defendant's expert"), 1313:5-14, 1313:23-1314:23.)

But there was no dispute that SharkNinja did incur advertising costs—the fact that this entire action is predicated on advertising that SharkNinja bought and ran on television ought to be proof enough of that—and so there is no basis, in law or equity, to allow the disgorgement of SharkNinja's profits without a dime attributed to the cost of advertising. The lesson of Judge Learned Hand's often-quoted and often-followed opinion for the Second Circuit, as affirmed by the Supreme Court, is particularly appropriate here: The "one certainly unjust course" would be "giving the plaintiffs everything," without deduction. *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 51 (2d Cir. 1939), *aff'd*, 309 U.S. 390 (1940). And Judge L. Hand wrote those words in a case where "the defendants cannot with certainty compute their own share." *Id.* at 51.

But here, the defendants did "with certainty compute their own share." Mr. Logarto, SharkNinja's CFO and a trained CPA (Tr. 2346:2-2348:22), testified that *all* of the financial data in the various profit and loss statements ("P&L") came from the company's audited general ledger. (Tr. 2353:4-7; *see also id.* at 2351:9-2353:3.) He confirmed that the backup support for *all* of the incremental or variable expenses was the *same* general ledger: (Tr. 2358:5-7; *see also* Tr. 2354:3-2355:25.) Dr. Lynde confirmed the reliability of SharkNinja's financial data. He testified that in his experience and opinion, the audited data from SharkNinja's general ledger was reliable, and

---

were included that didn't belong," and she further admitted that as of the time of "the third P&L, we have the right number of units." (Tr. 1329:14-1330:3.)

the financial data produced in this case was similarly reliable. (Tr. 2421:2-2423:6) He further testified that the advertising expenses reported were particularly reliable:

> [SharkNinja] can actually identify the media spend based on the invoices to the media distribution companies of what product is being discussed in a long form commercial or a short form commercial. So unlike a lot of these below the line categories of expense, this was not an apportionment based on revenue. These were really directly identifiable with the product in question.

(Tr. 2420:7-15.) This is particularly so given that Ms. Davis readily admitted that advertising directed to a particular product line is an incremental expense that should be deducted (Tr. 1315:5-16, *see also* Tr. 1315:17-22) and she had no doubt, "none whatsoever," that SharkNinja spent money to advertise the product line at issue in this case (*id*. at 1311:6-9). Ms. Davis further agreed that media short form spending, media print form spending, media digital spending, and long form media spending are all properly deductible incremental selling expenses. (Tr. 1317:4-1318:1.)

There is no dispute that SharkNinja spent substantial sums of money advertising its Rotator Powered Lift-Away, and so any properly calculated damages award must take into account those expenses. The only question should be how much. During trial, Dyson's counsel argued that SharkNinja's advertising expenditures should not be deducted in accordance with GAAP (*i.e.,* at the time when the expense was incurred), but instead should be amortized across the life of the product. (Tr. 2726:23-2728:6.) (Recall that Ms. Davis was precluded from advancing her late-disclosed amortization theories, so Dyson was limited to lawyer argument on this point. (Dkt. No. 656 at 2-3).) SharkNinja's expert, Dr. Lynde (as well as Mr. Lagarto, who is a CPA), testified that GAAP requires advertising expenses to be booked when incurred. (Tr. 2456:10-19, 2475:2-10, 2508:7-18, 2349:7-2351:8.) Their testimony on that point stands unrebutted.

Thus, as shown in SharkNinja's motion for JMOL, the documentary evidence admitted at trial demonstrates that when the entire advertising expense is deducted according to GAAP, the incremental profit for the period of liability was negative $5,041,172; ergo, there are no profits to disgorge, and a take-nothing JMOL is appropriate. (Ex. S.)

But even if incremental expenses should be amortized contrary to GAAP and contrary to the only expert evidence in this case, the total incremental profits earned by SharkNinja from August 25, 2014 through December 31, 2017 were $14,927,675, yielding an incremental profit margin of 4.8%. (Ex. H (Summary By Channel Tab).)  As SharkNinja's counsel demonstrated during closing arguments, if the total incremental profits over the life of the product (40 months) are allocated for the 3.7-month period of liability, the total incremental profits for the liability period would be $1,380,810. (Tr. 2705:11-2706:20.)  Similarly, if the life-to-date incremental profit margin of 4.8% is applied to the agreed net sales of $29,443,384 for the period of liability (Tr. 1311:12-19, Ex. S), the incremental profits earned on those sales ($29,443,384 x 0.048) would be $1,413,282.  And this does not even take into account the need to apportion the disgorgement award attributable to the allegedly false advertisement.  A disgorgement of profit by the defendant under the Lanham Act "must, of course, have been caused by the infringement itself[.]" *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157 (7th Cir. 1994).  While "the amount must be provable, … some uncertainty in making this calculation is allowed." *Id.*.  Apportionment *must* be part of the damages analysis where "the evidence suggests some division which may rationally be used as a springboard[.]" *Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 829 (9th Cir. 1985).[3]  In such circumstances, "it is the duty of the court to make some apportionment." *Id.*  Indeed, it is reversible error to award all of defendant's profits "merely because the infringer fails to establish with certainty the portion attributable to the non-infringing elements," when it is clear that "not all of the profits are attributable to the infringing material." *Id.* at 828.

On this record, there is no reasonable basis to attribute 100% of SharkNinja's profits to the offending infomercial.  That conclusion defies common sense, and it defies the record here.  Dr. Lynde analyzed the vacuum cleaner market to identify "drivers or factors, as economists call them,

---

[3] *Cream Records*, a copyright infringement case, is instructive.  The Seventh Circuit has looked to copyright-damages cases to inform its understanding of Lanham Act damages, because "both the Lanham Act and the Copyright Act provide for the same measure of damages under like circumstances," including the requirement to prove apportionment. *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 940-941 (7th Cir. 1989).

9

influencing consumer demand for the vacuum cleaner in question, the NV650 family of SKUs." (*Id.* at 2423:13-20.) He concluded that price, prices of competing (substitute) products, customer reviews, word-of-mouth, brand, and retailer (point-of-sale) marketing choices also affect demand. (*Id.* 2424:2-21; *see also* Tr. 2423:13-2436:4, Ex. F at 95301, Ex. T at 142340.) Ms. Davis *agreed* that "it is possible" that "each of those factors could have driven sales in this case for the NV650." (*Id.* at 1321:25-1323:5.) Dr. Lynde's evidence, accordingly, stands unrebutted, and is further supported by testimony from SharkNinja witnesses and documents. (Tr. 1457:14-1461:19, 1462:18-1468:14, 1473:24-1474:23; Exs. F, T, I.)

Dyson witnesses and documents likewise acknowledged these various drivers of demand. Dyson Inc.'s President at the time the challenged claim ran, Mr. Culley, testified that "at least one reason a consumer might purchase the Shark over Dyson is that Shark usually is a lower price" and that "price, of course, will play a factor in a consumer's decision to purchase a vacuum cleaner, including a Shark." (Tr. 388:7-12, 471:13-20.) He confirmed that Dyson had concluded with regard to SharkNinja's business that, "combined with a low RDD investment, a lean overhead structure and lower margin expectations, Shark has been able to offer consumers a much lower price and fill a price gap in the market between 150 and 299." (Ex. R at 2; Tr. 459:4-6, 462:3-22, 464:3-16.) Mr. Culley also confirmed that Dyson had identified among the "root causes of [its] decline" that "Shark has introduced innovative products in the U.S. that allow them to market[:] performs well, particularly on carpet, no loss of suction, light and maneuverable. In sum, as good as or better than a Dyson and all at hundreds of dollars less" and that Shark was outspending Dyson in its advertising investment. (Tr. 465:9-467:20; Ex. R at 2-3. *See also* Tr. 473:12-474:13 (admitting that "Dyson advertising awareness saw a decline likely driven by the lower upright spend by Dyson in Q3").) He also admitted that the Brainjuicer report, commissioned by Dyson and on which Dyson relied allegedly to show harm, actually "was pretty critical of [Dyson's] own ads without regard to any advertising by SharkNinja." (Ex. G at Dyson_IL 929; Tr. 468:4-470:4, 1163:1-2. *See also* Ex. E at DYS 285; Tr. 1190:6-23, 1192:5-9.)

Dyson, Inc.'s VP of marketing, Ms. Dunbar, admitted that "even before SharkNinja introduced its NV650 and the advertising that's at issue in this case, that consumers regarded Dyson's vacuums as expensive." (Tr. 1151:20-23, 1184:22-25.) She is "one of the stakeholders" that "ha[s] a role in setting the price points of the vacuums at Dyson," and she admitted that she had "testified under oath in connection with this case" that she "think[s] that if the price that Dyson chooses to retail its vacuum at isn't aligned with the value proposition for the consumer, then it would affect sales." (Tr. 1205:8-10, 1206:5-10.) She also confirmed that Dyson's Brainjuicer report concluded that "Shark's lightweight feature, affordability, and innovation are noted." (Tr. 1185:20-25, 1186:19-1187:5; Ex. E at DYS 304.) She testified that she understood the Brainjuicer's reference to Shark's "affordability" to include Shark's "reasonable price," that Shark is "cheaper than a Dyson," and that Shark's products "are all affordable." (Tr. 1187:23-1188:3; Ex. E at DYS 304.) She testified that Dyson's Brainjuicer study determined that "24 percent of respondents have a brand association of innovative with Shark" which she understood to mean "the design, the vacuums are helpful, they [*i.e.* study respondents] see as different technology. They feel like this is a newer brand." (Tr. 1188:7-18; Ex. E at DYS 304.)

Ms. Dunbar also testified about another study prepared by Dyson, the Phoenix study, which identified various drivers of demand including users' "'Word of mouth,' as the first listed place where people are researching as a driver of demand," as well as online reviews including star ratings. (Tr. 1213:10-1214:3, 1217:4-1218:4; Ex. O at 25692; *see also* Ex. Q (listing the 4.7 (out of 5) as the average star review rating for the NV650 as of Dec. 2014), Tr. 1446:16-1448:22.) Dyson's Phoenix study also stated that in-store "[p]eople want to try it out and have a reality check on price," and identified a concern that Dyson was "not improving our in-store comm's fast enough, while our competitors seem to be improving theirs significantly." (Tr. 1218:5-12, 1219:6-1220:1; Ex. O at 25692.) Dyson's Phoenix study further determined that "[t]he front of the Shark Powered Rotator box was particularly successful at attracting people and holding their attention by offering them multiple benefits quickly and clearly" and that "from just the front panel," of the

11

NV650 box consumer feedback identified a number of benefits of the NV650 (seven-year warranty, cleaned carpets, goes where Dyson Ball can't, works on hard floors, swivel steering, perfect for pets, anti-allergen technology, never loses suction); tellingly, Dyson's study did not even mention the challenged claim. (Ex. O at 25729; Tr. 1220:20-1222:9, 1224:24-1226:4.)

In the face of this unrebutted evidence, it would defy reality to allow Dyson to recover all of SharkNinja's profits from the product. As a matter of law, the Court should not allow such a result. In *Cream Records*, the defendant showed that "not all of the profits are attributable to the infringing material," although the evidence did not show "with certainty the portion attributable to the non-infringing elements." 754 F.2d at 828. The court found that apportionment was nonetheless *required*. Citing Judge Hand's *Sheldon* opinion, the court explained that "we are resolved to *avoid the one certainly unjust course of giving the plaintiffs everything*, because the defendants cannot with certainty compute their own share." *Id.* at 829 (quoting *Sheldon*, 106 F.2d at 51 (emphasis added)). "'[W]hat is required is … only a reasonable approximation." *Id.*

Because SharkNinja introduced substantial evidence that drivers of demand other than the challenged advertising are responsible for a portion of SharkNinja's sales, and because Dyson offered *no* evidence in response, the jury had no reason to believe that apportionment was not required, and accordingly had no rational basis for failing to do *any* apportionment. *Id.* at 828. On this record, apportionment was required; without it, the verdict is against the weight of the evidence, excessive, and unfair. If the Court does not deduct the entirety of SharkNinja's advertising expenses in accordance with GAAP, it should remit the damages award to $1,413,282, giving Dyson the election to accept that amount or retry this case.

## **CONCLUSION**

If the Court does not grant JMOL, it should order remittitur or a new trial.

Dated: July 9, 2018                                Respectfully submitted,

/s/ John G. Froemming
John G. Froemming (admitted *pro hac vice*)
Gregory A. Castanias (*pro hac vice* pending)
Jessica D. Bradley (admitted *pro hac vice*)
jfroemming@jonesday.com
gcastanias@jonesday.com
jbradley@jonesday.com
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Telephone: (202) 879-4693
Facsimile: (202) 626-1700

Kristina Katz Cercone
kcercone@jonesday.com
JONES DAY
77 West Wacker Drive
Chicago, IL 60601-1692
Telephone: (312) 782-3939

*Counsel for Defendants SharkNinja Operating LLC and SharkNinja Sales Company*

13

## **CERTIFICATE OF SERVICE**

      I certify that on July 9, 2018, the foregoing document was filed electronically through the Court's Electronic Case Filing System. Service of this document is being made upon all counsel of record in this case by the Notice of Electronic filing issued through the Court's Electronic Case Filing system on this date.

      /s/ John G. Froemming
      John G. Froemming