**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DYSON, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No.: 1:14-cv-09442 |
| | ) | |
| v. | ) | Judge: Hon. Gary S. Feinerman |
| | ) | |
| SHARKNINJA OPERATING LLC and | ) | **JURY TRIAL DEMANDED** |
| SHARKNINJA SALES COMPANY, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**DYSON'S OPPOSITION TO SHARK'S RENEWED MOTION
<u>FOR JUDGMENT AS A MATTER OF LAW</u>**

## TABLE OF CONTENTS

I.     LEGAL STANDARD .................................................................................... 2

II.    SHARK WAIVED ARGUMENTS REGARDING ASTM F608 COMPLIANCE AND THE GRAMS GRAPHIC BY NOT RAISING THEM IN ITS RULE 50(A) MOTION .................................................................... 3

III.    THE JURY REASONABLY FOUND THAT SHARK FALSELY ADVERTISED ............................................................................................... 3

       A.      A Jury Could Have Found Intertek's Tests Were Not "Independent".................... 4

       B.      A Jury Could Have Found Intertek's Tests Were Not F608 Compliant................. 6

IV.    THE GRAMS GRAPHIC PORTION OF THE INFOMERCIAL CONSTITUTED FALSE ADVERTISING ..................................................... 9

       A.      A Jury Could Have Found The Grams Graphic Was False .................................... 9

       B.      A Jury Could Have Found The Grams Graphic Was Material And Harmful ................................................................................................................ 10

V.     THE JURY REASONABLY CALCULATED THE DISGORGEMENT AWARD ...................................................................................................... 11

       A.      A Jury Could Have Found Shark Failed To Prove Its Deductions ...................... 12

       B.      A Jury Could Have Found Shark Failed To Prove Apportionment...................... 14

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Airadigm Commc'ns, Inc.*,
  616 F.3d 642 (7th Cir. 2010) ....................................................................8

*Am. Taxi Dispatch, Inc. v. Am. Metro Taxi & Limo Co.*,
  582 F. Supp. 2d 999 (N.D. Ill. 2008) .......................................................11

*BASF Corp. v. Old World Trading Co.*,
  41 F.3d 1081 (7th Cir. 1994) ....................................................................8

*Blackwell v. Kalinowski*,
  2011 WL 3046320 (N.D. Ill. July 25, 2011)...............................................3

*Cream Records, Inc. vs. Jos. Schlitz Brewing Co.*,
  754 F.2d 826 (9th Cir. 1985) ...................................................................15

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008)...................................................................................3

*Hot Wax, Inc. v. S/S Car Care*,
  1999 WL 966094 (N.D. Ill. Oct. 14, 1999).................................................7

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
  299 F.3d 1242 (11th Cir. 2002) .................................................................8

*Mohr v. Toledo, P. & W. R. Co.*,
  232 F.2d 869 (7th Cir. 1956) .....................................................................2

*Passananti v. Cook Cty.*,
  689 F.3d 655 (7th Cir. 2012) .....................................................................2

*Production Specialties Group, Inc. v. Minsor Sys., Inc.*,
  513 F.3d 695 (7th Cir. 2008) .....................................................................3

*Q Sales & Leasing, LLC v. Quilt Protection, Inc.*,
  2004 WL 2420640 (N.D. Ill. Oct. 26, 2004)..............................................14

*Reeves v. Sanderson Plumbing Prod., Inc.*,
  530 U.S. 133 (2000).................................................................2, 5, 12, 13

*Roulo v. Russ Berrie & Co.*,
  886 F.2d 931 (7th Cir. 1989) ...................................................................11

*S.C. Johnson & Son v. Clorox Co.*,
    241 F.3d 232 (2d Cir. 2001)................................................................................9

*S.C. Johnson & Son v. Clorox Co.*,
    930 F. Supp. 753 (E.D.N.Y. 1996) ...................................................................8

*Scranton Gillette Commc'ns, Inc. v. Dannhausen*,
    1999 WL 558134 (N.D. Ill. July 27, 1999).......................................................9

*Sheehan v. Donlen Corp.*,
    173 F.3d 1039 (7th Cir. 1999) ..........................................................................2

*Sheldon vs. Metro-Goldwyn Pictures Corp.*,
    106 F.2d 45 (2d Cir. 1939)..............................................................................15

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) ..........................................................................9

*Tart v. Illinois Power Co.*,
    366 F.3d 461 (7th Cir. 2004) ............................................................................2

*Wallace v. McGlothan*,
    606 F3d 410 (7th Cir. 2010) .............................................................................3

*WMS Gaming Inc. v. WPC Productions Ltd.*,
    542 F.3d 601 (7th Cir. 2008) ....................................................................11, 15

*Zelinski v. Columbia 300, Inc.*,
    335 F.3d 633 (7th Cir. 2003) ............................................................................3

**Statutes**

15 U.S.C. § 1117(a) ...............................................................................................11

15 U.S.C. § 1125(a)(1)...........................................................................................4

**Rules**

Fed. R. Civ. P. 50(a) ...............................................................................................3

Fed. R. Civ. P. 50(b) ...................................................................................2, 3, 7, 10

iv

As the Seventh Circuit has made clear, "once a jury has spoken, we are obliged to construe the facts in favor of the parties who prevailed."  After hearing a dozen-plus witnesses over two weeks, a jury of ten spoke loudly and clearly: the evidence proved that Shark's advertising was false, Shark's false advertising was intentional, and Shark's after-the-fact excuses, dissembling, and witnesses were not credible.  Shark's motion, however, turns Rule 50 on its head.  Shark rehashes its failed version of events and view of the evidence, while ignoring its own witnesses' admissions, damning emails and other documents, its failure of proof on its cost and apportionment arguments, and everything else that supports the jury's verdict in Dyson's favor.

Without question, there is sufficient evidence to support the jury's verdict—indeed, the evidence compelled that verdict.  ***First***, the evidence established that Shark's testing was not independent because Shark overrode Intertek's independent determination of how to set the suction and controlled Intertek's tests.  ***Second***, the evidence showed that Shark's tests did not comply with ASTM F608, and thus Shark's claim that its tests complied with the "one and only industry standard" was false.  ***Third***, Shark's repeated use of the Grams Graphic portion of its infomercial—which Shark undeniably claimed was supported by independent tests—was not, in fact, supported by independent tests.  Indeed, the allegedly independent tests showed that ***Dyson*** cleaned better on the advertised carpet.  Shark knew its Grams Graphic portion of the infomercial was not only false but contradicted by Intertek's testing, yet nonetheless launched the infomercial and left it on Shark's own website and YouTube channel throughout the damages period.

As to the jury's disgorgement verdict, Shark again ignores the applicable standard and law, acting as if the jury was required to, without exception, reduce Shark's gross profits further by including additional costs or applying apportionment without regard to whether Shark met its burden of proof.  That ignores the purpose of a trial and upends Rule 50.  It was ***Shark's*** burden

at trial to prove the reasonableness and amount of any deductions, and the jury was well within its province to decline to apply deductions if it determined that Shark had not met its burden. Here, given Shark's own Chief Financial Officer's candid admissions to the jury that its NV650 showed a profit on its originally-produced, internal financials (and that its claims to the contrary were only based on later-created litigation documents), the jury rightly determined that Shark had not met its burden. Determinations about the credibility of Shark's witnesses and financial evidence are squarely in the province of the jury, and the Court may not disturb the jury's finding.

Shark's last-ditch attempt to disregard the evidence, ignore its burden of proof, and toss aside the diligent work of the jury over two weeks is contrary to Rule 50. Shark's motion should be denied and the jury's proper and well-supported verdict left completely intact.

## I. LEGAL STANDARD

"To warrant judgment as a matter of law because of legal insufficiency of evidence, there must have been *no legally sufficient evidentiary basis* for a reasonable jury to find for the non-moving party." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043 (7th Cir. 1999) ("Attacking a jury verdict is a hard row to hoe.") In a Rule 50(b) motion, the Court "construes the evidence strictly in favor of the party who prevailed before the jury" and "determine[s] whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook Cty.*, 689 F.3d 655, 659 (7th Cir. 2012); *Tart v. Illinois Power Co.*, 366 F.3d 461, 464 (7th Cir. 2004) ("Once a jury has spoken, we are obliged to construe the facts in favor of the parties who prevailed."); *see also Mohr v. Toledo, P. & W. R. Co.*, 232 F.2d 869, 870 (7th Cir. 1956) (finding the same standard applies for a general verdict). The Court must "review *all* of the evidence," "may not make credibility determinations or weigh the evidence" because those are "jury functions, not those of a judge," and "*must disregard* all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150-151 (2000).

2

## II.    SHARK WAIVED ARGUMENTS REGARDING ASTM F608 COMPLIANCE AND THE GRAMS GRAPHIC BY NOT RAISING THEM IN ITS RULE 50(A) MOTION

The law is clear:  "Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion."  *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010); *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n. 5 (2008) (establishing the same); *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 638 (7th Cir. 2003) (finding a party waived its right to review an issue by failing to move for directed verdict on that issue); *Production Specialties Group, Inc. v. Minsor Sys., Inc.*, 513 F.3d 695, 699 (7th Cir. 2008) (same); Fed. R. Civ. P. 50(b), comm. note (2006 amend.  Indeed, this is "black letter law." *Blackwell v. Kalinowski*, 2011 WL 3046320, at *6 (N.D. Ill. July 25, 2011).

Shark filed Rule 50(a) motions at the close of Dyson's evidence and at the close of all the evidence.  (*See* Dkt. 707; Dkt. 717.)  Both of Shark's motions made substantially the same argument:  no reasonable jury could find that Intertek's tests were not independent.  (Dkt. 707 at 3-7; Dkt. 717 at 3-9.)  Shark's Rule 50(a) motions ***never*** argued that no reasonable jury could conclude that (1) its tests did not comply with ASTM F608 or (2) the Grams Graphic portion of the infomercial was not false.  Accordingly, the Court should deny Shark's motion with respect to the arguments raised in Section I.B ("ASTM F608 Compliance") and Section II ("Grams Graphic") of its current Rule 50(b) post-verdict motion.  *Wallace*, 606 F.3d at 418.

## III.    THE JURY REASONABLY FOUND THAT SHARK FALSELY ADVERTISED

In addition to being waived in large part, Shark's Rule 50(b) arguments also fail in light of the evidence at trial.  Drawing all reasonable inferences in Dyson's favor, as the law requires, there is overwhelming evidence to support the jury's verdict that Shark's advertisements were false.[1]

---

[1]  Shark continues to insist there is a special "extremely high standard" for literal falsity.  (Dkt. 754 at 5.) The Court already rejected Shark's attempt to raise Dyson's burden.  (Trial Tr. at

## A. A Jury Could Have Found Intertek's Tests Were Not "Independent"

Shark's argument that "no reasonable jury could conclude that SharkNinja's representation of independent testing was literally false," (Dkt. 754 at 3), disregards the jury's role as a fact-finder, the standards that govern post-trial briefing, and the actual evidence presented at trial.

In fact, the jury could have reasonably concluded that Shark, not Intertek, controlled the manner in which Intertek's tests were conducted. It is undisputed that Intertek contacted Shark about the suction settings to use to test the NV650 under ASTM F608. (TX-99.)[2] ASTM F608 is clear: the test operator must determine that the instructions are "unclear or inadequate" before any contact with the manufacturer is permitted, (TX-149 at § 9.2.3.1), and there is ample evidence that this critical criteria was not met. Ms. Medler, Shark's head of testing, testified the manual was clear. (Trial Tr. at 751:3-4.) More importantly, Steve Reese—the Intertek test operator who **_actually conducted_** the testing—understood the manual to instruct consumers to use different suction settings for different ASTM carpets, (_id._ at 1128:22-1129:9 ), and conducted testing "per the owner's manual" using different suction levels for different carpets before Shark overrode Intertek's independent judgment and demanded that Intertek test all carpets with high suction, (TX-99; TX-104; Trial Tr. (Porter) at 2282:12-18.) Intertek's reports confirm the testing was not independent by including a note that the tests **_deviated_** from the standard "**_per client's request_**." (TX-127 at 3; TX-128 at 3; Trial Tr. (Porter) at 2280:9-12.)

Moreover, even buying into Shark's counterfactual argument that the instruction manual was unclear or inadequate, the jury also could have reasonably found Intertek's correspondence

---

2591:15-22.) Moreover, there is no special standard for literal falsity; Dyson need only prove that the statement is, in fact, false. 15 U.S.C. § 1125(a)(1).

[2] Trial Exhibits are cited as "TX-###" and are attached with the same Exhibit number used at trial. Cited excerpts of the Trial Transcript are attached as Exhibit 1.

with Ms. Medler showed a lack of independence. Mr. Miller testified that an F608 test operator should contact the manufacturer's service number when conducting an *independent* F608 test. (Trial Tr. at 600:18-601:10.) Shark's NV650 instruction manual provides just such a number (TX-77 at 3), yet Intertek directly contacted Ms. Medler instead of the service number. (TX-99.)[3]

Shark asks the Court to disregard this evidence and focus only on snippets of evidence that favor Shark. For example, Shark argues Dyson's expert, Mr. Miller, testified there was "some confusion about which settings Intertek was to use." (Dkt. 754 at 4.) Shark made the same argument during closing arguments, and Dyson exposed that argument for what it was: a mischaracterization of Mr. Miller's actual and full testimony. (Trial Tr. at 2667:12-18, 2718:2-15.) As the jury heard, *immediately preceding* Shark's cited quotation, Mr. Miller testified there was *no confusion* about Shark's *instruction manual*. (Trial Tr. at 650:13-25.) The jury was entitled to credit Mr. Miller's testimony in full and disregard Shark's incorrect characterization. And the Court *must* do the same here. *Reeves*, 530 U.S. at 151.

Similarly, Shark's argument that no reasonable jury could find that "Intertek, an accredited, indisputably separate, $4-billion-a-year company …. was 'beholden to or controlled by' SharkNinja" ignores the whole of the evidence. (Dkt. 754 at 5.) The question is not whether Intertek was "beholden to or controlled by" Shark *as a company*, but rather whether the *testing* conducted by Intertek was "controlled by" Shark. While Shark presented evidence regarding Intertek's size and corporate structure, there is ample evidence for a reasonable jury to infer that Shark controlled Intertek's testing.

---

[3]  Before testing, Ms. Medler told Intertek that Shark wanted results to show that "an independent third party lab confirms that our NV650 out cleans the Dyson DC65." (TX-110 at 1; Trial Tr. at 1062:1-7.) Ms. Medler admitted that an independent test would not involve pre-informing someone of the desired results. (Trial Tr. at 1059:18-24.) A reasonable jury could have found that pre-informing Intertek of the desired results showed Intertek lacked independence.

**B.** **A Jury Could Have Found Intertek's Tests Were Not F608 Compliant**

The jury was instructed that the advertisements were false if "the tests upon which SharkNinja relied in making its statements were not conducted in compliance with the ASTM F608 standard." (Trial Tr. (Jury Instructions) at 2617:3-5.) There is ample evidence that Shark's testing was not in compliance with ASTM protocol and thus the jury's verdict is supported.[4]

*First*, Dyson presented substantial evidence that Shark used the wrong suction setting for its ASTM F608 test. Mr. Miller, the **only** expert on ASTM F608 testing, testified that Shark should have tested the NV650 in low-suction mode for the ASTM shag carpet because it is a high-pile carpet, and that because it did not follow its own manual, Shark's testing was **not a valid comparative** test. (Trial Tr. at 604:18-605:11, 617:17-618:6.)[5] Mr. Miller's (unrebutted) testimony alone provides sufficient evidence from which a reasonable jury could conclude that Shark's tests did not comply with ASTM F608. Moreover, the evidence supports the jury's rejection of Shark's argument that the manual was unclear or inadequate and that ASTM shag is not high pile. Prior Shark manuals classified "shag" as "high pile," (TX-32 at 5; TX-33 at 5), and Shark's own presentation about the NV650 stated that "many [consumers] understood" that low

---

[4] In a desperate attempt to avoid liability, Shark argues that "[i]t would defy logic … if the same Intertek tests that were not literally false post-December 2014 could sustain this jury verdict of literal falsity," with no further explanation. (Dkt. 754 at 2.) As Dyson explains in its concurrently filed opposition to Shark's new trial motion, Shark's argument is a complete reversal from its earlier position, essentially seeking to turn an already-flawed summary judgment outcome into a case-dispositive motion that Shark never sought in the first place, and, regardless, is meritless because the Court found Shark's "rigged" manual change in December 2014 explains any alleged inconsistency.

[5] Though Shark claims Mr. Miller "agreed that Intertek 'followed the procedure for running the tests' under ASTM F608" (Dkt. 754 at 5), Shark ignores that in the **very next** Q-and-A, Mr. Miller explained he only meant that Intertek "did not operate the vacuum cleaner across the carpets," did not "use[] a different dirt," and did not "use[] different carpets." (Trial Tr. (Miller) at 630:19-631:1.) Mr. Miller was unequivocal that Intertek did not comply with ASTM F608 protocol as a whole, especially on use of proper settings. (*Id.* at 616:12-14.)

suction should be used for shag carpet. (TX-831 at 16.) Mr. Barrocas also previously swore under oath that shag was an example of a high-pile carpet. (Trial Tr. at 1580:25-1581:10; 1582:6-16.) And, in response to a juror question, Mr. Barrocas admitted that **no other company** classified shag as low pile. (*Id.* at 1636:25-1637:6.) Thus, a reasonable jury could have concluded Intertek violated the F608 protocol by using high suction for ASTM shag.[6]

**Second**, a reasonable jury could have concluded that Intertek's tests did not comply with § 7.1 of ASTM F608, which requires that the vacuums used in the test be "selected at random in accordance with good statistical practice." (TX-149 at § 7.1.)[7] Ms. Medler testified that Intertek tested vacuums "from a single factory" and "from the same date code." (Trial Tr. at 789:21-22; 791:10-13; 793:20-22.) Shark's own statistical "guru" did not believe testing "from the same factory with the same Date Code" was good statistical practice. (TX-228 at 3.) Indeed, Shark was so concerned about the sourcing of vacuums in its substantiation testing that, in January 2015, Shark instructed Intertek to "procure both sets of products" for **additional** testing. (TX-96.)

**Third**, a reasonable jury could have concluded that Intertek did not even test a mass-produced NV650. Mr. Barrocas testified that Shark should have tested an actually-sold mass-

---

[6] Shark's argument that Intertek's vacuums "had different instructions on the handles" or that Intertek possessed an "unclear and self-contradictory" instruction manual, (Dkt. 754 at 4), continues to be a red herring and is certainly insufficient to overturn the jury's verdict. Shark's President testified that the "handle, descriptor, [and] the selector settings matched the manual in the box" and that no consumer ever receives multiple handles with different setting names. (Trial Tr. (Barrocas) at 1568:17-1569:3; *id.* (Bilger) at 2058:11-17.) If Shark is arguing that Intertek disregarded the marketplace manual in favor of a Shark-provided manual, no evidence was presented to support that argument. In any event, it is self-defeating because, if true, it is also evidence that Shark controlled Intertek's testing or did not test production vacuums.

[7] Shark presumes that the Court must accept its definition of "good statistical practice," but the Court must presume the jury rejected Shark's definition. *Hot Wax, Inc. v. S/S Car Care*, 1999 WL 966094, at *5 (N.D. Ill. Oct. 14, 1999) ("To the extent that there are competing definitions of [a term in an ad], it must be assumed the jury was not persuaded by defendant's definition" for the purposes of a Rule 50(b) motion.).

produced product to make its advertising claim. (Trial Tr. at 1496:5-14.) Yet Intertek recorded

codes that were "not four-digit mass production date codes." (*Id.* at 1502:5-14.) Intertek's Mr.

Reese also noted the tested units had "measurement numbers written on the beater brush … in

white marker." (TX-101.) And the jury saw that the vacuum Intertek tested was blue (TX-128 at

8), despite the fact that there was no evidence that Shark ever commercially sold a blue NV650.

(Trial Tr. (Medler) at 1000:13-1001:6; *id.* (Barrocas) at 1503:14-21.)

*Finally*, Shark does a complete 180-degree turnabout and attempts to minimize its failure

to comply with ASTM F608 by claiming Dyson's arguments are "ticky-tack criticisms" and

arguing that its "based on" disclaimer absolves it of the need to actually comply with F608. (Dkt.

754 at 7.) Shark advertised it used the "one and only industry test,"[8] and its newly-flexible, "close

enough" view of F608 compliance directly contradicts Shark's prior successful argument that

"testing that fails the requirements of ASTM F608 is irrelevant and unreliable." (Dkt. 495 at 6;

*see also* Trial Tr. at 1480:15-17.) Shark's reversal is squarely precluded by judicial estoppel. *In

re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 661 (7th Cir. 2010) (preventing "a party from

prevailing in one phase of a case on an argument and then relying on a contradictory argument to

prevail in another phase"). Moreover, factually, Shark's head of testing said that it is critical to

adhere to every aspect—and specifically the provisions at issue here—of the F608 protocol. (Trial

Tr. at 743:2-9, 750:1-6; TX-263.)

---

[8]   The cases Shark cites for its "nobody is perfect" argument are inapposite for this reason. (Dkt. 754 at 6.) Those cases involved an advertising claim in the form of "tests showed X." *E.g. Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1248 (11th Cir. 2002); *S.C. Johnson & Son v. Clorox Co.*, 930 F. Supp. 753, 777-78 (E.D.N.Y. 1996). But, as the Court noted, "[t]he principal issue [here] is *not* whether the tests showed X." (Trial Tr. (Charge Conf.) at 2588:12-15.) The claim here is akin to *BASF*—*i.e.*, a claim that the advertiser had "run specific tests and achieved specific results." *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1091 (7th Cir. 1994). Here, Shark claimed it ran the "one and only industry test," and thus Shark's claim is false if its tests did not comply with ASTM F608.

## IV.  THE GRAMS GRAPHIC PORTION OF THE INFOMERCIAL CONSTITUTED FALSE ADVERTISING

Like its prior arguments, Shark's argument that its "Grams Graphic" is just "misleading" instead of "false," and was not "harmful" or "material," improperly asks this Court to draw all reasonable inferences in Shark's favor instead of Dyson's.  Shark's argument must be rejected.

### A.  A Jury Could Have Found The Grams Graphic Was False

The only evidence the jury needed to conclude Shark's "Grams Graphic" portion of its ads is false was the advertisement itself.  (TX-12 at 6:06, 10:06.)  Shark's infomercial verbally states that "independent tests prove" while visually showing a graph with test data that all parties agree is not independent.  (*Id.*; Dkt. 754 at 8-10.)  There is nothing ambiguous about it: the claim is false.

Incredibly, Shark argues its false statement is not false advertising by picking apart and individually analyzing each element of its advertisement in isolation. (Dkt. 754 at 8-10.)  But "[t]o determine whether a particular representation is literally false, it must be analyzed with its full context."  *Scranton Gillette Commc'ns, Inc. v. Dannhausen*, 1999 WL 558134, at *1 (N.D. Ill. July 27, 1999).  When it served its own purposes, Shark argued that "the claim must be analyzed in its full context" to evaluate falsity and provided numerous citations to support its argument.  (Dkt. 338 at 4 (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139, 1144 (9th Cir. 1997) (reversing grant of summary judgment where court "failed to consider Defendants' bar-chart advertisements in their full context"); *S.C. Johnson & Son v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001) ("[A] court must consider the advertisement in its entirety and not … engage in disputatious dissection")).)  Shark now asks the Court to disregard the law and its own representations of the law, and engage in a "disputatious dissection" of its advertisement.  But, as the Court aptly noted, "if [someone] pointed to a dog and said it was a mongoose, that's literally false…It's not a mongoose.  If [someone] points to a graph and says, 'independent test,' and it's

9

not independent, that's literally false." (Trial Tr. at 2529:21-2530:1.) It was reasonable for the jury to reach the same conclusion.[9]

### B. A Jury Could Have Found The Grams Graphic Was Material And Harmful

Shark's claim there was "zero evidence" of materiality or harm due to the Grams Graphic portion of the infomercial, (Dkt. 754 at 10), is wrong. Shark's CEO testified that visually depicting the amount of dirt that Shark and Dyson vacuums picked up on a single carpet type "would be impactful to consumers." (Trial Tr. at 1690:3-14.) Shark's documents confirm it specifically wanted to show the Grams Graphic portion of the infomercial to ensure consumers perceived Shark as better at carpet cleaning than Dyson. (TX-245 at 4.)[10] And carpet cleaning is clearly material to vacuum purchasers. (Trial Tr. (Barrocas) at 1253:8-13 (carpet cleaning "is a very important aspect" of vacuum); *id.* (Bilger) at 2088:12-2089:19 (customer satisfaction depends, in part, on "cleanability.").)[11] Finally, the evidence showed Shark's advertising impacted Dyson's sales and reputation during the critical holiday-shopping months when the Grams Graphic was in the market. (Trial Tr. (Culley) at 424:17-24, 425:5-16, 441:20-442:1; *id.* (Dunbar) at 1160:19-1161:6; TX-334 at 2, TX-353 at 2-3.) The jury was asked—at Shark's insistence—to determine materiality and harmfulness. (Trial Tr. at 2585:22-2587:20.) There is evidence to support the jury's finding on

---

[9]  Shark's argument that "independent tests *did* [] prove that SharkNinja's vacuum deep-cleaned carpets better" (Dkt. 754 at 10), assumes, contrary to Rule 50(b) standards, that the jury found an F608 NV650 test should be run on high suction for shag carpet. But the jury found the opposite, and there is no dispute that Shark's claim is false in those conditions. (Trial Tr. (Medler) at 1058:4-7; *id.* (Closing) at 2682:8-10.)

[10]  Shark's argument that replacing the data in the Grams Graphics portion of the infomercial to reflect the total grams from Intertek's testing of all carpets would result in a "virtually identical" graph is irrelevant and wrong. Shark never advertised "total" grams, but rather always referred the geomean. Moreover, the visual impact is ***not*** the same: a five-gram difference with 42 grams (10%) is ***different*** than a five-gram difference with 170 grams (3%).

[11]  Indeed, Shark previously stated "[s]uction and … cleaning ability are the raisons d'etre for a vacuum cleaner." *Euro-Pro, Inc. v. Dyson, Inc.*, Case No. 1:14-cv-13720 (D. Mass.), Dkt. 173.

both and this Court should not disturb it.[12]

## V.  THE JURY REASONABLY CALCULATED THE DISGORGEMENT AWARD

With respect to the damages amount awarded by the jury, Shark contends that (1) Dyson "failed to rebut" its evidence that Shark's incremental profits were negative; and (2) "the jury had no rational basis for failing to do any apportionment."  (Dkt. 754 at 11-15.)  Again, Shark ignores all of the evidence that does not support its position—evidence which the jury was entitled to, and did, credit—and instead blindly insists the jury was wrong.  To be sure, it is Shark who is wrong.

Shark bore the burden to "prove *all elements* of cost or deduction claimed" from its sales. 15 U.S.C. § 1117(a); *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 940 (7th Cir. 1989) (placing "the burden on the infringer to establish any deductions for expenses"); *WMS Gaming Inc. v. WPC Productions Ltd.*, 542 F.3d 601, 608-09 (7th Cir. 2008) ("The burden was therefore on [defendant] to show that certain portions of its revenues ... were not obtained through its infringement of [plaintiff's] marks.").  Indeed, when a defendant "fails to carry its statutory burden to offer evidence of deductions, the plaintiff's entitlement to profits … is equal to the [defendant's] gross sales."  *Id.* at 609; *Am. Taxi Dispatch, Inc. v. Am. Metro Taxi & Limo Co.*, 582 F. Supp. 2d 999, 1007-08 (N.D. Ill. 2008) (awarding plaintiff gross profits where defendant was "responsible for the lack of certainty as to its profits").

The Court instructed the jury that "SharkNinja is required to prove any incremental selling expenses," and whether "a portion of the profit, if any, is due to factors other than false advertising."  (Trial Tr. at 2618:16-2619:3.)  Thus the jury began with Shark's gross profits number, *subtracted* amounts for which it concluded that Shark had met its burden, and *declined*

---

[12]  Shark's reliance on the time the graph is displayed is also an irrelevant argument.  (Dkt. 754 at 10.)  As the Court noted, the "actual airtime" of a statement "doesn't seem pertinent to the impact of the statement."  (5/23/2018 Hr'g Tr. at 59:13-15.)

*to subtract* amounts for which it concluded that Shark had ***not*** met its burden. The jury's award of $16,410,681—a ***portion*** of Shark's gross profits— is reasonable and supported by the evidence.

### A. A Jury Could Have Found Shark Failed To Prove Its Deductions

Shark argues that the damages award is unsupported because the jury did not apply all of Shark's proposed deductions. But the jury saw Shark's ever-changing financial documents, assessed the witnesses' credibility, and properly determined that Shark had not met its burden.

***First***, Shark argues that Dyson failed to rebut Shark's argument that it lost money on the NV650. (Dkt. 754 at 12.) That is incorrect. Shark produced ***four*** financial documents, each showing different amounts for Shark's alleged media spend and, consequently, profits. (TX-285 (no media spend), TX-286 ($33.6M media spend), TX-290 ($78.7M media spend), TX-291 ($83M media spend).) This inconsistency was not lost on the jury, who asked Shark's former CFO, Brian Lagarto, why he did not "double check things." (Trial Tr. at 2393:8-11.) In response, Mr. Lagarto admitted that TX-286, which showed the NV650 *was* profitable, "***wasn't even supposed to leave the building***." (*Id.* at 2393:14-16.) Mr. Lagarto also admitted there were errors and variations in the financials Shark produced, which contradicted his testimony that the data "should stay the same every time you pull it." (*Id.* at 2400:2-4; 2393:8-19; 2366:16-2367:5; 2368:7-20; 2371:7-20; 2375:15-2376:1; 2385:20-2386:9.) The jury found that Shark's shifting and litigation-created financial evidence was not credible and the Court must do the same here. *Reeves*, 530 U.S. at 151.

Further, Shark's own witnesses testified to drastically different media spend amounts. Shark's expert, Dr. Lynde, testified that Shark spent more than $21 million on media through December 15, 2014. (Trial Tr. (Lynde) at 2455:12-16.) But Shark's former general counsel, Jennifer McCabe, had previously submitted a sworn declaration stating that Shark's media spend in that period was "significantly less than $15.25 million." (Trial Tr. at 1956:20-1957:2.) And, in response to a juror's question, Ms. McCabe stated that "if I do the math, it was probably 9

12

million"—*less than half* of the $21 million amount calculated by Dr. Lynde. (*Id.* at 1997:5-6.)

**Second**, Shark contends the jury was *required* to deduct certain expenses because Dyson's damages expert, Ms. Davis, "agreed that the categories of expenses Dr. Lynde deducted" were *types* of variable expenses. (Dkt. 754 at 12.) But Ms. Davis only agreed "that the categories would be appropriately deducted *if you had a reliable amount to use*," and explained she could not reliably determine Shark's variable expenses due to the errors in Shark's financial data. (Trial Tr. at 1318:5-11, 1303:2-11 ("[W]e now have four sets of financial data, none of which agree with each other. It's hard to know which, if any, of them are accurate."); *id.* at 1292:25-1302:19.)

**Third**, Shark argues that "Ms. Davis admitted she had no reason to believe that the financials Dr. Lynde used for his calculations are inaccurate." (Dkt. 754 at 12.) This is wrong. Ms. Davis testified she did not have "sufficient [information] to subtract any amount of media expense." (Trial Tr. at 1309:8-15.) She then explained that: (1) "[w]e don't really know where these numbers come from" because Shark did not provide underlying media expense receipts; and (2) Shark's ad spend "just doesn't make sense" because the amounts went out to nine decimal places, *i.e.*, not dollars and cents. (*Id.* at 1310:3-22.) The jury reasonably credited Ms. Davis over Shark's witnesses and the Court must do the same. *Reeves*, 530 U.S. at 151.

**Fourth**, Shark contends that its P&Ls are reliable because its general ledger was audited and the P&Ls "came from SharkNinja's general ledger." (Dkt. 754 at 12.) But Mr. Lagarto admitted that the P&Ls in this case were *not* audited, and in fact, that they contained such significant errors that they "would probably fail an audit." (Trial Tr. at 2385:24-2386:12.) Similarly, Dr. Lynde never reviewed Shark's general ledger. (*Id.* at 2438:1-3, 19-24.) In fact, the jury asked Dr. Lynde "how do you not share Miss Davis's concern about the accuracy of the numbers, given that you haven't looked at the general ledger?" (*Id.* at 2498:21-24.) Dr. Lynde

responded that, although he "shared some concerns," he "talked to Mr. Lagarto" and "gained an understanding" that the numbers were reliable. (*Id.* at 2498:25-2499:15.) The jury posed a similar question to Ms. Davis, who provided what the jury found to be a more credible answer: "that just doesn't make sense … [the media spend] should be the same number every time." (*Id.* at 1330:4-13.) The jury was not ***required*** to believe Shark's witnesses' biased testimony, and properly resolved "doubts against the defendant in calculating profits." *Q Sales & Leasing, LLC v. Quilt Protection, Inc.*, 2004 WL 2420640, at *2 (N.D. Ill. Oct. 26, 2004).

### B. A Jury Could Have Found Shark Failed To Prove Apportionment

Shark argues that because it told the jury that profits ***could*** be apportioned, the jury was required to do so. But Shark's own motion illustrates the problem with this position: even now Shark cannot explain to this Court ***how*** the NV650 profits allegedly should have been apportioned. (*See generally* Dkt 754 at 13-15.) Instead, Shark argues that it is "undisputed" that Dr. Lynde proved that so-called "drivers" of demand drove—in some unidentified way—sales of the NV650 instead of Shark's false advertising. (Dkt. 754 at 14.) The reality is that Dr. Lynde admitted that he is not aware of any quantitative or qualitative data showing reasons why consumers purchased an NV650, and he was impeached when he tried to assert, for the first time at trial, that the "three surveys [he relied upon] do provide qualitative indications of the type of factors which do influence the purchase decision for [the] product." (Trial Tr. at 2481:22-2483:19.) He further admitted that he has not "seen any consumer study showing why consumers purchased" the NV650 because no such study exists.[13] (*Id.* at 2478:23-2479:3, 2485:17-21.) Dr. Lynde provided ample reasons for the jury to find that Shark ***failed*** to meet its burden to prove apportionment.

---

[13] Shark further argues that Ms. Davis "agreed that 'it is possible' that" other factors "could have driven sales." (Dkt. 754 at 14.) But as Ms. Davis explained, while "[i]t's possible," "no one has quantified that" here. (Trial Tr. at 1322:25-1323:3.)

Even if Shark had introduced such data, Shark failed to tell ***anyone*** how to use this data to apportion profits. Dr. Lynde admitted that he did "not provide any analysis of how those demand drivers can be used to apportion profits," and in fact was "unable to do so." (*Id.* at 2489:16-21.) If Dr. Lynde, an economist with access to Shark's documents and witnesses, cannot conduct an apportionment analysis, it was reasonable for the jury to conclude it could not do so either.[14]

Shark cites two out-of-Circuit copyright infringement cases and contends that the jury (and, now, the Court) was ***required*** to conduct an apportionment. (Dkt. 754 at 14-15.) Neither case supports Shark. In *Sheldon*, Judge Hand relied upon "percentages" provided by "the opinions of experts" to establish apportionment. *Sheldon vs. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 50 (2d Cir. 1939). Shark has ***never*** offered a percentage here. In *Cream Records*, the Ninth Circuit affirmed a ***factual finding*** of apportionment and noted that "[t]hese were determinations ***for the [factfinder] to make***." *Cream Records, Inc. vs. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 829 (9th Cir. 1985). The Ninth Circuit did not ***disturb*** a factual finding, as Shark attempts to do here.

More fundamentally, Shark ignores ***this Circuit's*** precedent. Indeed, "[t]here may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer." *WMS Gaming*, 542 F.3d at 608. Dr. Lynde admitted that he could not isolate the profits attributable to the false advertising. (Trial Tr. at 2489:16-21.) To award some apportionment—the amount of which Shark does not provide—would violate *WMS*'s mandate that the Court ***not*** award a windfall to the wrongdoer, ***especially*** a willful wrongdoer like Shark.

---

[14] Shark argues that Dr. Lynde's "evidence is also supported by testimony from [SharkNinja/Dyson] witnesses and documents." (Dkt. 754 at 14, 14 n.8, 14 n.9.) Evidence about the Shark brand generally, or Dyson's sales, is not relevant to which portion, if any, of Shark's profit on the ***NV650*** is attributable to other factors.

Dated: July 30, 2018                    Respectfully submitted,

                                        By: */s/ Megan M. New*
                                        Robin A. McCue (IL Bar No. 6256551)
                                        rmccue@kirkland.com
                                        Megan M. New (IL Bar No. 6300442)
                                        megan.new@kirkland.com
                                        Brian A. Verbus (IL Bar No. 6314193)
                                        brian.verbus@kirkland.com
                                        Greg Polins (IL Bar No. 6309928)
                                        KIRKLAND & ELLIS LLP
                                        300 North LaSalle
                                        Chicago, Illinois 60654
                                        Telephone:  (312) 862-2000
                                        Facsimile:  (312) 862-2200

                                        Gregg F. LoCascio, P.C. (admitted *pro hac vice*)
                                        glocascio@kirkland.com
                                        KIRKLAND & ELLIS LLP
                                        655 Fifteenth Street, N.W.
                                        Washington, D.C. 20005-5793
                                        Telephone:  (202) 879-5000
                                        Facsimile:  (202) 879-5200

                                        *Counsel for Plaintiff Dyson, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2018, the foregoing document was filed electronically through the Court's Electronic Case Filing System. Service of this document is being made upon all counsel of record in this case by Notice of Electronic Filing issued through the Court's Electronic Case Filing System on this date.

By: *  /s/  Megan M. New*